# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **DONALD E. DEARDORFF,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **CIVIL ACTION NO. 17-00450-JB-MU** |
| **LEON BOLLING, Warden; et. al.,** | ) | |
| **Respondents.** | ) | |
| | ) | |

## <u>ORDER</u>

Petitioner, Donald E. Deardorff, a state prisoner currently in the custody of the Alabama Department of Corrections, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  Deardorff challenges the validity of his 2001 conviction for capital murder in the Circuit Court of Baldwin County, Alabama, and the resulting sentence of death.  This matter is now before the Court on Deardorff's petition (Doc. 1), Respondent's Answer (Doc. 13), and the briefs, responses, and exhibits filed by the parties, including the 78-volume record of state-court proceedings.  (*See* Docs. 15, 16).  Following a thorough review of the petition and record, the undersigned finds that an evidentiary hearing is not warranted on the issues.[1]  For the reasons set forth below, the Court finds that Deardorff's petition for writ of habeas corpus is due to be **DENIED**, and that if Deardorff seeks the issuance of a certificate of appealability, his request be

---

[1] Because Deardorff filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  "AEDPA expressly limits the extent to which hearings are permissible, not merely the extent to which they are required."  *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1337 (11th Cir. 2004).  Deardorff has failed to establish that an evidentiary hearing is warranted in this case.  *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc) ("The burden is on the petitioner . . . to establish the need for an evidentiary hearing.").

denied, along with any request to appeal *in forma pauperis*, except as to Claim 1.e., which is granted.

## I. BACKGROUND AND FACTS

On March 6, 2000, Mr. Deardorff was indicted on twenty-three counts, including several counts of capital murder for the death of Ted Turner.[2] (Doc. 15-1 at 38-51). Mr. Deardorff's trial began on September 10, 2001. The trial facts are summarized as follows:[3]

> Ted Turner was a minister of Unity Church, the father of two children, and a businessman who owned a warehouse and rental properties. He disappeared in September 1999. His decomposed remains were discovered in a remote area of Baldwin County in July 2001, after Deardorff's codefendant, Millard Peacock, cooperated with members of law enforcement investigating Turner's disappearance and led them to the body.
>
> The trial of this case spanned two weeks and involved many witnesses and exhibits. The evidence occasionally conflicted, but the evidence presented at trial tended to establish the following. Turner was 56 years old and had undergone knee surgery shortly before he disappeared in September 1999. He was still required to wear a knee brace and his mobility was restricted, but he could walk and drive a vehicle.

---

[2] Deardorff was initially indicted for four counts of capital murder, pursuant to Alabama Code § 13A-5-40(a)(4), murder committed during the course of a burglary; § 13A-5-40(a)(2), murder committed during the course of a robbery; §13A-5-40(a)(1), murder committed during the course of a kidnapping;  and § 13A-5-40(a)(7), murder committed for pecuniary gain or for hire, as well as five counts of theft of funds from Turner's bank and credit-card accounts, two counts of theft for stealing Turner's car and truck, § 13A-8-3(a), one count of receiving stolen property, § 13A-8-17, possession of a gun that had belonged to a relative of Deardorff's but was stolen in a burglary. Additionally, Deardorff was charged with 11 separate counts of conspiracy for conspiring with codefendant Millard Peacock to commit each of the eleven underlying capital-murder and theft offenses, § 13A-4-3. The charge of murder for pecuniary gain and the related conspiracy charge were dismissed on motion of the State before trial. The State withdrew the remaining counts charging conspiracy at the conclusion of the State's presentation of the evidence at the guilt phase.

[3] The summarization of facts is quoted from the Alabama Court of Criminal Appeals' memorandum opinion on Deardorff's direct appeal of his trial and conviction. *Deardorff v. State,* 6 So. 3d 1205, 1210–14 (Ala. Crim. App. 2004), *aff'd sub nom. Ex parte Deardorff,* 6 So. 3d 1235 (Ala. 2008). AEDPA directs that a presumption of correctness be afforded factual findings of state courts, "which may be rebutted only by clear and convincing evidence." *Bui v. Haley*, 321 F. 3d 1304, 1312 (11th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." *Id.* (citing *Sumner v. Mata*, 449 U.S. 539, 547, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981)).

Beginning in 1998, Turner had leased a storage warehouse to Deardorff and his girlfriend, Christy Andrews. Deardorff had, at some point, stopped making the rental payments for the warehouse and Turner pursued legal action against Deardorff and Andrews in the district court. Deardorff and Andrews were evicted from the warehouse and, on July 27, 1999, a default judgment was entered against them in the amount of $3,087.50. Numerous dismantled vehicles, vehicle parts, and tools were left in the warehouse when Deardorff and Andrews abandoned it, and Turner was attempting to seize those items through the court proceedings.

Turner had executed a will on January 22, 1999, in preparation for a trip to Paris, France. A copy of the will was found on his kitchen table after he disappeared. The will had an addendum in Turner's handwriting that stated: "Reaffirmed 7/27/99 just in case Don Deardorff is really crazy." Turner's signature followed the reaffirmation.

Deardorff became acquainted with his codefendant, Millard Peacock, several years before the murder, and they became friends and worked on cars together. Peacock entered into a plea bargain with the State of Alabama in which he received a sentence of 15 years' imprisonment; part of the agreement involved Peacock's promise to cooperate with the prosecution and to testify truthfully at Deardorff's trial. Peacock testified that Deardorff was very angry at Turner for filing the legal actions against him and attempting to seize his property. In August 1999, Deardorff told Peacock that he planned to rob Turner to "get even" with him. Deardorff also said that he would like to kill Turner.

On September 20, 1999, Deardorff drove to Lucedale, Mississippi, where Peacock was staying with his girlfriend, Dawn Dunaway. Dunaway later testified that she left Peacock a note with a picture of a handgun because her .38 Special handgun was missing from her house. During the evening of September 21, 1999, Deardorff and Peacock went to an area near Turner's house. They climbed the hillside behind Turner's house and planned how they would later break into the house. Deardorff had carried a .38 caliber handgun with him, and he hid the gun behind Turner's house before they left. Deardorff had previously told Peacock that that handgun had been stolen from his grandmother's house during a burglary and that he later found the gun and kept it without reporting that it had been recovered. On the evening of September 22, 1999, Deardorff and Peacock again climbed the hillside behind Turner's house, this time with the intent to rob Turner, Peacock said. Deardorff retrieved the handgun that he had hidden earlier, and they entered the house through an unlocked back door. Turner was not home. Deardorff looked in Turner's file cabinets, and then the men waited for Turner to come home.

When Turner entered through the front door of his house, Deardorff pointed the gun at him and told him to be quiet or "he would blow his brains out." Deardorff and Peacock then used duct tape they had found in the house to bind Turner's hands, and they placed him in a closet. Deardorff left for the evening and Peacock slept on the floor. He let Turner out of the closet to use the bathroom; he removed the tape

from Turner's hands and did not reapply it when he put Turner back into the closet. Deardorff returned to the house the following morning. Peacock testified that Deardorff forced Turner to write a personal check for $4,000. Peacock said that Deardorff told Turner that "he figured this was the best way to get even with him, to leave him financially broke." Turner told Deardorff he would give him whatever he wanted, and pleaded to be left alive. Deardorff then told Turner that he was not going to kill him. He also told Peacock that the two of them would leave the country after they had finished with Turner.

Peacock drove Turner's car to AmSouth Bank, taking the $4,000 check with him. Peacock said that he took the check to be cashed because Deardorff did not have any identification. Peacock cashed the check, returned to Turner's house, and gave Deardorff the money. Peacock said that Deardorff then made Turner write out four "credit card checks." The four checks totaled $17,750. Peacock again drove Turner's car, this time to United Bank, where Peacock had an account. The bank would not cash the checks; the teller told Peacock he would have to deposit them into his savings account and that the money would be available in five business days. Peacock deposited the checks in his account. When he returned to Turner's residence and told Deardorff that he could not access the money for five days, Deardorff said that they would have to change their plans.

Deardorff and Peacock spent that remainder of the day and night in Turner's house. They watched television and ate pizza purchased with Turner's money. Deardorff used Turner's computer; he ordered numerous automobile parts using Turner's credit cards, and he visited several pornographic Web sites. Turner remained in the closet the entire time.

Early the following morning, before dawn, Deardorff woke Peacock and told him they had to leave. Deardorff told Turner that they were going to take him to a park and leave him on a park bench, then call the police so they could pick him up. Turner requested a blanket because it was cool outside, so one of the men put a blanket in the car. Turner's hands and mouth were taped using the duct tape and he was placed in the passenger seat of his own car. Deardorff took some items from Turner's garage and some files from the file cabinet. Deardorff had the handgun and the proceeds from the check they had been able to cash. Deardorff drove the car with Turner in the front seat and Peacock followed, driving Turner's truck.

Deardorff stopped at a small gasoline service station and told Peacock to lock Turner's truck and leave it there. Peacock then got in the backseat of Turner's car. Deardorff told Turner that he did not want him to see where they were taking him, so he put a pillowcase over his head and taped it so it would not come off. Deardorff then placed the passenger seat in a reclining position and drove to a logging road blocked by a gate. The road was approximately one mile away from a house Deardorff and his girlfriend, Christy Andrews, had lived in until August 1999. Peacock said that he and Deardorff got Turner out of the car and walked him to the end of the logging road. Peacock did not believe at that time that Turner would be

killed, and he did not know whether Deardorff had a weapon with him. When they reached the end of the road, Peacock said, Deardorff told him to wait there and that he was going to walk Turner a few more feet. Deardorff walked a bit further with Turner, forced him to kneel on the ground, and then shot him in the head four times, killing him.

Peacock and Deardorff drove Turner's car to the service station where they had parked Turner's truck. Deardorff suggested that he and Peacock drive the vehicles to Dawn Dunaway's house in Mississippi and leave one of the vehicles there. Deardorff drove the car and Peacock drove the truck, and they left the truck in Mississippi. They spent two nights at a hotel in Mobile. Deardorff then instructed Peacock to drop him off at a Conoco brand gasoline service station and to pick him up there two days later, which Peacock did. The men then returned to Dunaway's house and stayed there overnight. Deardorff used the computer at Dunaway's residence to order additional car parts using Turner's credit cards.

On September 30, 1999, Deardorff drove Turner's car to a sandbar along a river in Mississippi and burned it. Deardorff and Peacock then drove to Atmore, where Peacock entered the United Bank and withdrew from his account $17,700 from the deposit of Turner's credit-card checks. Deardorff told Peacock to drop him off at the Conoco station. He gave Peacock several hundred dollars but told him that he would keep the rest of the money. He told Peacock that he would contact him later and that they would split the rest of the money then.

Deardorff went to stay with his girlfriend at her parents' residence. Deardorff told Andrews that he had gotten the money in a drug deal. He also showed her a handgun and he told her he had it for protection. On the following day, October 1, 1999, Andrews and Deardorff went to a Wal-Mart discount store in Andrews's car. As they were leaving the store parking lot, several law-enforcement officers, with guns drawn, stopped the car. Andrews was driving. The officers asked Andrews to follow them to the sheriff's office and she agreed to do so. While en route, Andrews told Deardorff that the officers must have found out about his drug deal. Deardorff disagreed and told Andrews that they wanted to question him about Turner. Andrews said that, earlier that day, she and her father had heard a news report of Turner's disappearance. Deardorff had asked them what information had been reported, and Andrews testified that Deardorff seemed surprised to hear that Turner was missing.

Upon their arrival at the sheriff's office, Andrews consented to the search of her vehicle. On the backseat of her car officers discovered a box that belonged to Deardorff. Inside the box the police found $18,900 in cash and a .38 caliber handgun with five unspent rounds in the chamber.[1] The box also contained a catalog of pornographic videotapes and paperwork relating to Internet orders for automobile parts placed in Turner's name and using his credit cards. The parts ordered were for cars of the same make and model as Deardorff owned and the documents were printed on the evening of September 28, 1999. When Deardorff

heard the officers talking about the money and the weapon being found in the car, he stated, "The gig is up." When one of the deputy sheriffs asked Deardorff what he meant by that remark, the officer testified that he replied, "[T]ake the death penalty off the table and I'll tell you."

Deardorff then told the officers that, a few days earlier, Peacock had given him the box to hold for safekeeping. He said that Peacock asked him to hold the box for two days and that Peacock would then retrieve it. Deardorff said that he became curious about the contents of the box and opened it; he said he was surprised to see the gun and the money, and he became scared and nervous. Deardorff told the officers that when he heard that Turner was missing, he "put two and two together; the money, Millard Peacock, the gun, Ted Turner missing," and put the box and its contents into Andrews's car. He said that he and Andrews rode around looking for Peacock so they could return the box to him. They stopped at a Wal-Mart, he said, and were then stopped by the police. The officers noted that the box was from a Dollar General Store, and that Andrews worked in a Dollar General Store. Deardorff was arrested on a charge of possessing a firearm without a permit.

Andrews consented to the search of the storage facility she and Deardorff had rented. Inside the facility the police found numerous items that came from Turner's house, including a roll of duct tape, the ends of which matched the tape used to bind Turner's hands and feet and to secure the pillowcase over his head, a pair of binoculars Turner frequently used at his house, and two cameras that a neighbor had recently loaned to Turner.

Peacock was arrested at Dunaway's house in Mississippi on October 5, 1999. He gave numerous conflicting statements to the police, and in July 2001, he agreed to cooperate fully and he led the police to Turner's remains.

*Deardorff v. State*, 6 So. 3d 1205, 1210–14 (Ala. Crim. App. 2004), *aff'd sub nom. Ex parte Deardorff*, 6 So. 3d 1235 (Ala. 2008) (internal record citations omitted). On September 21, 2001, the jury found Deardorff guilty of three counts of capital murder. (Doc. 15-22 at 64-70). The advisory jury sentencing phase of the trial occurred on September 24, 2001, with the jury recommending a death sentence by a 10-2 vote. (*Id.* at 163). On December 18, 2001, following a sentencing hearing, the trial court found the existence of two aggravating circumstances and four non-statutory mitigating circumstances; then, determining the aggravating circumstances outweighed the mitigating circumstances, the trial court upheld the jury's recommendation of a sentence of death. (*Id.* at 207-13).

Deardorff timely appealed to the Alabama Court of Criminal Appeals ("ACCA") and, following a denial of relief, timely petitioned the Alabama Supreme Court for a writ of certiorari, which was granted on four issues, but ultimately was denied relief.[4]  The United States Supreme Court denied certiorari on April 20, 2009.  *Deardorff v. Alabama*, 556 U.S. 1186, 129 S. Ct. 1987, 1988, 173 L. Ed. 2d 1091 (2009) (mem).

On October 30, 2009, Deardorff timely filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure ("Rule 32"), as well as an amended petition. After oral arguments, the trial court summarily dismissed counts 1-3, 7, 10-13, 18-20, 21A-21C, 22A, and 22C of Deardorff's amended petition.  (Doc. 15-30 at 171).  An evidentiary hearing was held on August 7, 2012, for the remaining counts, where Deardorff called seven witnesses, and proffered 22 affidavits after the hearing.  (Doc. 15-70 at 76-203; Doc. 15-71; Doc. 15-37 at 39-173).  The trial court, thereafter, denied Deardorff's amended Rule 32 petition (Doc. 15-65 at 33), and the ACCA affirmed the denial.  (Doc. 15-78 at 66-137; *Deardorff v. State*, 236 So.3d 125 (Ala. Crim. App. Oct. 14, 2016) (unpublished)).  The Alabama Supreme Court denied, without opinion, Deardorff's petition for writ of certiorari and issued a certificate of judgment on April 21, 2017. (Doc. 15-78 at 201; *Ex parte Deardorff*, 251 So.3d 12 (Ala. April 21, 2017) (unpublished)).

Deardorff timely filed the current federal habeas petition, pursuant to 28 U.S.C. § 2254 on October 10, 2017.[5]  (Doc. 1).

---

[4] After review of four claims, the Alabama Supreme Court affirmed the Court of Criminal Appeals' decision, finding: (1) the murder was especially heinous, atrocious, or cruel when compared to other capital offenses; (2) testimony that defendant was in illegal possession of a handgun was not inadmissible prior-bad-act evidence; (3) basis for expert's testimony about information that he sought on computers was in evidence, as required for testimony to be admissible; and (4) any error in allowing prosecutor to make arguments during evidentiary stage of penalty phase was not plain error.  *See Ex parte Deardorff*, 6 So. 3d 1235 (Ala. 2008).

[5] The parties do not dispute the timeliness of Deardorff's petition.  (*See* Doc. 13 at 4).

## II.   GROUNDS FOR RELIEF

Deardorff asserts the following nine claims for relief in this current habeas petition:

1. Trial counsel provided ineffective assistance for failing to adequately seek suppression of statements obtained as a result of unlawful arrest in violation of the Fourth Amendment.

2. Trial counsel provided ineffective assistance when counsel failed to raise an objection to the admission of the victim's will on confrontation grounds, in violation of the Sixth Amendment.

3. Prosecutor improperly commented on Deardorff's failure to testify during closing argument in the guilt phase in violation of his Fifth Amendment rights.

4. Trial counsel provided ineffective assistance for failing to request a hearing regarding Juror C.M.'s note to the trial court in violation of his Sixth Amendment right to a fair and impartial jury.

5. Trial court erred when it failed to *sua sponte* declare a mistrial after Juror C.M. declared herself mentally incapable of deliberating and engaged in improper *ex parte* contact with C.M.

6. Trial counsel provided ineffective assistance of counsel when they failed to request a continuance and obtain a duct-tape expert to challenge the State's expert testimony.

7. Trial counsel provided ineffective assistance of counsel in the penalty phase by failing to investigate and present mitigation evidence.

8. Challenge to the sufficiency of the evidence to establish Turner's murder was heinous, atrocious, or cruel when compared to other capital offenses, as well as a challenge to the constitutionality of this aggravating circumstance.

9. Alabama's judge-based capital sentencing violates the Sixth Amendment and the requirements of *Ring* and *Apprendi*.

For the sake of clarity and efficiency of review, the Court has renumbered Deardorff's claims within this Order.

## III.   STANDARD OF REVIEW.

This Court's review of Deardorff's petition is governed by the Antiterrorism and Effective

Death Penalty Act (AEDPA).  Under AEDPA, "the role of the federal court . . . is strictly limited."

*Jones v. Walker*, 496 F.3d 1216, 1226 (11th Cir. 2007).  Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim - -
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d).

According to subsection (1), "[a] federal habeas court may issue the writ under the 'contrary

to' clause if the state court applies a rule different from the governing law set forth in [Supreme

Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of

materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed.

2d 914 (2002) (citation omitted).  "A state court's decision is not 'contrary to . . . clearly established

Federal law' simply because the court d[oes] not cite [Supreme Court] opinions." *Mitchell v.

Esparza*, 540 U.S. 12, 16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (alteration in original) (citation

omitted).  Indeed, "a state court need not even be aware of [Supreme Court] precedents, so long as

neither the reasoning nor the result of the state-court decision contradicts them." *Id.* (internal quotes omitted).

The "clearly established Federal law" contemplated by subsection (1) "refers to the holdings, as opposed to the dicta, of [U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003) (internal quotes omitted); *accord Greene v. Fisher*, 565 U.S. 34, 37-38, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011). Moreover, review under § 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011); *see also Shinn v. Ramirez*, ⸺ U.S. ⸺, 142 S. Ct. 1718, 1732, 212 L.Ed.2d 713 (May 23, 2022) ("the federal court may review the claim based solely on the state-court record").

Importantly, "[f]or purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (internal quotes omitted, emphasis in original). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* (internal quotes omitted). That is, "an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014) (internal quotes omitted); *Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law *erroneously* or *incorrectly*. Rather, that the application must also be *unreasonable.*"). "To satisfy this high bar, a habeas

petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (internal quotes omitted). The petitioner bears the burden of showing that the state court's ruling was contrary to, or involved an unreasonable application of, controlling Supreme Court precedent. *Harrington*, 562 U.S. at 98, 131 S. Ct. at 784; *Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).

Likewise, with respect to §2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18, 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013) (internal quotes omitted). In other words, "if some fair-minded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied. . .[T]he deference due is heavy and purposely presents a daunting hurdle for a habeas petitioner to clear." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011); *see also Greene v. Fisher*, 565 U.S. 34, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011) (AEDPA standard is purposely onerous because "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction") (citations and internal quotation marks omitted); *Cullen v. Pinholster*, 563 U.S. 170, 181 (AEDPA standard "is a difficult to meet . . . and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (citations and internal quotation marks omitted).

Accordingly, in evaluating Deardorff's § 2254 petition, the Court takes great care to abide by the stricture that "[a] federal court may not grant habeas relief on a claim a state court has rejected on the merits simply because the state court held a view different from its own." *Hill v.*

*Humphrey*, 662 F.3d 1335, 1355 (11th Cir. 2011); *see also Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286, 2012 U.S. App. LEXIS 6501 (11th Cir. 2012) ("This inquiry is different from determining whether we would decide *de novo* that the petitioner's claim had merit."). "If this standard is difficult to meet, that is because it was meant to be." *Holsey*, 694 F.3d at 1257 (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotation marks omitted).

Additionally, when a state court refuses to decide a federal claim on state procedural grounds, the federal habeas court is generally precluded from reviewing the claim at all. *See*, *e.g., Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015) ("[I]t is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment.") (citation omitted); *Conner v. Hall*, 645 F.3d 1277, 1287 (11th Cir. 2011) ("a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If, however, the state court's procedural ruling is not adequate to bar federal review, then the federal habeas court must review the claim *de novo* and is not confined to the state-court record. *See Williams*, 791 F.3d at 1273.

Section 2254 also generally requires petitioners to exhaust all available state-law remedies. In that regard, "[a] petitioner must alert state law courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights." *Lamarca v. Secretary, Dep't of Corrections*, 568 F.3d 929, 936 (11th Cir. 2009). "[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present

federal constitutional issues." *Lucas v. Secretary, Dep't of Corrections*, 682 F.3d 1342, 1352 (11th Cir. 2012); *see also Williams v. Allen*, 542 F.3d 1326, 1345 (11th Cir. 2008) (exhaustion requirement not satisfied unless "petitioner presented his claims to the state court such that a reasonable reader would understand each claim's ... specific factual foundation") (citation omitted). It is not sufficient "that a somewhat similar state-law claim was made." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004).  Nor is it sufficient for a petitioner to present federal claims to the state trial court; rather, "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Powell v. Allen*, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted); *see also Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) ("Exhaustion requires that state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") (citations and internal quotation marks omitted). That said, "habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain unchanged in substance." *Kelley*, 377 F.3d at 1344.

Having established the proper standard of review, the Court turns to the claims asserted in Deardorff's petition.

## IV.    ANALYSIS OF CLAIMS

### 1.    Ineffective Assistance of Counsel.

The Sixth Amendment of the Constitution guarantees every accused "the right . . . to have Assistance of counsel for his defense."  U.S. CONST. AMEND. VI.  To establish an ineffective assistance claim under the Sixth Amendment, a petitioner must make both showings of the two-prong standard, discussed in *Strickland v. Washington*, that has been adopted by the Supreme Court

for evaluating claims of ineffective assistance of counsel. 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). That is, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citing *Strickland*, 466 U.S. at 687). Because the failure to demonstrate either deficient performance or prejudice is dispositive of the claim, courts applying the *Strickland* test "are free to dispose of ineffectiveness claims on either of [*Strickland's*] two grounds." *Oats v. Singletary*, 141 F.3d 1018, 1023 (11th Cir. 1998).

In order to satisfy the "performance" prong of the *Strickland* test, a petitioner is required to show that his attorney's representation "fell below an objective standard of reasonableness," which is measured by "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. That is, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. In considering such a claim, the court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F. 3d 1051, 1053 (11th Cir. 1999) (citations omitted). Thus, the petitioner has a difficult burden, as to be considered unreasonable, "the performance must be such that 'no competent counsel would have taken the action that [the petitioner's] counsel did take.'" *Ball v. United States*, 271 F. App'x 880 (11th Cir. 2008) (citations omitted).

The petitioner must also satisfy the "prejudice" prong of the *Strickland* test. To that end, the petitioner must show that a reasonable probability exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. The petitioner "must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety

and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'"  *Butcher v. United States*, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations omitted).  Further, it is not enough to satisfy the prejudice prong to merely show that the alleged errors affected the case in some imaginable way.  *See id*. at 1293-1294. ("[T]hat the errors had some conceivable effect on the outcome of the proceeding is insufficient to show prejudice") (quoting *Strickland*, 466 U.S. at 693) (internal quotation marks omitted).  Thus, "under the exacting rules and presumptions set forth in *Strickland*, 'the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between.'"  *Windom v. Sec'y, Dep't of Corr*., 578 F.3d 1227, 1248 (citations omitted).

Given that the state courts have adjudicated Deardorff's claims on the merits in post-conviction proceedings, the question now is not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. 86, 105 (emphasis added).  Put another way, Deardorff must not only satisfy the two *Strickland* prongs, but he must also "show that the State court applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (citations and internal quotation marks omitted). "Although courts may not indulge 'post hoc rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions, *Wiggins*[, 539 U.S. at 526-527], neither may they insist counsel confirm every aspect of the strategic basis for his or her actions."  *Harrington*, 562 U.S. at 109. The Eleventh Circuit has further elaborated on this difficult, but not insurmountable, burden stating that,

> When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could

disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." [*Harrington*, 562 U.S. at 102], 131 S.Ct. at 786. So long as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. Id., 131 S.Ct. at 786. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. *Id*., 131 S.Ct. at 786.

*Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011). As a result of this difficult burden, "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Id.*

Having set forth the appropriate standard for determining an ineffective counsel claim, the Court turns to Petitioner Deardorff's asserted challenges in Claims 1, 2, 4, 6, and 7 in his petition.

> **a. Deardorff claims trial counsel provided ineffective assistance by failing to adequately seek suppression of statements obtained on October 1, 1999, pursuant to a Fourth Amendment violation.[6]**

In his habeas petition, Deardorff challenges counsels' failure to adequately prepare for and litigate the suppression of his statements, "the gig is up" and "take the death penalty off the table and I'll tell you", made to Officer Lankford while at the sheriff's department, following the October 1, 1999, vehicle stop in the Walmart parking lot. (Doc. 1 at 8-16). Deardorff claims that in litigating his Fourth Amendment rights during the trial, counsel "relied on incorrect law, ignored controlling law, and failed to present a meritorious claim supported on the facts of the case." (Doc. 1 at 8). Specifically, in seeking to suppress Deardorff's statements at trial, counsel asserted the statements lacked voluntariness to be admissible and attempted to prove that, as co-owner of the stopped vehicle, Deardorff had standing to challenge the consensual search of the car. (Doc. 15-

---

[6] Presented as Claim I of habeas petition. (*See* Doc. 1 at 8-16).

29 at 56, n.4).  This challenge was unsupported by the law at the time of the trial and, moreover, at no time did counsel raise any argument as to the legality of the stop/arrest. (*See id.*).

This claim was previously reviewed and rejected by the state court pursuant to Ala. R. Crim. P. 32.6(b), [7] as being insufficiently pleaded.  (*See* Doc. 15-30 at 171).

A dismissal pursuant to Ala. R. Crim. P. Rule 32.6(b) and 32.7(d) is considered an adjudication on the merits.  *Borden v. Allen*, 646 F.3d 785, 816 (11th Cir. 2011) (a ruling "under Rule 32.6(b) is ... a ruling on the merits"); *Daniel v. Comm'r Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016) (dismissal pursuant to 32.6(b) is evaluated under AEDPA's "contrary to, or involved an unreasonable application of clearly established Federal law' standard); *Frazier v. Bouchard*, 661 F.3d 519, 525 (11th Cir. 2011) ("[B]ecause a dismissal under Rule 32.7(d) for failure to sufficiently plead a claim under Rule 32.6(b) requires an evaluation of the merits of the underlying federal claim, the Court of Criminal Appeal's determination was insufficiently 'independent' to foreclose federal habeas review. . . . [T]he determination that adjudications under Rules 32.6(b) and 32.7(d) of the Alabama Rules of Criminal Procedure are on the merits comports with this court's precedent.").  "Thus, AEDPA requires us 'to evaluate whether the Court of Criminal Appeals's determination that [Deardorff's] relevant ineffective assistance of counsel claims were due to be dismissed for failure to state a claim with sufficient specificity under Rule 32.6(b) was contrary to, or involved an unreasonable application of Federal law, or whether it

---

[7] Pursuant to Alabama's Rule 32 pleading requirements:

> Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

Ala. R. Crim. P. 32.6(b).

'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Daniel,* 822 F.3d at 1261 (internal citations omitted). Under AEDPA, the Court must therefore ask two questions. First, could "fairminded jurists [] disagree on the correctness of the state court's decision"- that is, did Deardorff fail to plead facts sufficient to demonstrate a possibility of constitutional error? *Harrington*, 562 U.S. at 101. Second, if the first question is answered in the affirmative, we must determine whether the Alabama Court of Criminal Appeal's decision to the contrary was unreasonable under § 2254(d). *See Daniel*, 822 F.3d at 1261. To answer these questions, the Court turns to the state court record.

In affirming the trial court's dismissal of Deardorff's claim, the ACCA concluded:

[T]o the extent Deardorff alleges that trial counsel were ineffective for failing to argue that his statement should have been suppressed because his arrest was illegal, this claim was also insufficiently pleaded. Other than a few phrases, Deardorff failed to plead the contents of his statement or statements. He has failed to plead facts that if true would establish that there is a reasonable probability that, in light of the other evidence presented at trial, suppression of the statement would have altered the outcome of the trial. Consequently, Deardorff failed to meet his burden to plead the full factual basis of this claim, and the circuit court did not err by dismissing it without a hearing. Rules 32.6(b) and 32.7(d), Ala. R. Crim. P.

(Doc. 78 at 124).

Review of Deardorff's Amended Rule 32 Petition reveals that in presenting this claim, Deardorff argued:

As a result of Mr. Deardorff's illegal arrest, he and Ms. Andrews were interrogated by the police. During that interrogation Mr. Deardorff fully cooperated with the police, but made a comment which the State portrayed at trial as a confession. . . .

The State repeatedly emphasized his inculpatory statement as evidence of Mr. Deardorff's complicity in the victim's murder. (R. 1595, 1596, 1598). During the guilt-phase closing, the State stated:

All of a sudden, Mr. Con man changes. Oh, Lord, the story has got to change now. And I think he said - - and I don't know if it was the jig or the gig. I guess it depends on how old you are. In my day, it was the jig is up. And in today's world, it's the gig is up. But

> whatever it is, it was up, and he knew it, because the gun had been found and the money had been found. And he goes on. And you heard Brett Lankford. His testimony was, not only did he say that, I leaned over and I said what do you mean by that? Take capital murder off the table and I'll talk to you. You can't have capital murder without a dead person. Nobody had been arrested for murder. Nobody even knew the minister was dead, but he did, and I submit that's why he said that to Brett Lankford. Take it off the table and I'll talk some more.

(R. 2718)

> Mr. Deardorff's supposed confession was critical to the State's case. Yet, had counsel adequately litigated the suppression of evidence, the jury would not have heard that "confession".

> . . .

> In sum, counsels' deficient suppression litigation gave the jury access to material physical and confessional evidence. The State used that excludable evidence to show Mr. Deardorff's connection with Mr. Turner's property and his remains, to show Mr. Deardorff as the leader in the conspiracy, and to show his supposed confession.

(Doc. 15-29 at 63, 65). Notably, the record citations provided in the pleading, "R. 1595, 1596, 1598", discuss the two statements ("the gig is up" and "take the death penalty off the table and I'll tell you") made by Deardorff during his October 1, 1999, interview following the vehicle stop, which he now challenges. Specifically, these record citations reference Officer Lankford's testimony when questioned about Deardorff's statements, as referenced below:

> Q:    Did Mr. Edgar ever come up during the interview process that you and Mr. Huggins was making with Mr. Deardorff or did he interrupt you?

> A:    Yes.

> Q:    What happened?

> A:    There was a knock at the door of the interview room calling us away from conducting the interview. We stepped into the hallway outside and pulled the door to behind us. Charles Huggins and myself were informed that some items had been found in the car that Christy Andrews and Mr. Deardorff were traveling in.

> Q:    Could Mr. Deardorff hear what was being said?

A:     I believe that he could.

Q:     When you went back or came in contact with Mr. Deardorff, did he say anything?

A:     Yes, he did.

Q:     What did he say?

A:     He said the gig is up?

Q:     Did you respond to him?

A:     Yes, sir, I did.  I asked him what he meant by that, and his response to my response was take the death penalty off the table and I'll tell you.

Q:     Are you sure he said that?

A:     Yes, sir.

(Doc. 15-15 at 198-199, R. 1595-1596).

Accordingly, as argued by Respondent, Deardorff did not specifically quote or identify these statements in the body of his Amended Petition.  However, considering the citations "R. 1595, 1596, 1598", pinpointed in the Amended Petition, relate solely to the two statements made by Deardorff during the October 1, 1999, interview, categorized by the State as a confession, it is arguable as to whether this satisfies Alabama's pleading specificity requirement.  And, it reasons that a fairminded jurist could determine that Deardorff "plead the contents of his statement or statements," which he challenges counsel should have suppressed.  However, fairminded jurists could not disagree that Deardorff failed to plead with specificity the facts necessary to establish prejudice under *Strickland*, as determined by the ACCA.

Review of the Amended Petition reveals that Deardorff provided only vague, conclusory assertions that his statements effected the outcome of the trial, including:

> Mr. Deardorff's supposed confession was critical to the State's case.  Yet, had counsel adequately litigated the suppression of evidence, the jury would not have heard that "confession".
>
> The State repeatedly emphasized his inculpatory statement as evidence of Mr. Deardorff's complicity in the victim's murder.
>
> A "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)"

(Doc. 15-29 at 63) (internal citation omitted).  These allegations are simply insufficient to show that, but for the inculpatory statement(s) made during his October 1, 1999, interview, the result of the proceeding would have been different.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding;" rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 693.  Here, Deardorff has made no reference to the abundant evidence admitted at trial, which the jury heard, that connected Deardorff to and implicated his guilt in the kidnapping and murder of Turner.  Taking the record as a whole, the exclusion of the two "confessional" statements would not have altered the outcome of the trial, and Deardorff has provided no facts, and only conclusory allegations (in both his state court petitions and the current habeas petition) to suggest otherwise.  Thus, the ACCA's determination that Deardorff's Amended Petition failed to sufficiently plead such facts was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

Alternatively, Deardorff's claim is meritless.

"The Fourth Amendment protects individuals from unreasonable search and seizure." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir.), *cert. denied*, 534 U.S. 830, 122 S. Ct.

73, 151 L.Ed.2d 38 (2001); *see* U.S. CONST. amend. IV.  Warrantless searches and seizures are *per se* unreasonable unless an exception applies.  *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 1716, 173 L. Ed. 2d 485 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967)).  A seizure takes place "whenever a police officer accosts an individual and restrains his freedom to walk away." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).  However, not all interactions between law enforcement and citizens qualify as a "seizure[ ] of persons" triggering Fourth Amendment protections. *Terry v. Ohio*, 392 U.S. 1, n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

> The Supreme Court has identified at least three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply: (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

*United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  Deardorff's claim implicates the second and third categories.

Based on the record before the court, however, the challenged vehicle stop did not contravene the Constitutional prohibition against unreasonable searches and seizure.[8]

The Supreme Court has declared a traffic stop is a constitutional detention if it is justified by reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), or probable cause to believe a traffic violation has occurred under *Whren v. United States,* 517 U.S. 806, 810, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996).  "The touchstone of the Fourth

---

[8] A traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).

Amendment is reasonableness. . . ." *United States v. Knights,* 534 U.S. 112, 118, 122 S. Ct. 587, 591, 151 L. Ed .2d 497 (2001). Thus, to determine whether a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. *See Ornelas v. United States,* 517 U.S. 690, 696, 116 S. Ct. 1657, 1661–62, 134 L. Ed. 2d 911 (1996); *see also United States v. Acosta,* 363 F.3d 1141, 1145 (11th Cir. 2004) (A determination of reasonable suspicion is based on the totality of the circumstances, and "[i]t does not require officers to catch the suspect in a crime. Instead, [a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.") (citations omitted).  The Eleventh Circuit has outlined the reasonable suspicion standard:

> "[R]easonable suspicion" is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop. Such a level of suspicion is obviously considerably less than proof of wrongdoing by a preponderance of the evidence, or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found. Nevertheless, "reasonable suspicion" must be more than an inchoate "hunch," and the fourth amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop.

*United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (internal citations omitted).

The record reflects that Deardorff became a person of interest, early on, in the investigation of Mr. Turner's disappearance.[9]  Deardorff's name was provided by Mr. Turner's family as a person who might have had a "dispute" with Turner, as Deardorff and Ms. Christy Andrews had previously rented a warehouse from Mr. Turner, from which they were evicted after failing to pay rent.  (Doc. 15-15 at 86-87).  After Mr. Turner's disappearance, email confirmations were received

---

[9] Officer Brett Lankford testified that information had been "gathered throughout the investigation that was showing that there was connection between Mr. Deardorff, Mr. Peacock, and Ted Turner. There was prescription of Mr. Turner's that some person had tried to fill.  There was credit cards being used.  There was computers being used.  There was a very strong connection being drawn or correlation being drawn that indicated that they may be in contact with Mr. Turner.  So, of course, we wanted to talk with them." (Doc. 15-10 at 26).

at Mr. Turner's email address for car parts placed with Mr. Turner's credit card, which matched as replacement parts for vehicles left in the warehouse from which Deardorff was evicted.  (Doc. 15-2 at 35-36).  Additionally, a handwritten addendum to Mr. Turner's Last Will and Testament was found in Mr. Turner's house which mentioned Deardorff.  (*Id*.; Doc. 15-15 at 87-88; Doc. 15-51 at 23).

Based on these facts, officials had reasonable suspicion to believe that Deardorff could be involved in the disappearance of Turner, and it was further reasonable based on these circumstances for the multi-jurisdictional task force to locate Deardorff for questioning, in what was thought to be an ongoing kidnapping.[10]  *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (Courts look to the totality of the circumstances to ascertain "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.").  Accordingly, officials had more than enough objectively reasonable suspicion that Deardorff was involved in criminal activity (that is an active, ongoing kidnapping) to stop Deardorff for investigatory purposes.  To the extent Deardorff attempts to argue that the stop amounted to an arrest, the court disagrees.  *See Terry*, 392 U.S. at 20 (Under *Terry's* two-part inquiry, an officer's action must be justified at its inception, but the stop itself must be "reasonably related in scope to the circumstances which justified the interference in the first place.").

"There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required."  *United States v. Acosta*, 363 F.3d 1141, 1145-46 (11th Cir. 2004).  The Supreme Court has explained that this "difference is one of extent, with the line of demarcation resulting

---

[10] The task force was also seeking to locate Mr. Peacock during this time based on knowledge that he had negotiated the victim's stolen checks. (*See* Doc. 15-15 at 89-90; Doc. 15-9 at 177-78; Doc. 15-10 at 10).

from the weighing of a 'limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety.'" *Id*. at 1146 (quoting *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 2255, 60 L. Ed. 2d 824 (1979)).   In distinguishing between a *Terry* stop and arrest, the Eleventh Circuit considers four non-exclusive factors: (1) the law enforcement purposes served by the detention, (2) the diligence with which the police pursue the investigation, (3) the scope and intrusiveness of the detention, and (4) the duration of the detention.  *Id*. (quotation and citation omitted).  The facts of record support that the multi-jurisdictional surveil and stop of Mr. Deardorff and Ms. Andrews in the Wal-Mart parking lot on October 1, 1999 (as previously laid out) did not run afoul of the Fourth Amendment.

Testimony was put forth that on October 1, 1999, officers "waited until [Mr. Deardorff and Ms. Andrews] came back out [of Wal-Mart] and got back in their vehicle" and the decision was made to "go ahead and make the stop and ask them to voluntarily accompany [the officers] back to the sheriff's office for questioning."[11] (*Id*. at 185).   Under the circumstances and belief that criminal activity may have been afoot, it was reasonable for the officers to expect that Deardorff could "be armed and dangerous" and conduct the stop as a "felony stop",[12] which included the blockading of Deardorff's car and Officer Lankford initially drawing his weapon. (Doc. 15-9 at 196, 201-202).   The record reflects that the situation quickly deescalated when Deardorff was

---

[11] Officer Lankford testified that the couple was stopped because, "we believed that they were responsible for [Mr. Turner's] disappearance or beginning to believe they were responsible for that disappearance, and we wanted to make sure we didn't put ourselves in a position to be harmed or they weren't in apposition to be harmed, or the general public wasn't in a position to be harmed." (Doc. 15-10 at 25-26).

[12] Officer Lankford explained that a felony stop is a traffic stop where "all due care is practiced in regard to officer safety and the safety of the persons we are stopping, with the expectation that anything can happen." (Doc. 15-9 at 201)).

cooperative,[13] and Officer Lankford testified that he holstered his weapon before approaching Deardorff and performing a pat down weapons search of Deardorff for safety reasons (which was explained to Deardorff). (*Id*. at 202). Deardorff was further informed by Officer Lankford that he was not under arrest and that law enforcement "wanted to speak with Mr. Deardorff in regards to Ted Turner being missing." (Doc. 15-9 at 197, 196-198). During the stop, Deardorff stated to Officer Lankford (something to the effect of), "I've been expecting this. I've been expecting y'all to be looking for me." (Doc. 15-9 at 199; *see also* 15-10 at 5-7). Officer Lankford "asked him if he would speak with [the officers] and asked him if he would follow [the officers] to the administration building of the Baldwin County Jail." (Doc. 15-9 at 197). Testimony was presented that no threats of force were used (and Deardorff alleges none); Deardorff was not handcuffed; the vehicle was not searched at that time, and Deardorff and Ms. Andrews agreed to come to the station to talk to the officers. (*Id*. at 196, 198; Doc. 15-10 at 5, 9-10, 12). The officers' blockade was then moved, and Ms. Andrews and Deardorff (as a passenger) drove their vehicle in a caravan to the sheriff's station. (Doc. 15-9 at 201-203). The record further supports that upon arriving at the station, Deardorff was questioned in an unlocked interrogation room, where he was free to leave by "just turn[ing] the knob and walk[ing] out", and that Deardorff also signed a waiver of rights form before the interview with Officers Lankford and Huggins began.[14] (*Id*. at 8, 12-14).

Given that the task force perceived Mr. Turner's disappearance as an active kidnapping at the time Deardorff was stopped, Deardorff has failed to put forth facts showing that the procedures

---

[13] Officer Lankford testified that his fear of Deardorff lessened quickly after Deardorff was stopped, as Deardorff "appeared noncombative, very cooperative, courteous." (Doc. 15-10 at 10).
[14] The trial court has concluded, and the ACCA affirmed, that the consent given by both Deardorff and Ms. Andrews (for the property searches and statements) was voluntary. Furthermore, Deardorff has failed to plead any claim challenging this finding by the state courts in his current habeas petition.

used were unreasonable and matured the stop into an arrest.  *See United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985) (Whether a search or seizure is reasonable "depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself."); *see also Long,* 463 U.S. at 1051 (officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous."); *United States v. Roper,* 702 F.2d 984, 987–88 (11th Cir.1983) (an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon); *United States v. Hastamorir,* 881 F.2d 1551, 1556 (11th Cir. 1989) (restriction on freedom of movement, alone, is not sufficient to transform a *Terry* stop into a *de facto* arrest).  Based on the totality of circumstances, "the level of restraint imposed on [Deardorff] was reasonably necessary to effect the stop and ensure the safety of the officers at the scene." *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) (traffic stop did not violate the Fourth Amendment where surveilling officers having knowledge of possible drug sale, stopped Acosta by blockading his vehicle in the parking lot, approximately 6 officers approached Acosta, with at least one officer having a drawn weapon (weapons were holstered within 10 second); Acosta was informed he was not under arrest but wanted for questioning; Acosta gave consent for search of vehicle.).

For these reasons, the evidence supports that the vehicle stop for investigatory purposes into the kidnapping and disappearance of Mr. Turner was reasonable under the circumstances (in scope and duration) and did not run afoul of the Fourth Amendment.  Accordingly, trial counsel cannot render ineffective assistance by failing to file a meritless motion.  *Kimmelman*, 477 U.S. 365, 375 ("Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth

Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."). Thus, Deardorff is not entitled to relief on this claim.

### b. Deardorff claims trial counsel provided ineffective assistance by failing to object to the admission of the victim's will on confrontation grounds, in violation of the Sixth Amendment.[15]

The record reflects that within days of Mr. Turner's disappearance, a handwritten codicil to Mr. Turner's Last Will and Testament was discovered by his family.[16]  The codicil contained the notation, "Reaffirmed 7/27/99 just in case Don Deardorff is really crazy." (Doc. 15-5 at 48). This codicil was admitted into evidence at the trial, witnesses were questioned regarding the finding and authenticity of the addendum, and it was referenced in the State's closing argument. Deardorff claims that trial counsel rendered ineffective assistance by failing to object to the admission of the codicil under the Confrontation Clause, because it accused Deardorff of being responsible for Mr. Turner's death, and that counsel was deficient for failing to request an instruction from the court that the evidence be offered for a limited purpose.  (Doc. 1 at 17, 20-21).  The ACCA dismissed Deardorff's claim as meritless.[17]  The ACCA reasoned that because it had previously held on direct appeal that the evidence relating to the notation on the codicil was not offered for the truth of the matter asserted, the Confrontation Clause could not bar its admission, stating:

> Similarly, under both *Roberts* and *Crawford*, "[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v.*

---

[15] Presented as Claim II of the habeas petition.  (*See* Doc. 1 at 17-22).

[16] The court will hereinafter refer to this document as "will" or "codicil".

[17] In his appeal to the ACCA, Deardorff argued that the circuit court erroneously denied his claim that appellate counsel was ineffective for failing to raise a Confrontation Clause argument relating to evidence regarding the notation on Turner's last will and testament.  (Doc. 15-78 at 115).

*Street*, 471 U.S. 409, 414 (1985)).  As the Supreme Court of the United States has held, "the Confrontation Clause . . . has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012).

. . .

> Gail Goodwin testified that she had witnessed the original will, and she identified Turner's handwriting on the original portion and on the addendum. Goodwin did not testify as to the contents of the will or to the reference to Deardorff. Clearly, Goodwin's testimony was offered for the purpose of establishing that the will was Turner's and that the addendum had been written by Turner. Thus, Goodwin's testimony did not constitute hearsay because it was not offered to prove the truth of that matter asserted-that Deardorff killed Turner. No plain error occurred as a result of Goodwin's testimony.

> Karen Hodge testified that she found the will at her father's house. She, too, testified that the addendum to the will was in Turner's handwriting and she read for the record the text of the addendum. She stated that she took the will to the police department. Karen's testimony was offered, not for the truth of the matter asserted-that Deardorff killed Turner-but for the purpose of establishing that the signature on the original will and the text of the addendum were in Turner's handwriting and that the addendum verified some concerns Turner had had as a result of his legal problems with Deardorff. Her testimony was not hearsay, and it was properly admitted.

> Greg Hodge, Turner's son-in-law, testified that he built Turner's computer. After Turner disappeared, Hodge examined the computer to review recent activity on the Internet. Hodge discovered e-mail confirmations that several automobile parts had been ordered, and he determined that the types of parts ordered matched the automobiles that Deardorff had left in the warehouse he had rented from Turner. Hodge testified that the companies were contacted to confirm that the parts were ordered after Turner had disappeared. Hodge testified that he began to suspect Deardorff's involvement in Turner's disappearance because the automobile parts ordered matched the automobiles Deardorff had in the warehouse. The prosecutor then asked Hodge whether he had seen the addendum to Turner's will, and Hodge said he had seen it. The prosecutor asked if that, too, caused him to suspect Deardorff, and Hodge said that it did. (R. 1292.) Hodge said that he and Karen turned the information over to law-enforcement officers.

Agent Montgomery testified that in a missing-person case, a series of steps is generally followed to determine whether the person left voluntarily or as a result of foul play. He said the victim of a crime often knows the perpetrator, and he asked Turner's daughter, Karen Hodge, whether anyone was mad at her father or had had a dispute with him. Karen advised the agent that her father had had difficulties with two tenants at his rental property; one tenant had been evicted from a mobile home, and the other tenant had been evicted from a warehouse facility from which he had run an automotive business. Further investigation revealed that Deardorff was the tenant who had been evicted from the warehouse. Agent Montgomery testified that a few days after Turner disappeared, Karen informed him that she had found her father's will and that Deardorff was mentioned in the addendum to the will. He said that Deardorff and his girlfriend, along with the other tenant Turner had evicted from a rental property, were the initial suspects in Turner's disappearance. Montgomery also testified that law enforcement became aware of Peacock's name when AmSouth Bank personnel notified the Turner family that he had cashed a $4,000 check on the victim's account. Agent Montgomery testified that he had no evidence of malice between Peacock and Turner at that time. He further testified that he learned of Peacock's association with Deardorff on October 1, 1999, in his interview with Deardorff's girlfriend, Christy Andrews.

A review of the record demonstrates that Agent Montgomery's testimony and Karen and Greg's testimony about Turner's will, and particularly the addendum to the will, was given in context of the investigation of the case and the reasons for the actions the police took. It was by definition not hearsay and it was properly admitted into evidence.

. . .

The testimony about Turner's will that was elicited from Goodwin, the Hodges, and Agent Montgomery was not hearsay and it was properly admitted at trial. No error or plain error occurred as a result of the admission of their testimony.

*Deardorff v. State*, 6 So. 3d 121[6]-18 (emphasis added)

Because evidence relating to the notation on the will was not offered for the truth of the matter asserted, it did not offend the Confrontation Clause. Thus, appellate counsel could not have raised a legitimate Confrontation Clause argument and will not be held ineffective for failing to do so. *McNabb v. State*, 991 So. 2d 313, 327 (Ala. Crim. App. 2001)). Therefore, this issue is without merit and does not entitle Deardorff any relief.

(Doc. 15-78 at 110-15).  Deardorff contends the ACCA's decision was contrary to, and involved the unreasonable application of *Crawford* and *Street*,[18] and was based on an unreasonable determination of the facts in light of the evidence, namely that the State used the evidence for the truth of the matter asserted, as demonstrated in its closing argument, where the challenged will was used as substantive evidence of his guilt.  Accordingly, Deardorff contends this evidence was testimonial hearsay and violated his right to confrontation of the witness. Deardorff bears the burden of showing that there is no reasonable basis for the state court's decision.  *Harrington v. Richter*, 562 U.S. at 105 (Under AEDPA, where "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard," the writ must be denied.).  He must further satisfy both *Strickland* prongs, showing that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable.  *Id.* at 104. The likelihood of a different outcome "must be substantial, not just conceivable." *Id.* at 112.

> The Confrontation Clause of the Sixth Amendment prohibits the admission of certain forms of hearsay, specifically testimonial, out-of-court statements, unless the declarant is unavailable and the defendant had a previous opportunity to cross-

---

[18] Deardorff relies on *Tennessee v. Street* for the proposition that Mr. Turner's codicil implicated the Confrontation Clause because, like *Street*, if the jury was asked to infer that the evidence proved he participated in the murder, then the evidence is hearsay and implicates the Confrontation Clause.  This reasoning and comparison are off base and distinguishable.

In *Street*, the defendant and an accomplice made out-of-court-confessions to a sheriff.  At trial, the defendant argued his confession had been coercively derived from his accomplice's written confession and that he was directed to say the same thing.  471 U.S. 409, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985).  In rebuttal, the sheriff denied that the defendant was read the accomplice's confession, and the two confessions were read to the jury, with the limiting court instruction that the accomplice's confession was admitted solely for the purpose of rebuttal of the defendant's testimony - not for the purpose of proving its truthfulness.  The Supreme Court held that the confession was introduced for comparison of the two confessions to determine whether it was plausible that the defendant's account of the crime was a coerced imitation; thus, this nonhearsay purpose did not violate the Confrontation Clause.

Unlike Deardorff, the statements in *Street* are clearly testimonial and would be given with knowledge that they could be later used at trial.  Furthermore, the statements were strictly limited by the court to be considered for rebuttal purposes only.

> examine the declarant. *Id.* at 1286 (citing *Crawford v. Washington,* 541 U.S. 36, 51–52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Id.* at 1287 (quoting Fed.R.Evid. 801(c)). Hearsay is considered testimonial if it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *United States v. Baker,* 432 F.3d 1189, 1203 (11th Cir.2005) (quotations omitted). The Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. *Jiminez,* 564 F.3d at 1287.

*United States v. Florez*, 516 F. App'x 790, 794 (11th Cir. 2013).[19]

A Last Will and Testament is not an out-of-court statement which one would reasonably consider to be used later at a criminal prosecution, nor is a codicil reaffirming a will. The codicil at issue here lacks details likening it to an affidavit, deposition, declaration, or the functional equivalent of in-court testimony. The record further confirms, based on the direct examination of witnesses regarding the codicil, that Mr. Turner's will was not initially entered into evidence for its truth but as an explanation of how and why Deardorff became a person of interest in the investigation of Mr. Turner's disappearance. *See United States v. Eberhart,* 434 F.3d 935, 939 (7th Cir.2006) (testimony is not for its truth where it is offered "only as an explanation of why the

---

[19] While the Supreme Court has not provided "a comprehensive definition" of a "testimonial statement", the Court did explain that the following "modern practices [bear the] closest kinship to the abuses at which the Confrontation Clause was directed":

> "(1) *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and (4) statements taken by police officers during the course of an interrogation. *Crawford,* 541 U.S. at 51–52, 124 S.Ct. at 1364 (quotation marks omitted).

*United States v. Thompson*, 568 F. App'x 812, 817–18 (11th Cir. 2014).

investigation proceeded as it did").  This "course of investigation" rationale, as reasoned by the

ACCA, is consistent with the Confrontation Clause, which "does not bar the use of testimonial

statements for purposes other than establishing the truth of the matter asserted." *See Crawford,*

541 U.S. at 59 n. 9.  The Eleventh Circuit, however, has noted this exception to the hearsay rule

may lead to abuse implicating *Crawford*.  *Cf. Untied States v. Sharp*, 6 F.4th 573, 581-82 (5th Cir.

2021) ("But the mere existence of a purported nonhearsay purpose does not insulate an out-of-

court statement from a Confrontation Clause challenge.").  Specifically, the Eleventh Circuit has

cautioned:

> Trial courts have an obligation to assess independently whether the ostensible non-hearsay purpose advanced by the proponent of the evidence is valid. *See United States v. Sallins,* 993 F.2d 344, 346 (3d Cir.1993). And while police officers generally should be permitted to explain why they began an investigation, "the use of out-of-court statements to show background has been identified as an area of 'widespread abuse.'" *Id.* (quoting 2 *McCormick On Evidence* § 249, at 104 (4th ed.1992)). Nevertheless, such evidence may be admitted "provided that it is simply background information showing the police officers did not act without reason and, in addition, that it does not point specifically to the defendant." *United States v. Vitale,* 596 F.2d 688, 689 (5th Cir.1979) (citations omitted). Furthermore, if such evidence is admitted, a limiting instruction should be given. *Id.*; *see also United States v. Vizcarra–Porras,* 889 F.2d 1435, 1440 (5th Cir.1989) (emphasizing that the district court repeatedly gave the jury limiting instructions regarding the use of the challenged testimony).

*United States v. Issa*, 265 F. App'x 801, 806 (11th Cir. 2008).  The Seventh Circuit has explained:

> [T]he "course of investigation" gambit is so often abused and/or misunderstood that it is an evidentiary and constitutional minefield. See, e.g., *Jones,* 635 F.3d at 1046; *United States v. Silva,* 380 F.3d 1018, 1020 (7th Cir.2004) ("Allowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule."). To convict a defendant, after all, the prosecution does not need to prove its reasons for investigating him. *United States v. Mancillas,* 580 F.2d 1301, 1310 (7th Cir.1978). When the prosecution offers out-of-court statements of non-witnesses on the theory they are being offered to explain "the course of the investigation," it runs a substantial risk of violating both the hearsay rules of evidence and the Confrontation Clause rights of the defendant under the Sixth Amendment. Both

defense counsel and trial judges need to be on high alert when the prosecution offers what sounds like hearsay to explain "the course of the investigation."

*Carter v. Douna*, 796 F.3d 726, 736 (7th Cir. 2015).  It is to these warnings that Deardorff directs his claim.  Deardorff points to the prosecutor's closing statements, where the truthfulness of the codicil statement was argued before the jury, as follows:

> He named the man he thought might do evil to him.  And I submit to you that's what he has left in his will and why he left it.  "Just in case Donald Deardorff is as crazy as I think he is."  That's a message.  That's the man I fear.  It was so significant to him that he put it down.  And, ladies and gentlemen of the jury, he didn't just put it down, he wrote it in red. You can't miss it.  It's designed so you can't miss it.

(Doc. 1 at 18 (quoting R. 2708)).  The prosecutor further referenced Mr. Turner's will in his closing argument to corroborate the testimony of State's witnesses (Mr. Peacock and two jailhouse snitches) arguing:

> And early in the case, a name surfaced.  Early in the case, Deardorff surfaced.  And it didn't surface from some snitch.  It didn't surface from some drug dealer from Miami, Florida.  It didn't surface from some thug out in the county [jail], or it didn't surface from some witness David Whetstone [the prosecutor] generated.  It surfaced from Ted Turner.

(Doc. 1 at 19 (quoting R. 2708)).

The record confirms the ACCA's decision that the introduction of the evidence did not violate the Confrontation Clause, as it was nontestimonial and not asserted for the truth but, instead, to explain why Deardorff became a suspect.  Accordingly, any objection by counsel to its admittance would have been overruled, and counsel's performance cannot be deemed deficient for failure to make a futile objection.  *See Carter v. Douma,* 796 F.3d 726, 735 (7th Cir. 2015) ("If Carter's counsel had objected to this testimony on hearsay or Confrontation Clause grounds, his objection should have been overruled. His performance was not deficient by failing to make a futile objection.").  The failure to appropriately limit the jury's use of this evidence with an instruction from the court, however, is concerning, but falls short of ineffective assistance because

Deardorff has failed to establish prejudice to the outcome of his trial.  *Cf.*, *United States v. King*, 36 F.3d 728, 732 (8th Cir. 1994) ("While we are concerned that the jury's use of this evidence was not appropriately limited by an instruction from the court and it therefore could have considered the out-of-court statements about "Bill" to be true with respect to the defendant's guilt or innocence, we are satisfied that the court did not abuse its discretion in determining initially to admit the evidence for the nonhearsay reasons it stated on the record.").

The evidence showed that Deardorff was angry with Turner after being evicted from the rented warehouse and that a single file was missing from Turner's file cabinet – the warehouse rental file.[20]  The evidence showed that after Turner was reported missing, Turner's credit cards had been used to order car parts which matched vehicles owned by Deardorff.[21]  Evidence was put forth that Deardorff was witnessed driving Turner's car after his disappearance.[22]  Turner's

---

[20] Christy Andrews testified that Deardorff was "angry" about Mr. Turner's lawsuit against him for failing to pay rent on the warehouse, explaining that Deardorff "was upset" because, "[h]e felt Mr. Turner hadn't treated him properly."  (Doc. 15-16 at 176-77).  Deardorff stated to investigators on October 4, 1999, that he and Peacock "were upset and angry over the law suit."  (Doc. 15-4 at 190).

Mr. Turner's daughter, Karen Hodge, testified that Mr. Turner kept "all of his rental property information in file folders and he had two file cabinets in an empty room in the house."  (Doc. 15-14 at 44).  After his disappearance, the family discovered that the warehouse file, containing Deardorff's information was missing.  (Doc. 15-14 at 46).  The folder, or a substantial amount of its contents, was recovered from the search of Ms. Christy Andrews' storage unit. (Doc. 15-17 at 118-119).

[21] Investigating officers testified that Deardorff possessed documentation evidencing internet orders placed with Mr. Turner's credit card after the date of his disappearance.  (Doc. 15-17 at 107-110; Doc. 15-15 at 126-27, 183).

[22] Dawn Dunaway, Millard Peacock's girlfriend, testified that Mr. Peacock returned to her home on Friday, September 24, in a Ford pickup, and left her home in a gold Nissan Maxima.  (Doc. 15-16 at 26).  The reported missing vehicles from Mr. Turner were a Ford pickup and gold Nissan Maxima.  (Doc. 15-17 at 111).  According to Ms. Dunaway, the male driver of the Nissan Maxima looked like Don Deardorff.  (Doc. 15-16 at 27).

binoculars and camera bag were found in a storage unit to which only Deardorff had had access.[23] A roll of duct tape was also found in the storage unit, which forensics matched to the duct tape found at the scene where Turner's body was recovered.[24]  The money seized from Deardorff during the vehicle search was matched to Turner's stolen, cashed checks.[25]  Evidence reflected that, before investigators knew Turner had been murdered, Deardorff told his mother he knew where Turner's body was but that he was not going to tell the police,[26] that the murder of Turner matched

---

[23] Doreen Sorrels testified that she previously loaned Mr. Turner a polaroid camera to take pictures of items abandoned in his warehouse property. (Doc. 15-16 at 88-89).  Agent Montgomery testified that polaroid photographs of vehicles and car engines that were left at Mr. Turner's warehouse in Bay Minette were seized from the storage unit owned by Christy Andrews.  (Doc. 15-17 at 120). Karen Hodge testified that a set of Ted Turner's binoculars were missing from his back patio (Doc. 15-14 at 43), and Agent Montgomery testified these binoculars, as well as Ms. Sorrel's Polaroid camera bag were recovered from the storage unit, where they were "sitting right in front of the door."  (Doc. 15-17 at 112-15).  Christy Andrews testified that she owned the storage building from which the evidence was seized, that she possessed the only key to the unit on her personal key ring, which Deardorff had possession of "all day" on Monday, September 27, following Mr. Turner's disappearance.  (Doc. 15-16 at 178-79, 198; Doc. 15-17 at 78, 105-06).

[24] (Doc. 15-17 at 86).  Forensic scientist Richard Carter testified that while he could not make a fracture match with the duct tape found in the storage unit to that found on the jacket and pillowcase, he opined that "the tape from the jacket and the pillow case and the roll of duct tape were all made on the same machine during the same four to six months period."  (Doc. 15-20 at 181).  Furthermore, he testified that the extrusion marks or manufacturing marks reflected that the "tape came from $1/30^{th}$ of the amount that was made on that machine during that same four to six month period."

[25] Agent Montgomery testified, "we were able to associate back through the teller straps that are around the money. . .  which teller this money was strapped by." (Doc. 15-17 at 110).  The money was traced to Mr. Turner's checks negotiated by Mr. Peacock.  (*Id*. at 111; *see also* Doc. 15-5 at 95-109).

[26] (Doc. 15-41 at 159).  In a taped jail-house telephone conversation with his mother, Deardorff states, "But I'm not gonna say on this where I, where I think the gun is or where, where I think Ted is, I think I know where he's at too.  Millard, just something Millard said when we went to bond hearing. 'Cause I asked him, I said, "*Millard, am I gonna get the fucking electric chair for your stupid ass?*", he said, "*No, you got nothing to worry about, I took care of it*".  But I'm pretty sure, I'm pretty sure, well what he said, I'm pretty sure I know, I know but you know these motherfuckers, if I give, if I was to step up now and say "*I, Millard told me*", you know what they gonna do, they're gonna slam me with accessory after the fact and I'll still get the fucking death penalty. . . ."  (*Id*.).

that described by Deardorff to other jail inmates,[27] and that the recovery of Mr. Turner's body was in a location with which Deardorff was familiar and had communicated to another inmate.[28]  The evidence further reflected that Deardorff threated to kill Peacock if Peacock "mentioned anything about him and Mr. Turner's involvement."[29]  (Doc. 15-19 at 183).

Considering the abundant evidence heard by the jury, it cannot be said that the outcome of Deardorff's trial would have been different or that Deardorff was prejudiced by the admission of the codicil or the prosecutor's later use of the evidence in his closing argument.  *United States v. Florez*, 516 F. App'x 790, 794 (11th Cir. 2013) (Based on the evidence supporting his conviction, the admission of evidence explaining why law enforcement started an investigation, though later used as substantive evidence of his guilt, did not affect the petitioner's substantial rights.).

---

[27] Inmate Michael Hicks, convicted of forgery, testified as to aspects of the murder of Mr. Turner that Deardorff told him, i.e., that "it would be easier to use [Mr. Turner's] credit card if he had a fake I.D.", that "kidnapping would be same as murder as far as the time that he got", that he shot Mr. Turner in the back of the head, and that Deardorff had someone take care of the guns so that "the guns were gone by the time they got to his house."  (Doc. 15-19 at 166-69).

Inmate Walter Fambro, a Miami, Florida native convicted of drug trafficking, testified that he had been jailed with both Millard Peacock and Donald Deardorff.  (Doc. 15-19 at 180-81).  Inmate Fambro testified that Deardorff told him how he and Peacock kidnapped Turner, stole and cashed his checks, and further described how Deardorff stayed with Mr. Turner while Peacock wen to the banks and negotiated the checks.  (Doc. 15-19 at 181, 183-84).  Deardorff also described the murder of Turner, stating he and Peacock "took turns" killing Mr. Turner, took his body "[t]o a wooded area", and specified, "if the body wasn't found during hinting season, that it would be difficult to be found."  (*Id.* at 181-184).  Although unfamiliar with Baldwin County, Alabama Inmate Fambo correctly identified the location of Mr. Turner's body as being between Stockton and Tensaw, which is where the body was ultimately found. (Doc. 15-20 at 9; Doc. 15-20 at 60-75, 99-100).

[28] Christy Andrews testified that Maytower Road, where Mr. Turner's body was found, was approximately one mile from where she and Deardorff previously lived and where she once dropped Deardorff off to hunt.  (Doc. 15-17 at 21-22).

[29] Dawn Dunaway testified that Millard Peacock called her "and said Don had threatened his family and friend."  (Doc. 15-16 at 73).  Inmate Fambro testified that Deardorff communicated threats of harm to Peacock, stating, "if the stupid M.F. [Peacock] say anything about me, I will have him killed wherever he goes, because I know someone at every pen in Alabama."  (Doc. 15-20 at 8).

Accordingly, the ACCA's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, and Deardorff is not entitled to relief.

### c. Deardorff claims trial counsel provided ineffective assistance by failing to request a hearing regarding Juror C.M.'s note to the trial court in violation of his Sixth Amendment right to a fair and impartial jury.[30]

During guilt-phase jury deliberations of Deardorff's trial, the court received a note from Juror C.M., stating:

> I need to discuss some concerns with you about being on a jury to decide on this case "murder". [E]motionally it is hard for me to deal with this. I am very confused and my thought process is not working. To me, this is freightening[sic].
>
> I do not know how to deal with something of this matter. May I be dismissed or helped?

(Doc. 15-4 at 103; Doc. 15-22 at 63). In response to the received note, the trial court called the jury to the courtroom and addressed the issue with the following instruction to the entire jury:

> The Court:   Y'all be seated. Ladies and gentlemen, it's been brought to my attention that you or some of you may be having some difficulty in working through the facts and law in this. You need to understand that you should not be jumping ahead by any means to consider anything other than the guilt or innocence of the defendant on the charges that are placed before him right now. You should not concern yourselves with any other issues.
>
> There are times in trials with certain charges, that a jury may have to make a recommendation or be asked to make a recommendation to the Court. That is not the time right now. That may or may not come about in this case. We don't know and you don't need to, as they say, try to cross a bridge before you even reach it. And if that time comes, it will be in the form of a recommendation from you, and ultimately, any other decisions other than guilt or innocence will be with me as the Judge and trier of the law in this case.
>
> So, what you need to do is listen to the others in there and also listen to yourself, but most important, you need to look at the facts and the law and determine from the facts and the law if you feel, if you can reach a unanimous decision as to whether the defendant is guilty or not guilty of the charges. And that is your sole charge

---

[30] Presented as Claim IV of habeas petition. (*See* Doc. 1 at 26-27).

> that I have given you at this time.  And to be considering anything else is going beyond the oath that you've taken at this time.
>
> Okay.  Now, I'm going to ask you, if you will, to go back in and, if you will, try to continue to deliberate.

(Doc. 15-22 at 57-59).  Deardorff maintains that Juror C.M.'s note supports that she was mentally incapable of rendering a judgment, and counsel's failure to have Juror C.M. questioned constitutes deficient performance that denied him of his right to be tried by an impartial jury.  (Doc. 1 at 26).

Upon consideration, the Court finds that Deardorff's ineffective assistance claim is both procedurally defaulted and, alternatively, meritless.

The record reflects that Deardorff raised this claim in his Amended Rule 32 Petition to the trial court, challenging Juror C.M.'s qualification to be a juror based on her "mental ability to render satisfactory service" within the meaning of Ala. Code § 12-16-60(a)(3) (1975),[31] and the trial court summarily dismissed the claim.[32]  Thereafter, Deardorff proceeded with the state appellate process, but he failed to raise the current claim to the Alabama Court of Criminal Appeals

---

[31] The issue was raised under Claim 11 of Deardorff's Amended Rule 32 Petition to the Circuit Court. (Doc. 15-29 at 118).  Deardorff alleged in his petition that had counsel moved for a *Remmer* hearing, the court would have learned that Juror C.M. "found the whole experience of serving on the jury extremely troubling, she felt mentally and emotionally unable to sit in judgment of another person, and she felt pressured by the rest of the panel".[31]  As such, Deardorff contends "there's a reasonable probability" that the court would have granted a mistrial. (*Id.*).  (Doc. 15-29 at 119). The state responded that Deardorff's claim was meritless and a "gross misinterpretation of statements made on the record", as Juror C.M.'s note expressed how she was feeling (emotional and overwhelmed) about serving on the jury, not her mental ability.  (Doc. 15-30 at 60).  The State further maintained, had counsel moved for a mistrial, the court's action would likely have been same, that is to advise jurors to only consider the charge at hand - guilt or innocence – not any potential sentence. (Doc. 15-30 at 60).  Thus, Deardorff was not prejudiced. (*Id.*).

[32] On February 14, 2012, The Circuit Court of Baldwin County, Alabama summarily dismissed Claims 1, 2, 3, 7, 10, 11, 12, 13, 18, 19, 20, 21, 22(a), 22(c) of Deardorff's Amended Rule 32 Petition.  (Doc. 15-30 at 171-72).

or the Supreme Court of Alabama.[33]   Accordingly, Deardorff failed to submit his present ineffective assistance of counsel claim to a complete round of state review, rendering the claim unexhausted.  *Price v. Warden, Att'y Gen. of Ala.,* 701 F. App'x 748, 749-50 (11th Cir. 2017) (In Alabama, a complete round of the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing in that court, and a petition for discretionary review in the Supreme Court of Alabama.) (per curiam).   Because Deardorff's unexhausted *Strickland* claim can no longer be raised in the Alabama courts, it is procedurally defaulted.[34]   *See Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) (A habeas claim "is procedurally defaulted if it has not been exhausted in state court and would now be barred under state procedural rules."); *see also Coleman v. Thompson*, 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("[I]f the petitioner failed to exhaust state remedies and the court to which the petition would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] ... there is a procedural default for purposes of federal habeas[.]").

"The doctrine barring procedurally defaulted claims from being heard is not without exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Trevino v. Thaler*, 569 U.S. 413 (2013) (citation omitted). "Cause exists if there was 'some objective factor external to the defense [that]

---

[33] *See* Docs. 15-76; 15-78 at 138; *see also Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (Where a claim has not been exhausted in the state courts and the time in which to present the claim has expired, federal courts deem the claim procedurally defaulted and habeas review of the claim is precluded.).

[34] Pursuant to Alabama law, the sole avenue for a defendant to collaterally attack an Alabama conviction or sentence is a proceeding under Alabama Rule of Criminal Procedure 32.  *See* Ala. R. Crim. P. 32.4.  Deardorff's ineffective assistance claim is not cognizable in a successive Rule 32 petition; thus, Deardorff has no means to properly exhaust the claim.  *See* Ala. R. Crim. P. 32.2(d)

impeded counsel's efforts to comply with the State's procedural rule.'" *Mize*, 532 F.3d at 1190 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986).).  Such impediments "include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel." *Id*.  To show prejudice, "a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different" had the constitutional violation not occurred. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003).  A petitioner may also overcome the procedural default of a claim by establishing a fundamental miscarriage of justice, which "occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id*. "This exception applies if the petitioner can show that, in light of new evidence, it is probable that no reasonable juror would have convicted him." *Mize*, 532 F.3d at 1190.  That said, appellate courts "repeatedly have emphasized that circumstances meriting the consideration of procedurally defaulted or barred constitutional claims are 'extremely rare' and apply only in the 'extraordinary case.'" *Rozzelle v. Secretary, Florida Dep't of Corrections*, 672 F.3d 1000, 1015 (11th Cir. 2012) (citations omitted).

Deardorff challenges the procedural bar of the claim, arguing he was not required to exhaust the claim, because there was "an absence of available State corrective process" and/or "circumstances exist[ed] that render[ed] such process ineffective to protect the rights of the applicant", citing 28 U.S.C. § 2254(b)(1)B)(i)-(ii); *Rose v. Lundy*, 455 U.S. 509, 516 n.7 (1982). (Doc. 16 at 9).  According to Deardorff, "[t]he trial court, in an unrecorded ruling, prevented Mr. Deardorff from calling jurors as witnesses in support of his juror claims.  As such, the ACCA declined to review any such claims.  Mr. Deardorff maintains he was, thus, deprived of a meaningful opportunity to litigate this claim in state post-conviction proceedings in violation of

his constitutional right to due process." (Doc. 1 at 27, n.87). The undersigned finds Deardorff has misconstrued the law applicable to his case and finds no support for Deardorff's argument or exception to the exhaustion requirement.

The record reflects that on August 3, 2012, nearly six months after his ineffective assistance claim related to Juror C.M.'s note was summarily dismissed, the circuit court held a conference call to discuss outstanding discovery issues related to the scheduled Rule 32 evidentiary hearing. At the hearing, Deardorff contends the court ruled, *inter alia*, that he was prohibited "from calling any juror to testify either to their predisposition to vote death (Claim 5) or their exposure to media coverage of the case both before and during trial. (Claim 14). Instead, the Court directed Petitioner to call an expert in jury selection to present evidence on these two claims." (Doc. 15-37 at 15). In moving for reconsideration of the denial, Deardorff argued that while the court's ruling addressed Claim 5, it did not address Claim 14. (*Id*. at 25-26). On appeal, Deardorff challenged "The Circuit Court's Ruling Prohibiting Deardorff From Calling Jurors to Testify in Support of Claims 5 and 14." (Doc. 15-76 at 49; Doc. 15-78 at 139, 170-72). Deardorff did not, however, challenge the circuit court's summary dismissal of this current habeas claim, that counsel rendered ineffective assistance for failing to question Juror C.M. Now, Deardorff attempts to persuade this Court that the circuit court's ruling as to Claims 5 and 14 of his Rule 32 petition should be interpreted as a decision denying him the right to call juror(s) in relation to his current habeas claim, excusing his failure to exhaust the claim in the state courts. Such is a far stretch of the record and reason.

"[T]o preserve a claim of ineffective assistance of counsel for federal review, the habeas petitioner must assert this theory of relief and transparently present the state courts with the *specific acts or omissions* of his lawyers that resulted in prejudice." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (emphasis added). The rule of exhaustion requires "that

petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation," *id.* at 1344–45, which affords the state courts an "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim," *id.* at 1344 (quoting *Picard*, 404 U.S. at 277 (alteration in original)). A reading of Deardorff's appellate petitions firmly supports that his challenges encompass only his claims of ineffective assistance of counsel for improper *voir dire* as to jurors' predisposition to vote for a sentence of death and failure to properly investigate jurors' exposure to media reports before and during the trial to request a change of venue. (*See* Docs. 15-76 at 50-52; 15-78 at 170-72). The current habeas claim is completely unrelated to such claims (presented as Claims 5 and 14 in Deardorff's Rule 32 Amended Petition). In other words, Deardorff utterly failed to present the same claim in the state courts he now raises in the petition and has not informed the state courts about the factual and legal bases for the current habeas claim. Yet, he clearly had the opportunity to challenge the current habeas claim in the state courts. Indeed, no facts support that there was an absence of available State corrective process or that circumstances existed to render such process ineffective to protect his rights. § 2254(b)(1)(B)(i)-(ii). To the contrary, he pursued and exhausted other ineffective assistance claims which involved jurors (namely Claims 5 and 14 of his Rule 32 petition) throughout the state courts. Simply put, the state appellate process was available to Deardorff, and he has failed to establish cause for his failure to raise the current habeas claim to the state courts. Accordingly, Deardorff's claim is procedurally defaulted for failure to exhaust state court remedies.

In the alternative, Deardorff's claim is meritless. Pursuant to Alabama law, "[a] prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and

also . . . [i]s capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror. . . ." ALA. CODE § 12-16-60(a)(3) (1975). Here, Juror C.M. was properly questioned as to her mental stability by the defense and the State during *voir dire*, where there was no indication that Juror C.M. was mentally unsound or incapable of serving on the jury.[35] (*See* Doc. 15-11 at 23). *Voir dire*, however, did reveal that Juror C.M. was hesitant and apprehensive to consider death as an option for punishment, as she specifically stated during individual questioning that she had concerns over "having somebody else's life in [her] hands." (Doc. 15-12 at 200; Doc. 15-13 at 7). Her nervousness was narrowed to the penalty phase of the trial (rather than the guilt phase), and she was accepted as a juror without challenge. (Doc. 15-12 at 202-203; Doc. 15-13 at 5, 138-40). Thereafter, no indication of a potential problem regarding Juror C.M.'s mental ability to serve arose until jury deliberations, when Juror C.M.'s note to the court referenced the exact fear(s) she previously disclosed to the court and all parties during jury selection.

Review of the note reveals no indication that Juror C.M. was mentally unstable or unable to comprehend the court's instructions, understand the facts, or apply the facts to the law given. Nor does the presented note state or suggest Juror C.M.'s incapacity to deliberate guilt or innocence. Rather, the note to the court implies the heavy burden felt by Juror C.M. in sitting on a capital murder jury. Furthermore, her request to be relieved from the task "or helped" was met by the court in its instruction to the jury to take the deliberations step-by-step and phase by phase. The court focused Juror C.M., as well as the other jurors, on their duty to apply the facts to the law

---

[35] During general voir dire, the trial court instructed prospective jurors that they must be of sound mind to serve on the jury and Juror C.M. did not respond that she was not of sound mind. (*See* Doc. 15-11 at 23).

and decide only guilt or innocence, without looking forward to the penalty phase, at that time.  This is simply not a case where mental capacity rendered a juror incapable of serving or a juror's actions indicated the need for further questioning.  *But cf., United States v. Walsh,* 75 F.3d 1, 3-5 (1st Cir. 1996) (Juror was questioned after foreperson reported to the court security officer that juror had become "mentally unstable."); *United States v. Huntress,* 956 F.2d 1309, 1312 (5th Cir. 1992) (Trial court received a note from the jury foreman regarding a holdout juror.  The next morning the court received a call from a juror's treating doctor, informing the court that the juror was distraught and suicidal due to the stress of his jury service and the juror had checked himself in to a hospital the night before.  Juror was released from service.); *United States v. O'Brien,* 898 F.2d 983, 986 (5th Cir.1990) (juror was dismissed during deliberations after juror's wife informed the court that juror suffered from severe depression and juror's treated psychiatrist confirmed he was in no condition to continue as a juror).  Deardorff has presented no facts showing that had counsel objected to the court's instruction or moved for a *Remmer* hearing that a mistrial would have been granted or that the outcome of his trial would have been affected in any way.

Accordingly, counsel was not ineffective for failing to request a hearing regarding Juror C.M.'s note to the trial court, and Petitioner Deardorff is not entitled to relief on this claim.

> **d. Deardorff claims that trial counsel provided ineffective assistance of counsel when they failed to request a continuance and obtain a duct-tape expert to challenge the State's expert testimony.[36]**

During the guilt phase of Deardorff's trial, the State called a forensics expert who testified that the duct-tape found wrapped around Mr. Turner's body was from a roll of duct-tape found in Deardorff's storage unit.  Deardorff claims that this was the only physical evidence tying him to

---

[36] Presented as Claim VI of the habeas petition. (*See* Doc. 1 at 29-35).

the crime scene and that defense counsel was only made aware of this evidence and expert testimony on the morning of the first day of Deardorff's trial.  Therefore, Deardorff claims that defense counsel's failure to request a continuance and to obtain expert testimony to counter the State's was deficient performance that prejudiced his defense.  (Doc. 1 at 28-35).

This claim was reviewed and denied by the state courts, with the ACCA relying on the circuit court's findings, stating:

> "First, Deardorff fails to prove that his trial counsel provided deficient performance in declining to hire expert assistance.  [Trial counsel] testified that he considered the State's offer to agree to a continuance, but the offer was rejected for strategic reasons.  [Trial counsel] testified that he did not file a motion for continuance or accept the State's offer for a continuance because 'Mr. Deardorff did not want a continuance.' (Tr. 80). [Trial counsel] further testified that he was 'sure' that Deardorff thought the State would be less prepared if they went ahead and had the trial. (Tr. 121)  Moreover, Deardorff fails to show that defense experts in ballistics, duct-tape analysis, or pathology were necessary in this case.  The trial transcript shows that each of the State's experts were subject to rigorous cross-examination by trial counsel.  This Court cannot hold that no reasonable trial counsel would have failed to hire expert assistance in this case.

> "Second, Deardorff fails to offer any evidence of prejudice.  Deardorff's Rule 32 counsel did not call appropriate forensics experts to challenge the testimony of Dale Carter.  Gillian Currie was called to testify about the FBI standards of duct-tape analysis as they were in 2001, but she conceded during voir dire examination that she had never read the 2001 standards.  Currie's testimony, therefore, was unhelpful to Deardorff's cause. . .

> . . .

> The circuit court's findings are supported by the record.  Trial counsel testified that he explained to Deardorff the need for additional time to perform additional investigations, and that "[i]f you get in a hurry, you just get in a hurry to get convicted." (R. 81).  Deardorff, however, adamantly refused to allow counsel to seek a continuance.  Under these circumstances, this Court cannot hold that trial counsel performed deficiently.  *See State v. Rockl*, 130 Wash. App. 293, 300, 122 P.3d 759, 763 (2005) (holding that when the defendant refuses to allow counsel to seek a continuance to investigate further, the court will not hold that counsel's investigation was unreasonable).

> More importantly, Deardorff failed to present any evidence upon which the circuit court could have found prejudice under *Strickland*.  Deardorff's expert in tape

analysis was unfamiliar with the standards in place at the time of Deardorff's trial, . . . Thus, Deardorff failed to present testimony regarding what an expert could have done to aid the defense and failed to establish prejudice under *Strickland*. Consequently, Deardorff failed to meet his burden of proving that counsel were ineffective, and the circuit court correctly denied relief.  *See* Rule 32.3, Ala. R. Crim. P.

(Doc. 15-78 at 94-96).

Deardorff has not demonstrated that this holding by the ACCA was contrary to, nor an unreasonable application of, clearly established law, or that his trial counsel acted in an objectively unreasonable manner by not seeking a continuance and/or obtaining an expert witness to discredit the State's forensic expert.

First, Defense counsel's failure to secure significant exculpatory or mitigating evidence can constitute ineffective assistance under *Strickland*.  *See Porter v. McCollum,* 558 U.S. 30, 130 S. Ct. 447, 453–56, 175 L. Ed. 2d 398 (2009) (per curiam); *Rompilla v. Beard,* 545 U.S. 374, 390–93, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); *Wiggins v. Smith,* 539 U.S. 510, 534–38, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).  However, such claims "based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because all allegations of what a witness would have testified are largely speculative." *Chaney v. Sec'y, Fla. Dep't of Corr.*, 447 F. App'x 68, 70 (11th Cir. 2011) (internal quotation and citation omitted) ("'Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision' that seldom, if ever, serves as grounds to find counsel's assistance ineffective.") (quoting *Conklin v. Schofield,* 366 F.3d 1191, 1204 (11th Cir. 2004)).  This deference is applicable to the decision to retain expert witnesses as well.  *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) ("Counsel's decision not to hire experts falls within the realm of trial strategy. . . . Great deference is given to counsel, strongly presuming that counsel has exercised reasonable professional judgment.") (internal quotation and citation omitted).  Furthermore, this court's review is limited

to and based solely on the state-court record.  *Shinn v. Ramirez*, __ U.S. __, 142 S. Ct. 1718, 1732 (2022) (citing *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011).

Deardorff failed to demonstrate in the state courts that counsel's representation fell below an objective standard of reasonableness or that, but for counsel's unprofessional errors, the result of his proceeding would have been different.  *Strickland*, 466 U.S. at 687-88.  Deardorff's contention, that had counsel attacked the State's duct-tape evidence with expert testimony of their own "they would have discredited the State's evidence completely, and removed the connection between Mr. Deardorff and the crime scene" (Doc. 1 at 29), is unsupported and speculative at best.

> [A] claim of ineffective assistance based on the failure to consult and call an expert requires "evidence of what a scientific expert would have stated" at trial to establish *Strickland* prejudice. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted); *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998). A habeas petitioner's unsupported and speculative assertion that testimony of an expert witness would have caused the jury to view the evidence differently is insufficient to establish prejudice, which is required to warrant habeas relief on a claim of ineffective assistance of counsel. *Duran v. Walker*, 223 F. App'x 865, 875 (11th Cir. 2007); *Reese v. United States*, 2018 WL 6495085, *9 (N.D. Ala. Nov. 15, 2018) (concluding that mere speculation about what an expert would provide favorable testimony fails to satisfy *Strickland*'s prejudice prong and will not sustain a claim of ineffective assistance of counsel).

*Jewell v. Dunn*, No. 218CV01258RDPSGC, 2019 WL 6975135, at *5 (N.D. Ala. Dec. 20, 2019).

As reasoned by the ACCA, the record confirms that Ms. Currie was presented by Deardorff at the Rule 32 hearing to testify as to the failure of the State's expert, Dale Carter, "to meet contemporary standards" in his duct tape analysis.[37]  (Doc. 15-29 at 72).  However, when

---

[37] Deardorff argued in his Rule 32 Amended Petition, as he does in his habeas petition, that "Prior to 2007, the FBI employed visual comparisons in combination with physical measurements, scanning electron microscopy/energy dispersive X-ray spectroscopy (SEM/EDS) and X-ray diffractometry (XRD)."  (Doc. 15-29 at 72; Doc. 1 at 32-33).  Mr. Carter, however, based his analysis on solely a visual comparison of the two duct tape samples in determining that they came from the same roll. (Doc. 15-29 at 72).  Deardorff contends that a defense hired expert could have explained to the jury "how Mr. Carter's reliance solely on visual comparison failed to meet the FBI standards at the time of trial."  (*Id.*).

questioned, Ms. Currie was unable to testify as to the FBI standards in place at the time of Deardorff's trial, nor could she confirm whether the method of testing/analysis she proscribed ("matching ends") was available at the time of Deardorff's trial:

> Mr. Taylor:    Judge, if I may, our existing claim, Claim 4, is that counsel was ineffective for failing to seek expert assistance as especially Subsection B1, the duct tape comparison evidence.  For me to prevail that they were ineffective on not seeking expert assistance, I have to show it existed, that expert assistance exists, and that's what I'm trying to do with this witness is show - -

> The Court:    Well, if it existed in 2000 and 2001 - -

> Mr. Taylor:    And that's what I'm trying to put her on - -

> The Court:    I haven't heard any testimony either way of whether this type of - - whether the type of testing that was done on the duct tape involved in this case, whether that type of duct tape - - that type of testing existed by this witness or any witness in 2001.

> . . .

> By the Court [to Ms. Currie]:

>     Q.    Are you familiar with the type of testing that was - - that was submitted during this trial back in 2001?

>     A.    I haven't seen the analyst bench notes or anything so I'm not entirely certain what type of testing he did.

>     Q.     So you can't tell me whether that type of testing was available back in 2001 or not if you don't know what type of testing they did, right?

>     A.    Right.

> . . .

> Mr. Taylor:    Judge, my notes have that I have - - I'm calling her to present evidence that counsel did fail to seek expert assistance in this field in general to try to in any way counter the duct tape argument - -

> The Court:    But, Mr. Taylor, she has already testified she has no idea whether any of this expert testimony was available to the defense to have found an expert and we're here 11 years later and in order to find her, you went to California.  I mean, nothing wrong with California but that's a long way away.  It means you had

to go all the way across the country to get somebody here 11 years later to testify to something of which is not even - - was not even an issue in the trial.  So, I mean, until you can make the threshold - - produce the threshold testimony of whether this type of testimony was available to the defense, you can't take the second step as to whether it was ineffective for them not going to find it.

(Doc. 15-70 at 107-110).

By the Court [to Ms. Currie]:

Q:      Do you know how the testing was done back in 2001?

A:      The standards that I've been using were published in 2008.

Q:      So - - I'm not trying to put words in your mouth but does that mean you don't know how it was done in 2001?

A:      The FBI standards that I go off of are reviewed every five years and they add in anything new but generally they follow - -

Q:      Let me back then.  Have you been asked for the purpose of this hearing to go back and review the FBI standards as to end comparisons by tearing or cutting as to what those standards were and those methods that were used back in 2001?

A:      Yes.  But I was unable to find a copy of the standards for 2001.

The Court:      All right.  I don't know where we go from there.  I mean, if she - - even if she can testify that there was that type of testing that was available, she can't testify to what the standards were at that time based on what she just said.  I mean, I don't know.  I don't know any other testimony she can give.
I mean, have you got other witnesses that are going to come in and testify as to what the standards were at that time?

Mr. Taylor:      No, Your Honor.  She was the only duct tape witness we could find - - that we have.  So - -

The Court:      Well, I mean, if there's an objection to her testifying as to what the standard or how she would have tested it based on here standards, I'll sustain that.  I'm not going to allow her to testify how she would have done the testing or what could have been done because that's a totally different standard than what was available back in 2001. . . Because the tape wasn't found until 2001.  Isn't that right?

Mr. Blackburn:      That's correct.  My understanding of the allegation, Your Honor, is that she's not going to say what she would have done.  She's going to say what the standard was such-and-such in 2001 - -

> The Court: - - she just told me she can't - -
>
> Mr. Blackburn:          Correct.  And that's why the State moves to exclude her.
>
> The Court:          And I'm going to sustain if that's the purpose of what you're offering her for, Mr. Taylor, is for her to testify as to what the standards were.  She's just said she can't tell us what the standards were in 2001.

(Doc. 15-70 at 115-17).  The testimony confirms that Deardorff failed to establish at the evidentiary hearing that an expert was available to testify at trial or what the expected content of that testimony would have been.  Furthermore, he provided nothing to support a finding that, even if this evidence was available, it would have created a reasonable probability the outcome of the trial would have been different - in fact, the record belies such a suggestion.

Review of the record confirms that the State put forth ample evidence at trial connecting Deardorff to the crime, including cash from Mr. Turner's negotiated checks that was seized from Deardorff, Mr. Turner's credit cards were used to purchase repair parts matching vehicles owned by Deardorff, Mr. Turner's body was found in close proximity to Deardorff's former residence and at a location where he previously hunted, as well as testimony that Deardorff was the "leader" of his co-defendant. (Doc. 15-17 at 18, 22).  Accordingly, Deardorff has not demonstrated a reasonable probability that the result of the proceeding would be different had the jury heard testimony disputing the method used by the State's expert in analyzing the duct-tape found at the scene of the crime.  *Harrington*, 562 U.S. at 111-12 ("This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' The likelihood of a different result must be substantial, not just conceivable." (quoting *Strickland*, 466 U.S. at 693)); *see also Berghuis v. Thompkins*, — U.S. —, 130 S. Ct. 2250, 2265, 176 L. Ed. 2d 1098 (2010) (quoting *Strickland*, 466 U.S. at 695) (In determining

prejudice, courts are to consider "the totality of the evidence before the judge or jury."). Mere speculation that an expert's opinion would have been beneficial to his case is simply insufficient to establish ineffective assistance. *See e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (*quoting Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)). Consequently, Deardorff has not shown under *Strickland* that counsel's performance was constitutionally deficient or prejudicial, and the ACCA's decision is afforded AEDPA deference. *Cf., Woolley v. Rednour*, 702 F.3d 411, 423 (7th Cir. 2012) (Defense counsel's failure to retain an expert witness, ask for a continuance, or move to bar expert's testimony due to untimely disclosure fell below the "objective standard of reasonableness" required by *Strickland*. However, the state court's finding that defendant suffered no prejudice as a result of the performance survived AEDPA scrutiny.)

Next, and likewise, Deardorff is not entitled to relief on his claim that counsel rendered ineffective assistance by rejecting or failing to seek a trial continuance. First, Deardorff has failed to show that counsel's decision was unreasonable under the circumstances. *See generally*, *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." (quotations omitted). As in all circumstances, counsel's performance is evaluated based on the reasonableness of his actions, and "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691; *see also Mulligan v. Kemp,* 771 F.2d 1436, 1441 (11th Cir. 1985) ("A defendant's Sixth Amendment rights are his alone, . . . it follows that, in evaluating strategic choices of trial counsel,

[the Court] must give great deference to choices which are made under the explicit direction of the client."). Trial counsel, Mr. Doerr, testified at the Rule 32 hearing that he considered the State's offer to agree to a continuance but rejected it for strategic reasons, namely that "Mr. Deardorff did not want a continuance." (Doc. 15-70 at 156). Mr. Doerr further testified that he was "sure" that Deardorff thought the State would be less prepared if they went ahead and had the trial (Doc. 15-70 at 197), and this belief is borne out by record.[38] Where Mr. Doerr advised Deardorff on the harm of rushing into trial, but Deardorff insisted on proceeding,[39] counsel's decision to abide by his wishes cannot be said to be professionally unreasonable, *see Prevatte v. French*, 499 F. Supp. 2d 1324, 1329 (N.D. Ga. 2007) ("[W]here . . . counsel advises a defendant as to the benefits of seeking a continuance, and that defendant, against the advice of counsel, instructs his attorneys not to seek a continuance and insists upon proceeding to trial quickly based upon his belief that the

---

[38] An October 14, 1999, recorded jailhouse telephone conversation between Deardorff regarding the benefits of and need for filing a motion for a speedy trial. (*See* Doc. 15-41 at 149). Deardorff indicates during the conversation that the State has "no proof" that he committed a crime and will likely use Peacock to turn evidence against him. (*Id*. at 171, 171-76). Deardorff surmises that a filed motion for a speedy trial forces the State into an impossible position of getting the cases ready in six months. (*Id*. at 172, Deardorff stating, "I need a speedy trial filed because there's no way with all his cases they can get [Peacock] in front of that judge in 6 months [in order to testify against me]. It's im-fucking-possible.").
The record further reflects that a motion for a speedy trial was filed by trial counsel approximately one month after court appointment. (Doc. 15-1 at 62, 121-122).

[39] Specifically, Mr. Doerr testified at the Rule 32 hearing:

> A.    The client didn't - - Mr. Deardorff did not want a continuance. He said under no circumstance did he want a continuance. The State offered us a continuance. And like I said, even when 9/11 occurred when we were picking the jury, the State said that they would agree to a mistrial if we wanted to just postpone it but Mr. Deardorff did not want to postpone his trial.
> Q.    And you explained to Mr. Deardorff your need to do additional - -
> A.    Absolutely.
> Q.    - - on this evidence?
> A.    Yeah. If you get in a hurry, you just get in a jury to get convicted. Yes, sir.

(Doc. 15-70 at 156).

State will be unable to prepare its case in time, the Court will not hear that defendant complain, literally decades later, that counsel's decision to abide by his wishes was professionally unreasonable."), especially in a case such as this where defense counsel was already aware of abundant State's evidence against him, including the confession and testimony of his codefendant, Mr. Peacock. *See Mulligan v. Kemp*, 771 F.2d 1436, 1443 (11th Cir. 1985) (Where counsel knew there would be strong evidence adduced against defendant, the additional effect of "surprise evidence" on an already strong state case was not overwhelming and did not constitute ineffective assistance.).    Second, as previously discussed, Deardorff has failed to show the outcome of his trial was prejudiced by counsel's failure to obtain a duct tape.  Consequently, he has failed to show the outcome of his trial was prejudiced by counsel's failure to seek a continuance to obtain a duct tape expert duct-tape.

Last, Deardorff further claims that the court erred in denying him the opportunity to present the testimony of Ms. Gillian Currie at the Rule 32 evidentiary hearing and now requests a hearing followed by *de novo* review of the claim.  (Doc. 1 at 31).  Respondent asserts that this claim is procedurally defaulted (Doc. 13 at 30-33), which Deardorff disputes.[40] (Doc. 16 at 14-15).

---

[40] Relying on *Ex parte Borden*, 60 So. 3d 940 (Ala. 2007), Deardorff asserts that 'waiver of an argument for failure to comply with Rule 28(a)(1), Ala. R. App. P., is limited to those cases where there is no argument presented in the brief and there are few, if any citations to relevant legal authority, resulting in an argument consisting of undelineated general propositions.' (Doc. 16 at 15) (quoting *Borden,*, 60 So. 3d at 944).

In *Borden*, the petitioner argued that the ACCA erred in holding that he failed to comply with Rule 28(a)(10) regarding his ineffective assistance of counsel claims.  The Alabama Supreme Court found:

> Borden's brief to the ACCA included 22 pages of facts addressing why the trial court erred in summarily dismissing the ineffective-assistance -of counsel claims in his Rule 32 petition.  Borden's brief included 11 pages of argument regarding ineffective assistance of counsel, including some 25 citations to caselaw, along with explanations and quotations form the cited cases. . . . [And, a]lthough another

Turning to the state court record, the ACCA affirmed the circuit court's exclusion of Ms. Gillian Currie's testimony, holding that Deardorff's claim failed to comply with Rule 28(a)(10), Ala. R. App. P., stating:

> …Rule 28(a)(10) requires that an argument contain "the contentions of the appellant/petitioner with respect to the cases, statutes, other authorities, and parts of the record relied on."  Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed.  *Hamm*, 913 So. 2d at 486.  Authority supporting only "general propositions of Law" does not constitute a sufficient argument for reversal.  *Beachcroft Props., LLP*, 901 So. 2d at 708 (quoting *Geisenhoff*, 693 So. 2d at 491).  *See also Spradlin*, 601 So. 2d at 78-79.  Thus, to obtain review of an argument ton appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal.
>
> In this section of his brief, Deardorff does not provide any citations to the record. Further, he has not provided any citations to legal authority for his argument that . . . Currie should have been allowed to testify.  (Deardorff's brief, at 36-38.). Consequently, Deardorff has not complied with Rule 28(a)(1), Ala. R. App. P., and this argument is not properly before this Court.

(Doc. 15-78 at 90-91).

Alabama's Rule 28(a)(1) is a procedural rule, requiring a petitioner to file a pleading in proper form or suffer waiver of his claim. "The purpose of Rule 28, Ala. R. App. P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So.3d 940, 943 (Ala. 2007); *see also Wagner v. State*, 197 So.3d 517, 520 n.3 (Ala. 2015) ("It is well

---

attorney may have treated the ineffective-assistance-of-counsel argument differently, Borden's brief is sufficient to apprise the Court of Criminal Appeals of Borden's contentions with regard to his ineffective-assistance-of-counsel claims. Accordingly, Borden did not fail to comply with the Rule 28(a)(10) and therefore did not waive his claims of ineffective assistance of counsel.

*Ex parte Borden*, 60 So. 3d 940, 944 (Ala. 2007).

settled that it is not the function of this Court to create legal arguments for the parties before us."). The procedural rule is essentially an effort at judicial economy, *Ex parte Borden*, 60 So. 3d 940, 943 (Ala. 2007), which "is not to be applied lightly". *Morris v. State*, 261 So. 3d 1181, 1194 (Ala. Crim. App. 2016). "Rule 28(a)(10), as well as its predecessor Rule 28(a)(1), [are] firmly established and regularly followed" in Alabama courts. *James v. Culliver*, 2014 WL 4926178, *14 (N.D. Ala. Sept. 30, 2014).[41]   Accordingly, federal habeas courts have routinely deemed claims dismissed pursuant to Rule 28(a)(10) as procedurally defaulted.[42]

In challenging the circuit court's exclusion of Gillian Currie's testimony, Deardorff asserted:

> [] Currie was not called to testify to the ultimate issue presented in Claim 4 – the accuracy of the State's duct tape expert's analysis of the duct tape evidence in this case. Rather, Currie was called to testify to the general science behind the analysis of "fracture points" in duct tape, to contradict certain assertions made by Carter during his testimony, and how trial counsel should have responded to those assertions. Currie would also have testified about why access to the State's physical evidence, and to Carter's analyses of that evidence, are critical to proving the ultimate issue in Claim 4. Given that Currie was called to testify as to subjects either from her own expert knowledge and from her review of Carter's testimony, the court's exclusion of any testimony by Currie was erroneous.

(Doc. 15-76 at 53-54). This threadbare argument exemplifies the type claim Rule 28 seeks to curtail, as it provides no citations to relevant cases or an analysis of why those cases or other authorities support an argument that an error occurred, nor does Deardorff cite to relevant portions of the record. And while "a habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice", *Borden*, 646 F.3d at 808 n.26 (11th

---

[41] *See Taylor v. Dunn*, No. CV 14-0439-WS-N, 2018 WL 575670, at *15, n.19 (S.D. Ala. Jan. 25, 2018) (listing cases where failure to comply with Rule 28(a)(10) resulted in waiver of argument).
[42] *See Id.* at *15, n.20 (listing cases).

Cir. 2011), Deardorff does not argue that either exception exists.[43]  Because the ACCA dismissed this claim on an independent and adequate state ground, it is procedurally defaulted from federal habeas review.

Even if this claim was not procedurally defaulted and therefore barred from habeas review, the Court would be obliged to deny it on the merits.  Based on Deardorff's Amended Rule 32

---

[43] The Court is not persuaded by Deardorff's assertion that "it was not [his] fault that he was deprived of the opportunity to present testimony in support of this claim" in state court, thus he is entitled to an evidentiary hearing in federal court pursuant to *Williams v. Taylor*, 529 U.S. 420 (2000). (Doc. 1 at 31).  The Supreme Court reaffirmed such position recently in *Shinn v. Ramirez*, 142 S. Ct. 1718, 1735 (2022):

> if a prisoner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may hold "an evidentiary hearing on the claim" in only two limited scenarios. Either the claim must rely on (1) a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by this Court, or (2) "a factual predicate that could not have been previously discovered through the exercise of due diligence." §§ 2254(e)(2)(A)(i), (ii). If a prisoner can satisfy either of these exceptions, he also must show that further factfinding would demonstrate, "by clear and convincing evidence," that "no reasonable factfinder" would have convicted him of the crime charged. § 2254(e)(2)(B). Finally, even if all of these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence. Like the decision to grant habeas relief itself, the decision to permit new evidence must be informed by principles of comity and finality that govern every federal habeas case. Cf. *Brown*, 596 U.S., at —— – ——, 142 S. Ct., at 1523–1524.

*Id. at* 1734 (emphasis in original).  Accordingly, Deardorff has failed to demonstrate the exceptions of § 2254(e)(2), citing no new rule of constitutional law that was previously unavailable or made retroactive to cases on collateral review, producing no new factual predicate that could not have been previously discovered through the exercise of due diligence, nor has he shown facts sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty, and is not entitled to an evidentiary hearing and *de novo* review.

Furthermore, the record solidly supports that an evidentiary hearing was held on August 7, 2012, where Deardorff presented witness testimony, his claims were allowed full briefing, an additional hearing was held on December 20, 2012, where the circuit court explained why Deardorff would not be granted an additional day to present evidence and argument was heard as to allow Deardorff to present evidence to the court through proffered affidavits.  (*See* Docs. 15-37; 15-70; 15-71; 15-75 at 66-99; 15-76).  Accordingly, the record reflects that Deardorff has had ample opportunity to present his claims before the state court.

Petition, the record confirms, Ms. Currie was called to testify as to how "Mr. Carter's methodology for comparing duct-tape samples was fundamentally flawed." (Doc. 15-29 at 71-72). Specifically, Ms. Currie was produced to establish that "Mr. Carter's methodology failed to meet contemporary FBI standards" at the time of the trial. (*Id*. at 72). Review of the Rule 32 hearing transcript demonstrates that Ms. Currie repeatedly testified that she was unable to render an expert opinion on that subject. (*See supra*; Doc. 15-70 at 107-117). Deardorff thus had the opportunity to develop his claim in the state court post-conviction proceedings but failed to do so. Consequently, Deardorff is not entitled to relief or an evidentiary hearing on this claim. *See Shinn,* 42 S. Ct. at 1735 (noting that a prisoner is responsible for attorney errors occurring during postconviction proceedings, including counsel's negligent failure to develop the state postconviction record, and must satisfy requirements of §2254(e)(2)).

### e. Deardorff claims trial counsel provided ineffective assistance of counsel in the penalty phase by failing to adequately investigate and present mitigation evidence.[44]

Deardorff alleges in his petition that trial counsel failed to adequately prepare or present a mitigation defense when they failed to investigate Deardorff's life, retain a competent mitigation expert, prepare Mr. Deardorff and his mother to testify, request and review Mr. Deardorff's U.S. Navy records, and have Mr. Deardorff psychologically evaluated. He asserts that but for this deficient performance, there is a reasonable probability that the jury's 10-2 recommendation for death would have been different. (Doc. 1 at 36-37). Respondent contends that this claim is procedurally barred from review based on the ACCA's denial of the claim for failure to comply with Rule 28(a)(10) of the Ala. R. App. P., as well as Deardorff's failure to carry his burden to establish ineffective assistance. (*See* Doc. 15-78 at 104-07).

---

[44] Presented as Claim VII of habeas petition. (*See* Doc. 1 at 36-46).

Review of this claim requires tracing and understanding its progression through the state courts.

## **Penalty Phase**

At the penalty phase before the jury, the State argued two aggravating circumstances: (1) the capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, robbery, burglary, or kidnapping, and (2) the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses.  (Doc. 15-22 at 133, 136, 142).   Deardorff put forth two witnesses – himself and his mother, Laura Byrd.

Ms. Byrd testified that her son was a "normal boy" until he joined the Navy, where he "was involved in things [that] changed his personality a lot", making him "harder, not [] showing his emotions as much as he normally did." (Doc. 15-22 at 98-99).  She testified that he has a daughter he loves very much, despite his tendency to be reserved with his emotions.  (*Id*. at 99-100).  She further testified that she believed in his innocence and pointed to the inconsistencies in codefendant Millard Peacock's testimony and questioned the veracity of the codefendant's statements.  (*Id*. at 100).  Upon cross-examination, Ms. Byrd was harshly questioned regarding Deardorff's discharge from the Navy (*Id*. at 101-106),[45] including exchanges like the following:

Q.      He did not leave the United States Military on honorable conduct, did he?

A.      No, he did not.  He was guaranteed a shore duty in his second reenlistment.

Q.      He was discharged for bad conduct; was he not?

A.      Would you like me to answer that?

---

[45] Notably, prior to trial, on July 30, 2001, the State filed a notice of intent to use 404(B) evidence which included Deardorff's dishonorable discharge from the military, prior convictions, prior statements made by Deardorff regarding prior killings and the disposal of bodies.  (Doc. 15-2 at 139-40).

Q.      Yes, ma'am. I want you to answer whether he was dishonorably discharged from the United States Military.

A.      Mr. Whestone, I told you I have never seen discharge papers.  I cannot tell you exactly what it says. I can tell you the circumstances why he left the military.  You asked me was it honorable.  I do not know.

Q.      You and he have never discussed the fact of his discharge from the United States Military?

A.      You asked me how he was discharged and I can tell you the circumstances.  What is written on the discharge papers, I do not know.  I've never seen them.  I know there are different categories.  I know it's other than honorable.  It may be dishonorable.  It may be general.  I really could not tell you and not lie to you that I know for sure.  I do not.  I know the circumstances, but that's as far as I know.

. . .

A.      He felt since the Navy did not fulfill their part of the agreement, he did not fill his.  He did not report for duty.

Q.      So he did not want to - - he felt like the Navy had done him wrong?

A.      True.

Q.      And so in his actions in return - -

A.      Was to stay at home and not report to duty.

. . .

Q.      How long did it go on between the Navy and him before the Navy found him?

A.      A very short time.  I really don't know.

Q.      A week?

A.      Mr. Whetstone, you're asking me something that happened 13 years ago and I've had three strokes since then and I could not tell you for sure.

(*Id*. at 101-102, 104).  She was further questioned by the State about her jailhouse telephone conversations with her son, where he admitted having information about Mr. Turner's body and conspired with her to have evidence suppressed, in part, as follows:

Q.      But you knew that Don knew where the body was located on the first telephone call?

A.      Don told me due to some things Mr. Peacock has told him, he felt he might know where the body. He felt from whatever was said at the bond hearing, which, of course, I wasn't there, that he felt something had to do with Mr. Turner.

. . .

Q.      In fact, you and Don attempted to block evidence coming before this jury by getting a car title changed. Do you remember that conversation you had on the tape?

. . .

Q.      He wanted to get the evidence suppressed, the gun and the money, didn't he?

A.      Yes, he did.

Q.      And he wanted to do that by getting you to go to her to change a document?

A.       He asked me about it, yes.

        Mr. Whestone:          Right. I pass the witness.

        Mr. Doerr:             No further questions.

(*Id*. at 107-111). Deardorff then took the stand and testified in narrative form, declaring his innocence of all charges and expounding upon his mother's testimony and the questions she was asked, stating in part:

[D]espite your unanimous decision that I'm guilty. I exert my innocence of all charges.

You heard Mr. Whestone bash my mother. Well, this is about me. It's not about my family. But throughout this whole case, that's really what it's been about. Mr. Whestone and the TV. Mr. Whestone and the papers. All about bashing my family and that's what his intention was here today. My mother said I have a hard time with my emotions. I keep them bottled up. Right now it's hard to get up here and talk to you, but I don't care what you do. You vote life without, you vote death. It doesn't matter. I'm not guilty.

He asked you about my military experience.  What I did is classified.  I'm not going to tell you what I did.  I'm going to tell you I saw some things that I shouldn't have saw.  It made me lock up those emotions so I wouldn't express them.

Did I leave?  Yeah.  Let me tell you about this discharge he's telling you about.  I reenlisted.  I was in a hot unit.  We stayed at sea consistently, I mean, nonstop.  My first four years, I think I stayed home about eight months.  The rest of the time, I was out somewhere.  I reenlisted.  I was a frocked T-6.  Some of you with military experience might know what that is.  I made E-6 through command advancement in five years, which is practically unheard of.  I was frocked, I was wearing E-6 strips, but I wasn't getting paid for it.  I was in a fourth increment cycle.  I probably would have started getting paid for it in seven or eight months.  That's how good I was.  I don't' have to sit and brag to you or convince you of it.  That's how good I was.

What my mother referred to as what my commanding officer said was, and I'll tell you exactly what he said, he said I was so damn good at what I did, it would take three or four people to replace me.  So, therefore, I wasn't going anywhere as long as he could stop it.  So after going to sea again, working seven days a week and I had 14 people I was responsible for.  I lived an hour away from the base.  By the time I drove back and forth to work every day, I put in about a 20 hour day.  I had had enough.  I was burned out.  I was through with it.  I said I need to go on an leave.  Can't give you a leave right now.  We've got too much going on.

So I said - - I took what's referred to in military terms as whether leave.  I'm taking leave whether you give it to me or not.  So I took it.  I called them.  I said I'm not coming in.  I'll be at home when you get ready for me.  I think I stayed home about 35 days when they finally came out and got me.  It wasn't a big show up with the guns as these people are so famous for, overwhelming force.  They simply came out and said, Don, we need you to come back and let's talk about it, and sure I did.  They took a stripe and said we're going to process you for a general discharge.  Get you on about your way.  We just don't think you're compatible anymore.  Okay.  Fine.

Well, then they came back and said, you know what, Don?  We've got something we want you to do and we're just going to overlook this right now. We want you to handle this for us, and I did, and it still drug on.  This happened in 1989, early '89. I think they've got some records.  My discharge wasn't until '91.  So, does that tell you what kind of a person I was in the military?

I took off.  I left.  I quit. They had to come and get me.  But I was so good, they kept me around for two more years.  And what does that have to do with this case? Absolutely nothing.  Why did they bring it up?  Once again to bash me.

I tell you again, you make your decision.  I have to live with it and so do you.  I didn't do anything to Ted Turner. . . .

(Doc. 15-22 at 111-115).

In closing arguments, the State maintained Deardorff had no respect for the law, analogizing his military desertion, when he felt "wronged", to the kidnapping and killing Mr. Turner, when he again thought he had been wronged. (*Id*. at 126). Mr. Doerr urged in closing that the jury vote to spare Deardorff's life, asking the jury to "consider what you would do if you were innocent and you couldn't prove it." (*Id*. at 130). Mr. Doerr further stated to the jury that he believed they "made an error in this case . . . a grave error" and "ask[ed] that [the jury] give Don and [him] the time to prove [Deardorff's] innocence" by not voting for a sentence of death. (*Id*. at 131). After deliberations, the jury recommend, by a 10-2 vote, that Deardorff be sentenced to death. (*Id*. at 196-97).

At the sentencing hearing, Deardorff addressed the circuit court and made the following statement:

> Of course, I maintain my innocence as I have been. I hate to disappoint Mr. Whestone with his political agenda, but if he thinks I'm bowing down or I'm terrified to die or anything like that, I hate to disappointment you, but I'm not. We all start dying the day we're born. And I'll maintain my innocence whether it be now, next year, or ten years, whatever the case may be.

> I would say to you, not that you're in any way political agenda, but bring the death penalty. It doesn't fear me. It's what the State wants. Bring the death penalty. We'll work it out on appeals. As far as Baldwin County, I don't expect to get any consideration here. So you do what you feel you need to do and I'll accept that. I thank you for the time.

(Doc. 15-22 at 193-94). The trial judge found the existence of two aggravating factors: (1) that the offense was committed while Deardorff was engaged or was an accomplice in the commission of a robbery, a burglary, and a kidnapping (Ala. Code § 13A-5-49(4) and (2) that the offense was especially heinous, atrocious and cruel (Ala. Code § 13A-5-49(8). (Doc. 15-1 at 32-35). The court found that no statutory mitigating factors existed but noted the consideration of nonstatutory mitigating circumstance provided in testimony by the Defendant and his mother. (Doc. 15-1 at

32-35).  Specifically, the court stated it "considered the family life of the Defendant, his past life experiences and his past service in the military.  The Court also considered the Defendant's testimony in continuing to maintain his innocence." (*Id*. at 35).  Taking into account the testimony heard at the guilt and penalty phase of the trial, the jury's recommendation of death by a vote of 10-2, the presentence investigative report, the sentencing hearing, and the aggravating and mitigating factors, the Court found that "the aggravating circumstances outweighed the mitigating circumstances and were sufficient to uphold the jury's recommendation of punishment of death." (*Id*. at 35-36).

### **Rule 32 Postconviction Proceedings**

As part of his postconviction Rule 32 proceedings, Deardorff raised the current habeas claim and challenged trial counsel's performance during the penalty phase of his trial.[46] (*See* Doc. 15-29 at 131-69, ¶¶ 338-453).  According to Deardorff, professional prevailing norms required counsel to obtain a psychological evaluation of Deardorff and pursue an adequate and reasonable investigation into every avenue of Deardorff's life.  Deardorff took specific issue with counsel's failure to obtain Deardorff's "military records, [as they] necessarily contain comprehensive educational, professional, disciplinary, medical and psychological information" (Doc. 15-29 at 138-39), counsel's failure to obtain a qualified mitigation expert (*id*. at 135-38), and counsel's failure to interview and prepare penalty phase witnesses for testimony. (*Id*. at 139-44).  In his Amended Petition, Deardorff thoroughly articulates the mitigating factors discovered through postconviction investigation, arguing that had such evidence been presented there is a reasonable

---

[46] Specifically, Deardorff maintained that trial counsel "based their entire mitigation case on an unlawful mitigating factor; they failed to seek expert assistance to assess Mr. Deardorff's mental health; they failed to request any records which would have presented substantial mitigation evidence; they failed to hire a competent mitigation investigator, and; they failed to locate and prepare witnesses to testify on Mr. Deardorff's behalf." (Doc. 15-29 at 131-132).

probability that at least one more juror would have been persuaded to vote for life, and the result of Deardorff's trial would have been different, citing Ala. Code § 13A-5-46(f). The trial court granted an evidentiary hearing on this claim (and all other claims which survived summary dismissal), and Deardorff informed the court through a submitted witness list, that he intended to call over thirty (30) witnesses at the hearing, and, in regard to the current claim, he intended to call two expert witnesses, trial counsel, and 13 lay witnesses. (Doc. 15-32 at 26-99, 164). Thereafter, the circuit court scheduled a two-day Rule 32 evidentiary hearing for August 7 and 9, 2012. (Doc. 15-31 at 15-16; Doc. 15-75 at 61-62).

At the August 7, 2012 hearing, Deardorff called two witnesses related to the current claim - his trial counsel, Mr. Doerr and Mr. Bellucci. Mr. Doerr, as Deardorff's lead trial counsel, testified that at the time of Deardorff's trial, he had previously tried three capital murder cases and at least 50 felony jury trials, was board certified by the National Board in Criminal Trial Advocacy, and a member of the American Bar Association, Baldwin County Bar Association, and National Association of Criminal Defense Lawyers. (Doc. 15-70 at 194-95). Mr. Doerr testified that he was aware of the ABA's guidelines that a mitigation investigation should be performed regardless of whether or not a convicted defendant maintains his innocence. (*Id*. at 201). When questioned about "what mitigating factors or evidence [he] attempted to put on", Mr. Doerr replied, "Don't have any idea." (*Id*. at 189; *see also id*. at 201). He did recall obtaining some school records but no mental health records (as Deardorff "seemed to be . . . a smart guy"), Navy records, or criminal records.[47] (*Id*. at 189, 192-93). He was not able to recall specifically if he interviewed members

---

[47] Notably, on July 30, 2001, the State filed a Notice of Intent to Utilize 404(B) Evidence at trial, which included "Evidence of Defendant Deardorff's dishonorable discharge from the Military", "Evidence of Defendant Deardorff's prior forgery convictions", "Evidence of statements made by Defendant Deardorff regarding prior killings and the disposal of bodies", "Evidence of Defendant

of Deardorff's family (and the proffered evidence affirms counsel did not), he testified that he "of course, [] talked to Don." (*Id*. at 188).  He also confirmed that a mitigation expert, Mr. Aaron McCall, was hired but performed little substantive work and it was later discovered that Mr. McCall was under federal supervision at the time he was hired by counsel.  (*Id*. at 189-90).  Mr. Doerr testified that when it did not "work out" with Mr. McCall, no other mitigation expert was hired.  (*Id*. at 191-92).  When Mr. Doerr was questioned on cross examination about the failure to hire a subsequent mitigation expert, the following transpired:

> A.   It was my understanding that Don just would not talk to [Aaron McCall] and Don originally told me he just didn't want any mitigation.  He didn't want people prying into his family.

> Q.   And did Mr. McCall to your knowledge attempt to contact Mr. Deardorff's family members for the purpose of obtaining mitigating evidence?

> A.   He says that in the letter that the other attorney sent.

> Q.   But other than the letter, you have no independent recollection?

> A.   No, sir.

> Q.   You testified a moment ago that you chose not to hire another mitigation expert because you were told not to?

> A    Yes, sir.

> Q    Who told you not to do that?

> A    Don did not want any mitigation evidence presented.

> Q    Did he say why he did not want that?

> A    He may have but, really, at this point, I can't tell you why.

> Q    Do you recall, yes or no, whether Mr. Deardorff wanted arguments related to his innocence or guilt to be presented during penalty phase?

---

Deardorff's prior conviction or involvement of a automobile theft", "Evidence of a prior conviction or involvement in a theft involving deception", "Evidence regarding the death of Lawrence Jones and the forgery of his will".  (Doc. 15-2 at 139-40).

> A      I believe that - - he was - - yes.  I believe it was but, I mean, I don't have an independent recollection but I know that he was stunned by it and was angered by their decision to find him guilty in the face of numerous snitches from the jail and Peacock who, you know, essentially admitted that he shot Mr. Turner and still walks free.

(Doc. 15-70 at 198-99).  Trial co-counsel, Mr. Bellucci, testified that his first and only capital case was Deardorff's.  (Doc. 15-70 at 202).  He testified that he did not recall meeting with Aaron McCall nor did he recall researching or presenting any of the statutory mitigation factors laid out in Ala. Code § 13A-5-51.  (Doc. 15-71 at 19).  He further testified that he knew Deardorff served in the Navy but did not request Navy records.  (*Id*. at 20).  Nor did he recall requesting medical records, criminal records, or interviewing family members in preparation for the penalty phase.  (*Id*.).  When specifically asked what the mitigation strategy was, Mr. Bellucci testified he "[had] no memory of mitigation."  (*Id*. at 19).

At a post-hearing conference, in chambers, on August 7, 2012, the court reconsidered its earlier decision to schedule a two-day evidentiary hearing and determined that the second-day hearing would not be held.  (Doc. 15-37 at 16, 32).  Deardorff then moved to proffer evidence (20 affidavits) necessary to meet his burden of proof for the surviving Rule 32 claims, arguing that he had been prevented from presenting necessary testimony from experts and lay witnesses in support of his claims when the court rescinded the order permitting future testimony.  (*Id*. at 30-38).  A status hearing was conducted on December 20, 2012, to "wrap up" outstanding issues, and the court granted Deardorff permission to submitted affidavits and exhibits as proffers and the parties were allowed to file post-hearing briefs.[48]  (*See* Doc. 15-75 at 66-99).  In his post-hearing brief,

---

[48] At the hearing, the court discussed its reasoning in denying additional hearing days for testimony on Deardorff's remaining Rule 32 claims, as well as whether proffered evidence should be admitted into the record, explaining:

Deardorff urged that his *Strickland* burden was satisfied by the record evidence and recounted the

pertinent proffered evidence, as follows:

> **Dr. DeFilippsis**[sic] has provided substantial expert analysis and evidence which
> form the bases, in part, of these claims.  In preparation for the Petition, Dr.
> DeFilippsis[sic] evaluated Mr. Deardorff via an in-person battery of evaluation
> tests, an interview with Mr. Deardorff's mother, and review of the [] interviews and
> records [reviewed by Dr. Cunningham].  *See* DeFilippis Report at pp. 5-6.  Based
> on this comprehensive evaluation, Dr. DeFilippsis[sic] has concluded that Mr.
> Deardorff suffers from BiPolar II disorder.  Report at pp. 12-13.  He explains that
> this disorder has a genetic component, that was exacerbated by his childhood
> environment.   Dr. DeFilippis opines that Mr. Deardorff exhibited "possibly
> delusional" behavior during his penalty-phase testimony.  *Id.* at p. 11.  Regarding
> Claim 9, Dr. DeFilippsis'[sic] evaluation, in combination with that of Dr.
> Cunningham, leads to the conclusion that Mr. Deardorff likely was not mentally
> capable of planning Mr. Turner's kidnap and murder, or of persuading Mr. Peacock
> to join in that endeavor.
>
> **Dr. Cunningham** has provided substantial expert analysis and evidence which for
> the bases, in part, of these claims.  In preparation of the Petition, Dr. Cunningham

---

> Well, I think the reason I agreed for the proffers to be done was because at the
> conclusion of the hearing, I made a ruling that I did not think that anything that the
> additional witnesses who were unable to be here at the time - - I thought I had made
> the ruling that based on relevance or the allegations made by Mr. Deardorff in his
> petition that on their face, they would not stand.
>
> And so because of that, there would be no relevance in hearing from those witnesses
> but I granted the petitioner leave to at least put a proffer on the record of what they
> would have testified to had they been allowed to so that that would be included in
> the record because the appellate court has no - - nothing to look at if I just say the
> person in not allowed to testify and so we're going to say, well, we'll let their
> proffer be on the record.
>
> So it's my - - I took the position, I thought, that I had already ruled that none of this
> was relevant - - would be relevant based on the allegations that were remaining in
> the petition, but that these were only being allowed - - these affidavits or proffers
> were being allowed or introduced to supplement the record for any appeal of those
> issues to the appellate court.

(Doc. 15-75 at 77-78).  The State thereafter argued that case law supported admittance of the
proffered evidence (from those persons included in Deardorff's submitted witness list who were
to be called at the subsequent hearing) to comply with the court's duty to make written findings of
facts as to the surviving Rule 32 claims, since the hearing was cut in half.  (*Id.* at 78-80).

conducted "an extended in-person interview of Mr. Deardorff; telephone interviews with Mr. Deardorff's mother, Laura Byrd; his sister, Judi Shuger; his maternal great-uncle, Clyde Burch; and his adoptive father, Clarence "Pete" Deardorff.  Dr. Cunningham has also reviewed Mr. Deardorff's Navy records and the transcript of the penalty phase of trial and the judicial sentencing hearing."  See Cunningham Affidavit at pp. 3-4.  Based on this comprehensive evaluation, Dr. Cunningham has concluded that Mr. Deardorff's family displays symptoms of hereditary mental illness, including mood disorders, personality disorders and schizophrenic symptoms. (Amended Petition at ¶257).  He has further identified twenty-three (23) negative developmental factors which, even notwithstanding Mr. Deardorff's exposure to hereditary genetic mental illness, would have had a detrimental effect on Mr. Deardorff's mental development.  (*Id.* at ¶385).

**Laura Byrd**, Petitioner's mother, was not prepared to testify at the penalty phase of trial.  Had she been prepared, she would have testified about her physically and emotionally abusive relationship with Petitioner's father and her subsequent, physically abusive relationship with Petitioner's adoptive step-father.  She also would have testified about her own mental impairments and those in Petitioner's maternal family.   She would have testified about head injuries that Petitioner sustained during childhood.  *See* Laura Byrd Aff at ¶¶ 3-64.

**Aaron McCall**, the defense investigator for Petitioner's trial, was hired by trial counsel, Doerr and Bellucci, to perform a mitigation investigation prior to Petitioner's capital murder trial.  His affidavit asserts, in relevant part, that he was a convicted felon and under "federal supervised release from when [he] started work on Mr. Deardorff's case on March 1, 2000 until [he] finished all of [his] investigation in the case on February 8, 2001.  [He] also made Mr. Doerr and Mr. Bellucci aware when they hired [him] that from on or about August 17, 2000, until January 17, 2001, [he] was confined to [his] home (and needed to seek permission from [his] federal probation officer in order to leave [his] house), as well as monitored 24 hours a day by an electronic ankle bracelet."  Aaron McCall Aff. at ¶¶ 5-6.

**Donald Deardorff's** own affidavit establishes he wanted his trial counsel to conduct an appropriate mitigation investigation for the penalty-phase of his trial and that he never gave them any contrary instruction.  Deardorff Aff. ¶ 8.  Rather, upon being told that Mr. McCall would be his mitigation investigator, Mr. Deardorff raised sensible concerns about having a recently convicted felon work on his case.  *Id.*

(Doc.15-64 at 89-90).

Having heard the testimony presented at the August 7, 2012 evidentiary hearing and having reviewed the proffered evidence and full briefings by the parties, the Circuit Court denied Deardorff's Rule 32 amended petition, stating as to the current claim:

In paragraphs 338 through 453 of his petition, Deardorff alleges that his trial counsel were ineffective in the presentation of mitigation evidence during the penalty phase. Deardorff fails to carry his burden of proving this claim.

Initially, Deardorff did not question trial counsel about the mitigation evidence alleged in his amended petition, or ask them how that evidence would have affected their mitigation case. See, e.g., Sheffield [v. State,] 87 So. 3d [607,] 636 [(Ala. Crim. App. 2010)] ("Sheffield did not question his trial counsel [at the hearing on the motion for new trial] as to why counsel chose not to request a limiting instruction. To hold that trial counsel was ineffective based on the asserted ground would call for speculation, which we will not do."); see also Martin [v. State,] 62 So. 3d [1050,] 1068 [(Ala. Crim. App. 2010)] ("[A]n ambiguous or silent record will not overcome the strong and continuing presumption that counsel's conduct was appropriate and reasonable.").

The Rule 32 transcript established that Deardorff directed his trial counsel not to investigate and present mitigation evidence. [Trial Counsel] Doerr testified that Deardorff was 'uncooperative' and did not want to speak to the investigator, Aaron McCall. When trial counsel became aware of deficiencies in McCall's investigation, Doerr was directed by Deardorff not to hire another mitigation investigator. According to Doerr, Deardorff told him that he did not want an investigator "prying into his family." (Tr. 123.) Moreover, Doerr testified that Deardorff said he "did not want any mitigation evidence presented." (Id.) Instead, Deardorff wanted to continue to argue his innocence in the penalty phase, which he did.

The transcript shows that trial counsel presented the testimony of Deardorff's mother, Laura Byrd, and Deardorff himself. Byrd testified that Deardorff's childhood was 'normal,' but that Deardorff was 'harder' and 'reserved in his feelings' after five and a half years' service in the Navy. Byrd further testified that Deardorff "loves people" and had a ten-year-old daughter, whom he loves. Byrd stated that she believed her son was innocent of capital murder, and she asked the jury to spare his life. The decision to present the testimony of Deardorff's mother was reasonable. See, e.g., Johnson v. Upton, 615 F.3d 1318, 1338 (11th Cir. 2010) ("[I]t was reasonable for counsel to present evidence of Johnson's childhood, hobbies, and a mercy plea from Johnson's mother in lieu of a full-bore good-character strategy.")

Deardorff – in keeping with his desire to argue innocence instead of mitigation evidence in the penalty phase - - took the stand, which is his own

decision, and said that he did not care what sentence was imposed on him because he was innocent of capital murder. Deardorff's testimony accused Peacock of the murder. To the extent this was trial counsel's strategy – as opposed to the sole decision of Deardorff himself, it was reasonable strategy. *See Ex parte Carroll*, 852 So. 2d 833, 836 (Ala. 2002) (holding that conflicting evidence regarding the identity of the triggerman is relevant consideration in capital sentencing); *see also, Jenkins v. State*, 972 So. 2d 111, 147 (Ala. Crim. App. 2004), rev'd on other grounds. 972 So. 2d 159 (Ala. 2005) ("creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty."). For these reasons, Deardorff fails to establish deficient performance.

With respect to the prejudice prong, this Court has reviewed the proffered testimony in this case and finds that the mitigation evidence presented in the proffered testimony would not have altered the outcome of Deardorff's trial, had the evidence been presented by trial counsel. The jury still likely would have recommended a death sentence, and this Court would have found that the aggravating circumstances outweighed the mitigating circumstances, even if the Jury had recommended a sentence of life imprisonment without the possibility of parole.

(Doc. 15-65 at 63-65).

Deardorff challenged the circuit court's denial of his claim on appeal. He alleged in his

brief to the ACCA:

The Final Order denying relief on this claim is due to be vacated because it rests on the faulty premise that it was Deardorff's decision not to present mitigation evidence. Final Order at p. 32 (*See also* R. 32 C. 7462). This finding is deficient, however, because it fails to address at all Deardorff's Affidavit concerning this subject, in which Deardorff quite reasonably explained: "At no time did I ever tell my defense lawyers that I did not want them to investigate and present mitigation evidence on my behalf during the penalty phase of my capital trial." Exhibit 22 appended to Deardorff's Proffer of Evidence at ¶ 8 (emphasis in original). (*See also* R. 32 C. 1971). Under these circumstances, the Final Order's assignment of blame to Deardorff and not to trial counsel for the deficient mitigation investigation conducted in this case is unsupportable and should be vacated. However, even if Deardorff had been uncooperative, "that [did] not obviate the need for defense counsel to conduct some sort of mitigation investigation." *Porter v. McCollum*, 558 U.S. 30, 40 (2009).

The Final Order's treatment of this claim is equally due to be vacated because of its clearly erroneous finding that "this Court has reviewed the proffered testimony in this case and finds that the mitigation evidence presented in the proffered testimony would not have altered the outcome of Deardorff's trial, had the evidence been presented by trial counsel." Final Order at p. 33. (*See also* R. 32 C. 7463).

The Final Order makes this wide-ranging finding without addressing any of the detailed arguments to the contrary made in Deardorff's Post-Hearing Brief at pp. 56-61 (*see also* R. 32 C. 7286-91), and in his Amended Rule 32 Petition. In them, Deardorff detailed that counsel failed to present evidence of his bipolar disorder, history of severe head injuries, and traumatic upbringing. Instead, counsel presented Deardorff's testimony that that he did not care whether the jury recommended a death sentence or life without parole (R. 2909), and his mother's testimony, which both affirmed her belief in Deardorff's innocence and [] invited a withering cross-examination about the circumstances surrounding Deardorff's alleged attempts to deceive authorities about his involvement in the victim's death and his eventual desertion and dishonorable discharge from Navy. (R. 2898-2905).

It is unreasonable for the court to find that the additional mitigation evidence uncovered in postconviction would not have made a difference where: (1) the new mitigating evidence was unrebutted by the State and demonstrated that Deardorff was mentally impaired at the time of trial and that his childhood was marred by privation, neglect, and abuse (2) this mitigating evidence would have weakened the State's aggravators, and (3) the new mitigating evidence is voluminous whereas trial counsel's penalty-phase presentation was misleadingly sparse. Indeed, in the complete absence of any substantive mitigating evidence, two members of Deardorff's jury voted to recommend a sentence of life without parole. (R. 2934).

Although at a number of points the Final Order stresses that none of the voluminous mitigating evidence that Deardorff has submitted would have made any difference to the Circuit Court, a petitioner is entitled to "presume [that he will have] a reasonable sentencer," *Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2001). *See also Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008) ("[T]he idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency[,] . . . are irrelevant to the prejudice inquiry.") (quoting *Strickland*, 466 U.S. at 695).

(Doc. 15-76 at 92-96).

The ACCA upheld the circuit court's decision and denied Deardorff relief of his claim,

finding that Deardorff's brief failed to comply with Rule 28(a)(10) and that Deardorff failed to

meet his burden to establish that trial counsel were ineffective (doc. 15-78 at 104-07), stating:

This portion of Deardorff's brief does to comply with Rule 28(a)(10), Ala. R. App. P. As stated above, Rule 28(a)(10) requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed. *Hamm*, 913 So. 2d at 486. Authority supporting

only "general propositions of law" does not constitute a sufficient argument for reversal. *Beachcroft Props., LLP*, 901 So. 2d at 708 (quoting *Geisenhoff*, 693 So. 2d at 491). *See also Spradlin*, 601 So. 2d at 78-79. Thus, to obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities and an analysis of why those cases or other authorities support an argument that an error occurred and that the alleged error should result in reversal.

Here, Deardorff provided citations only to general principals of law. More importantly, he has failed to cite to any portion of the record wherein he properly admitted evidence of mitigation that should have been, but was not, presented at trial. In other words, Deardorff has not directed this Court's attention to any evidence in the record that would prove his claim. According, his argument does not comply with Rule 28(a)(10).

(Doc. 15-78 at 104).

## **Federal Habeas Claim**

As previously discussed, a federal habeas court is generally prohibited from reviewing the claim when a state court declines to decide the merits of a claim because it is barred by a state procedural rule, *Williams v. Alabama*, 791 F.3d 1267, 1273 (11th Cir. 2015), and the application of Rule 28(a)(10) can present an adequate and independent state procedural ground for dismissal, *Harris v. Reed*, 489 U.S. 255, 262, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989), as it is firmly established and regularly followed by Alabama appellate courts. *Hamm v. State*, 913 So.2d 460, 486 (Ala. Crim. App. 2002), *cert denied*, 546 U.S. 1017 (2005). To be noncompliant with Rule 28(a)(10), a petitioner's argument must amount to "undelineated general propositions," which thwart meaningful appellate review. *Ex parte Borden*, 60 So. 3d 940,944 (Ala. 2007). Thus, whether Rule 28(a)(10) is firmly established to preclude habeas review of a claim turns on how developed the brief was on the applicable claim. Put another way, if Deardorff's brief to the ACCA gave adequate notice of his claim, then the ACCA's reliance of Rule 28(a)(10) will not support state-barred procedural review on habeas review. *See, e.g. Sneed v. Raybon*, No. 5:16-CV-1442-AKK, 2022 WL 3974490, at *35 (N.D. Ala. Aug. 31, 2022) (citing *Gaines v. Price*, No. 2:15-CV-

1822-VEH-TMP, 2017 WL 2296962, at *21 (N.D. Ala. May 2, 2017) (declining to apply state-barred procedural default on habeas review because "the brief ... sufficiently supplied facts and authority that would have allowed the [state] appellate court to address the issue on the merits"), *report and recommendation adopted*, 2017 WL 2289105 (N.D. Ala. May 25, 2017)).

Review of Deardorff's ACCA brief (especially when read in total) reveals that it provided adequate, albeit not precise, notice of the asserted claim. Specifically, where the petition failed to detail facts and supporting law within the body of the petition, it contained record citations which pointed to specific argument and facts, including affidavits and reports, which supported the claim. No doubt these referenced citations necessitated a factfinder to go outside the pages of the petition (and/or labeled claim) to additional pleadings. Nevertheless, the cited pleadings were included in the submitted appellate record. Furthermore, it cannot be said that the brevity of the allegations defeated the opposing party from identifying and understanding the claim being plead. Nor did it prevent the ACCA from understanding the claim, as the court provided an alternative ruling on the merits of the claim. Consequently, the Court agrees with Deardorff that he presented sufficient argument to the ACCA to comply with Rule 28(a)(10), and the state procedural default does not apply.

As to the ACCA's alternative ruling on the merits, the court upheld the trial court's findings, stating:

> The circuit court's findings are supported by the record. Trial counsel testified that they hired a mitigation expert. Trial counsel testified that Deardorff and his mother refused to cooperate with the expert, and that Deardorff did not want any mitigation investigated or presented. *See James v. State*, 61 So. 3d 357, 364 (Ala. Crim. App. 2010) ("[T]he scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions.") (citations omitted); *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1358-59 (11th Cir. 2009) ("[W]hen a competent defendant clearly instructs counsel not to investigate or present mitigation evidence, the scope of counsel's duty to investigate is significantly more limited than in the ordinary case."); *See also Knight v. Dugger*,

863 F.2d 705, 750 (11th Cir. 1988) ("Although a capital defendant's stated desire not to use character witnesses does not negate the duty to investigate, it limits the scope of the investigation required."); *Tafero v. Wainwright*, 796 F.2d 1314, 1320 (11th Cir. 1986) ("[A] defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation."). Further, Deardorff did not question trial counsel about the mitigation they had or if additional mitigation would have changed the penalty-phase presentation. *Burgess v. State*, 962 So. 2d at 301; *Hooks*, 21 So. 3d at 792. Consequently, Deardorff failed to meet his burden to establish that trial counsel were ineffective, and the circuit court correctly denied relief. Rule 32.3, Ala. R. Crim. P.

(Doc. 15-78 at 106-07). Despite the inapplicability of the procedural bar, Deardorff has failed to demonstrate entitlement to habeas relief, as he has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law or that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1), (2).

"It is unquestioned that under the prevailing professional norms at the time of [Deardorff's] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 39, 130 S. Ct. 447, 175 L. Ed. 2d 398 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). Where counsel has reason to know of potential mitigating evidence they are required to investigate. *See Wiggins v. Smith*, 539 U.S. 510, 524-25, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (held that counsel "fell short of ... professional standards" for not expanding their investigation beyond the presentence investigation report and one set of records they obtained, given the facts discovered in the two documents); *Daniel v. Comm'r.*, 822 F.3d 1248 (11th Cir. 2016) (counsel's performance was deficient where mitigation investigation ended after "acquir[ing] only rudimentary knowledge of [petitioner's] history from a narrow set of sources."). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances,

applying a heavy measure of deference to counsel's judgment." *Strickland*, 466 U.S. at 691.  The

"strategic choices [of counsel] made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable," while those "made after a less than complete

investigation are reasonable precisely to the extent that reasonable professional judgments support

the limitation on investigation." *Strickland*, 466 U.S. at 690-91.  Where counsel ignores "red flags"

"alerting them to the need for more investigation", counsel performs deficiently.  *Rompilla v.

Beard*, 545 U.S. 374, 392, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005);  *see also Blanco v. Singletary*,

943 F.2d 1477, 1503 (11th Cir. 1991) (counsel rendered ineffective assistance where he failed to

put forth any mitigating evidence despite that an investigation would have uncovered an

impoverished childhood, epileptic seizures, and organic brain damage); *Ferrell v. Hall*, 640 F.3d

1199 (11th Cir. 2011) (counsel's failure to conduct a mitigation investigation beyond petitioner's

character was ineffective where "obvious evidence of serious mental illness" was undiscovered).

> Because the attorney acts based on information he receives from the defendant,
> however, whether counsel acted reasonably depends in part on the actions or
> statements of the defendant. *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066
> ("The reasonableness of counsel's actions may be determined or substantially
> influenced by the defendant's own statements or actions."). Thus, "what
> investigation decisions are reasonable depends critically' upon the information the
> defendant furnishes to his counsel." *Pooler*, 702 F.3d at 1269 (quoting *Strickland*,
> 466 U.S. at 691, 104 S. Ct. at 2066). "[T]he scope of the duty to investigate
> mitigation evidence are substantially affected by defendant's actions, statements, and
> instructions." C*ummings v. Sec'y, Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir.
> 2009).

> When a competent defendant clearly instructs counsel either not to investigate or
> not to present any mitigating evidence, "the scope of counsel's duty to investigate
> is significantly more limited than in the ordinary case." *Id*. at 1358-59. This Court
> has recognized, and we now hold, that "the duty to investigate 'does not include a
> requirement to disregard a mentally competent client's sincere and specific
> instructions about an area of defense and to obtain a court order in defiance of his
> wishes.'" *Id*. at 1357 (quoting *Rutherford v. Crosby*, 385 F.3d 1300, 1313 (11th Cir.
> 2004)); *see Blankenship v. Hall*, 542 U.S. 1253, 1277 (11th Cir. 2008) ("Significant
> deference is owed to failures to investigate made under a client's specific
> instructions not to involve his family."); *Newland v. Hall*, 527 F.3d 1162, 1202

> (11th Cir. 2008) ("We have also emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance under the Sixth Amendment.").

*Krawczuk v. Sec'y, Fla. Dep't of Corr.*, 873 F.3d 1273, 1293-1294 (11th Cir. 2017). "When deciding whether the defendant has shown prejudice, [courts] must 'evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding,' and reweigh it with the aggravating evidence." *Id* at 1294 (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98, 120 S. Ct. 1495, 1515, 146 L. Ed. 2d 389 (2000)).

> [T]o establish *Strickland* prejudice after instructing counsel not to present mitigating evidence at trial, we hold that a capital defendant must satisfy two requirements: (1) establish a reasonable probability that, had he been more fully advised about the available mitigation evidence, he would have allowed trial counsel to present that evidence at the penalty phase; and (2) establish a reasonable probability that, if such evidence had been presented at the penalty phase, the jury would have concluded that the balance of the aggravating and mitigating factors did not warrant the death penalty. [*Schrio v.*] *Landrigan*, 550 U.S.[ 465,] 481, 127 S. Ct. [1933,] 1944[, 167 L. Ed. 2d 836 (2009)]; *see Pope v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 1254, 1266 (11th Cir. 2014) (concluding that a capital defendant who instructs his counsel not to present mitigating evidence must satisfy these two requirements to show prejudice); *Gilreath*, 234 F.3d at 551-52 (adopting these two requirements even before the *Landrigan* decision). The defendant bears the burden of establishing both elements. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069; *Pope*, 752 F.3d at 1267.

*Id*. at 1294.

Notably, "[courts] are not interested in grading lawyers' performances; [courts] are interested in whether the adversarial process at trial, in fact, worked adequately."  *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992).  "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another."  *Strickland*, 466 U.S. at 693.  Accordingly, when evaluating an attorney's decision not to pursue a defense or present evidence, the essential question is not whether counsel should have presented the evidence, but "whether the investigation supporting the decision not to introduce mitigating evidence . . . *was*

*itself reasonable.*" *Wiggins*, 539 U.S. at 523 (citation omitted). "Review of counsel's actions is 'highly deferential' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' *Gavin v. Comm'r, Alabama Dep't of Corr.,* 40 F.4th 1247, 1263 (11th Cir. 2022) (quoting *Strickland*, 466 U.S. at 687); *see also Cullen v. Pinholster*, 563 U.S. 170, 190, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 ("The Court of Appeals was required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons Pinholster's counsel may have had for proceeding as they did.'") (alteration in original) (internal citation omitted); *Strickland, supra* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1245 (11th Cir. 2011) ("To give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. . . and it is the petitioner's burden to persuade us otherwise."). In presuming that counsel's performance was reasonable, courts must also presume "that counsel made all significant decisions in the exercise of reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (internal quotation and citation omitted). This objective test "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id*. at 1316 (quotation and citation omitted). Counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have taken the action that his counsel did take." *Id*. at 1315.

Again, the question before this Court on federal habeas review is not whether counsel's performance fell below *Strickland's* standard of reasonableness.  Rather, this Court is required to review the state court's decision under § 2254.  *Harrington*, 562 U.S. at 101.  This requires that "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself", to hold otherwise would "be no different than . . . adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court."  *Id*.  "Consequently, '[f]ederal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."  *Id.*

Regarding the deficient performance prong, counsel was questioned at the state evidentiary hearing about their mitigation investigation and penalty phase strategy.  While neither recalled many specifics, Mr. Doerr testified that the strategy centered on arguing residual doubt as to Deardorff's guilt.  Whether this was reasonable or not depends on the circumstances.  *Strickland*, 466 U.S. at 690-91 ("Strategic choices made after less than complete investigation are reasonable" only to the extent that "reasonable professional judgments support the limitations on investigation", and the decision not to investigate "must be directly assessed for reasonable in all the circumstances.").

"To assess whether counsel exercised objectively reasonable judgment under prevailing professional standards, [courts] first ask, whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Deardorff's] background was itself reasonable".  *Andrus v. Texas*, __ U.S. at __, 140 S. Ct. 1875, 1882, 207 L. Ed. 2d 335 (2020) (internal quotations and citations omitted).  Since counsel was not directly questioned, here, as to how the findings of

postconviction discovered mitigation evidence would have influenced their mitigation strategy, [49]

the Court "[i]n assessing the reasonableness of [counsel's] investigation, ... [will] consider not only

---

[49] Although not a *per se* rule, *see Dunn v. Reeves*, __ U.S. __, 141 S. Ct. 2405, 210 L. Ed. 2d 812 (2021) (reversing, against a vehement dissent, that Alabama courts had adopted a "blanket rule" that failure to call trial counsel to testify defeats an ineffective assistance claim), Alabama courts have consistently maintained that the presumption of counsel's effective representation is difficult to overcome without "question[ing] trial counsel regarding his or her actions or reasoning." *Stallworth v. State*, 171 So.3d 53, 92 (Ala. Crim. App. 2013).

> *See, e.g., Broadnax v. State,* 130 So.3d 1232, 1255–56 (Ala.Crim.App.2013) (recognizing that "[i]t is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record[, and holding that] circuit court correctly found that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably"); *Whitson v. State,* 109 So.3d 665, 676 (Ala.Crim.App.2012) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question appellate counsel regarding their reasoning); *Brooks v. State,* 929 So.2d 491, 497 (Ala.Crim.App.2005) (holding that a petitioner failed to meet his burden of overcoming the presumption that counsel were effective because the petitioner failed to question trial counsel regarding their reasoning); *McGahee v. State,* 885 So.2d 191, 221–22 (Ala.Crim.App.2003) ( "[C]ounsel at the Rule 32 hearing did not ask trial counsel any questions about his reasons for not calling the additional witnesses to testify. Because he has failed to present any evidence about counsel's decisions, we view trial counsel's actions as strategic decisions, which are virtually unassailable."); *Williams v. Head,* 185 F.3d at 1228; *Adams v. Wainwright,* 709 F.2d 1443, 1445–46 (11th Cir.1983) ("[The petitioner] did not call trial counsel to testify ... [; therefore,] there is no basis in this record for finding that counsel did not sufficiently investigate [the petitioner's] background."); *Callahan v. Campbell,* 427 F.3d 897, 933 (11th Cir.2005) ("Because [trial counsel] passed away before the Rule 32 hearing, we have no evidence of what he did to prepare for the penalty phase of [the petitioner's] trial. In a situation like this, we will presume the attorney 'did what he should have done, and that he exercised reasonable professional judgment.'").

*Stallworth,* 171 So. 3d 53, 92–93; *see also Burt v. Titlow,* 571 U.S. 12, 23, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013) ("[T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.") (internal quotation marks and brackets omitted).

the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins,* 539 U.S. at 527.

Here, counsel opined that Deardorff was a "smart guy," negating the need for psychological evaluation or investigation. *But cf., Blanco,* 943 F.2d 1477, 1502 (finding counsel "had a greater obligation to investigate and analyze available mitigation evidence" because Blanco was, among other things, "noticeably morose and irrational," "depressed and unresponsive," and "uncommunicative and easily angered"); *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986) (finding counsel's decision not to investigate potential mitigating evidence because of the defendant's request was "especially disturbing" where counsel believed that the defendant had mental difficulties and noting, "[a]n attorney has expanded duties when representing a client whose condition prevents him from exercising proper judgment."). The Navy records which Deardorff claims counsel should have obtained and reviewed confirm that Deardorff suffered no mental illness, intellectual disability, cognitive issues from reported head trauma, academic failures, or drug problems. (Doc. 1 at 65-246). These records raise no "red flags" or potential issues that counsel would have investigated further. [50] In opposite, the records describe Deardorff similarly

---

[50] *But Cf., Andrus v. Texas*, 590 U.S. --, 140 S. Ct. 1875, 1882–83, 207 L. Ed. 2d 335 (2020) (Ineffective assistance found where counsel knew that defendant had been diagnosed with a seemingly serious mental health issue and that a clinical psychologist briefly retained to examine a limited sample of Andrus' files had informed him that Andrus may have schizophrenia, yet counsel failed to investigate further.); *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 2541, 156 L. Ed. 2d 471 (2003) (counsel's failure to investigate defendant's background was unreasonable "in light of the evidence counsel uncovered in the social services records--evidence that would have led a reasonably competent attorney to investigate further"); *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (counsel's failure to review previous conviction files for aggravating details and mitigation leads which might have influenced the jury's appraisal of petitioner's culpability was unreasonable given that counsel had notice that the prosecution sought to prove petitioner had a violent criminal history); *Jefferson v. Sellers*, 250 F. Supp. 3d 1340 (N.D. Ga. 2017) (counsel was ineffective for failing to obtain neuropsychological testing following mental health expert's recommendation and knowledge of head trauma

to how his mother did at the penalty phase, as a normal child, who excelled in the military, until he went absent without leave.  Furthermore, Deardorff has not shown that counsel knew or had reason to know of childhood experiences or familial issues that necessitated further investigation.  *Cf., Johnson v. Sec'y DOC*, 643 F.3d 907 (11th Cir. 2011) (Ineffective assistance was found were counsel failed to perform adequate investigation into defendant's abusive childhood after being told by defendant that he had an abusive upbringing).  Neither has Deardorff alleged that he informed counsel of any facts or experience which would have led objectively reasonable counsel to believe that further investigation was necessary into Deardorff's life or background.

Instead, the record evidence supports that counsel moved for court approval for funds for multiple evidentiary expenses, including mitigation investigation.[51]  On June 23, 2000, Deardorff was granted $7,500.00 to retain the services of the Alabama Prison Project's Mitigation Investigation Program for the development of mitigation evidence, and Aaron McCall was hired through the organization.  (Doc. 15-1 at 148-50).  While questions are undoubtedly raised by Mr. McCall's hire while on federal monitoring, they are meagerly overcome by his association with and hiring through the Alabama Prison Project, which lends credibility and reasonability to the decision, but, moreover, the record supports that the ultimate constraint to Mr. McCall's work was not limitation due to federal ankle monitoring but Deardorff and his family members' lack of

---

(petitioner was struck by a car when he was 2 years old)); *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) (counsel rendered ineffective assistance where he failed to put forth any mitigating evidence despite that an investigation would have uncovered an impoverished childhood, epileptic seizures, and organic brain damage); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) (counsel's failure to conduct a mitigation investigation beyond petitioner's character was ineffective where "obvious evidence of serious mental illness" was undiscovered).

[51] Deardorff was granted $4,500.00 for investigative expenses (Doc. 15-1 at 79), over $2,750.00 for obtaining computer software and computer technician to exam seized computers (*Id*. at 152, 192; Doc. 15-2 at 7, 89), and $2,000.00 for an accounting firm to review the financial records of Mr. Turner.  (Doc. 15-3 at 170).

participation and willingness to speak with him.  (*See id.* at 149-50).  The decision not to hire a mitigation expert after Mr. McCall is also reasonable under the circumstances, namely because Mr. Doerr testified that Deardorff "didn't want any mitigation", instructed counsel not to hire another mitigation expert, and wanted to argue his actual innocence at the penalty phase.  (Doc. 15-70 at 198-99).

The Court pauses to note that Deardorff specifically denies making these statements and affirms in his proffered affidavit that he *did* want a mitigation investigation - he just did not want Mr. McCall to do it.  (Doc. 15-37 at 172-73).   While the trial court broadly acknowledges considering all proffered evidence in making its decision, the court's reasoning relies solely on Mr. Doerr's recollection and testimony, offering no explanation for its ultimate credibility determination.[52]  Review of the record, however, lends support for this decision as an innocence plea, as described by Mr. Doerr, runs consistently throughout the penalty phase.  For instance, first, Mr. Doerr proclaims in his opening to the jury, "[i]f you have any doubt at all about your previous decision [of guilt of a capital offense], you cannot find that the aggravating factor exists" and you cannot vote for a death sentence. (Doc. 15-22 at 87).  Second, Mrs. Byrd, Deardorff's mother, pleads

> "I have no doubt my son is innocent.  I came in here to hear the truth like you all.  What happened to Mr. Turner, no one deserves by no means, or what his family has gone through.  My heart goes out to them.  And I came in here and heard - - like everyone, you want to hear the truth just in case there's some chance you've judged your sone wrong or your child.

---

[52] While caselaw maintains a sentencer is required to *consider* all mitigating evidence, it does not require the sentencer to *accept* the evidence as mitigating.  Indeed, a sentencer is generally free to accord presented evidence with such weight as it deems fit.  *Clark v. Dunn*, No. CV 16-0454-WS-C, 2018 WL 264393, at *30 (S.D. Ala. Jan. 2, 2018), *on reconsideration in part,* No. CV-0454-WS-C, 2019 WL 1119354 (S.D. Ala. Mar. 11, 2019), and *aff'd sub nom. Clark v. Comm'r, Alabama Dep't of Corr.,* 988 F.3d 1326 (11th Cir. 2021); *see also Ingram v. Stewart,* No. 1:17-CV-01464-LSC, 2021 WL 1208867, *47 (N.D. Ala. Mar. 31, 2021).

> I heard Mr. Peacock, who I know everything I heard on the stand was everything but the truth. I heard contradictions in his own testimony on the stand. Everything he said was completely opposite. He couldn't tell you what gun it was; he couldn't tell you what happened to the car; when it happened. He contradicted himself. So I know that what he told you did not happen. . . . I want you save my son's live[sic], yes."

(Doc. 15-22 at 100). Third, as previously quoted in full, Deardorff testified before the jury and "exert[ed] [his] innocence of all charges", stating he "didn't do anything to Ted Turner" and, after recounting apparent deficiencies in Millard Peacock's testimony, reclaimed, "I'm not guilty." (*Id*. at 111, 114-16). Fourth, in his closing to the jury Mr. Doerr, begged for Deardorff's life and stated:

> . . . I do not respect your decision in this case with regard to the guilt phase. I think you've made an error in this case and I think you've made a grave error. I ask that you give Don and me the time to prove his innocence.

> If you vote to kill him, the actual truth in the case will never be known. Thank You.

(*Id*. at 131). Fifth, Deardorff made the sole statement to the probation officer creating the court ordered Pre-Sentence Investigative Report, "I am innocent." [53] (Doc. 15-4 at 145). Lastly, before his sentence was handed down, Deardorff made a statement to the trial court, as quoted *supra*, again maintaining his innocence. (Doc. 15-22 at 193-94). Given the continuity of these statements throughout the penalty phase by counsel, Deardorff, and his mother, the state court's determination

---

[53] The record confirms that Deardorff was completely uncooperative with the probation officer creating the court ordered Pre-Sentence Investigative Report. (Doc. 15-22 at 179). In attempt to obtain up-to-date information, the probation officer sent Deardorff a form to be completed inquiring about his life history and background, but Deardorff refused to fill out the form and then complained at the sentencing hearing that the probation officer failed to (1) come and speak to him in person, or (2) seek the updated information by any other means. (*Id*. at 178-79). The probation officer, Mr. Brooks Whitehead, testified at the sentencing hearing that it is normal procedure to have the accused person fill out the form and then a probation officer conducts an in-person interview to go over the personal history portion of the form with the accused. (*Id*. at 180-81). In this case, Deardorff partially filled out the front page and nothing else. Therefore, the probation officer pulled a previous presence investigation report from the Mobile probation office and used the information contained therein to compile the court ordered report. (*Id*. at 181).

that Deardorff instructed counsel not to hire a mitigation expert, not to investigate, or to present mitigation evidence (but to argue his innocence) is supported by the record. *See also Schiro v. Landrigan*, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (held that a defendant, who objected to the presentation of mitigation evidence, could not establish he was prejudiced by counsel's failure to conduct an adequate mitigation investigation). Due to the "doubly deferential" standard of review imposed on federal courts on habeas review, the Court finds ample record support to justify the state court's determination to credit the testimony of Mr. Doerr in light of the facts and proceeds accordingly.

Turning back to the decision to argue residual doubt at the penalty phase, Deardorff has failed to establish deficient performance. "[R]esidual doubt is perhaps the most effective strategy to employ at sentencing." *Chandler v. U.S.*, 218 F.3d 1305, 1320 n.28 (11th Cir. 2000); *see also, e.g., Stewart v. Dugger*, 877 F.2d 851, 856 (11th Cir. 1989) (collecting cases); *Tarver v. Hopper*, 169 F.3d 710 (11th Cir. 1999) (citing law review and source articles discussing that "'[r]esidual doubt' over the defendant's guilt is the most powerful 'mitigating' fact." (citation omitted)).[54]

---

[54] "'[R]esidual doubt has been recognized as an extremely effective argument for defendants in capital cases.'" *Lockhart v. McCree,* 476 U.S. 162, 181, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (quoting *Grigsby v. Mabry,* 758 F.2d 226, 248 (8th Cir.1985) (en banc) (Gibson, J., dissenting)). A comprehensive study on the opinions of jurors in capital cases concluded:

> "Residual doubt" over the defendant's guilt is the most powerful "mitigating fact." ... [T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,* 98 Colum. L. Rev. 1538, 1563 (1998) (footnote omitted); *accord* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases,* 15 Am. J. Crim. L. 1, 28 (1988) ("The

"[P]etitioners can rarely (if ever prove a lawyer to be ineffective for relying on this seemingly reasonable strategy to defend his client", especially where the evidence of guilt at the trial phase was not overwhelming.  *Chandler*, 218 F.3d at 1320.  While counsel remains obligated at all times to make objectively informed strategic decisions, the lack of counsel's knowledge as to any childhood abuse, substance abuse, intellectual disability, mental illness, or trauma (as previously discussed) supports counsel's decision.  Also, the evidence at trial, while convincing, was not supported by eyewitnesses, conclusive forensics, or unquestionable evidence, which further supports the reasonability of presenting a residual doubt argument.  It cannot be said that under these circumstances no reasonable attorney would have chosen to not hire another mitigation expert, to not delve deeper into investigating Deardorff's background, and would not have chosen to pursue a residual doubt argument over presenting mitigation evidence.  *Pinhoster*, 563 U.S. at 196 ("*Strickland* specifically commands that a court must indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment.").

Based on the record before the Court, it cannot be said that the state court's application of clearly established federal law was objectively unreasonable.  *See Gavin v. Comm'r, Alabama Dep't of Corr.,* 40 F.4th 1247, 1266 (11th Cir. 2022) ("For purposes of § 2254(d), the state court's application of clearly established federal law "must be objectively unreasonable, not merely wrong; even clear error will not suffice." (internal quotation omitted)).  "In fact, even if there is reason to think that counsel's conduct was far from exemplary, a court still may not grant relief if [t]he record does not reveal that counsel took an approach that no competent lawyer would have chosen." *Dunn*

---

existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied.")

*Williams v. Woodford*, 384 F.3d 567, 624 (9th Cir. 2004).

*v. Reeves*, — U.S. —, 141 S. Ct. 2405, 2410, 210 L. Ed. 2d 812 (2021) (quotation omitted).  While the record lacks evidence regarding a full picture of what counsel did in preparation for the penalty phase, Deardorff bears the burden to show that counsel's performance "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.  He has failed to carry this burden.  Despite full opportunity at the state evidentiary hearing to present the postconviction discovered mitigation evidence to counsel and examine how the evidence would have altered their mitigation strategy, if at all, he did not pose a single such question.  Specifically, Deardorff failed to question counsel about whether the opinions of Drs. Cunningham and DeFilippis, the Navy records, and family interviews would have changed their strategy or not.  *See Whitson v. State,* 109 So.3d 665 (Ala. Crim. App. 2012) (Rule 32 petitioner failed to prove that appellate counsel was ineffective where, although petitioner called appellate counsel to testify at hearing, petitioner did not question appellate counsel about the ineffective-assistance claims raised in the petition). Neither did Deardorff testify as to any information he provided to counsel that necessitated further inquiry.  Nor did Deardorff question Mr. McCall as to what mitigation evidence he actually discovered or divulged to counsel while employed by counsel.  "An incomplete or ambiguous record concerning counsel's performance – like the record here – is insufficient to overcome the presumption of reasonable performance." *Gavin.,* 40 F.4th at 1263 (11th Cir. 2022) (quoting *Strickland*, 466 U.S. at 687).  Accordingly, Deardorff has not shown that the ACCA's decision was contrary to or an unreasonable application of Supreme Court precedent nor an unreasonable determination of the facts in light of the evidence presented.  Thus, Deardorff is denied relief on this claim.

The record further supports that Deardorff has failed to carry his burden to establish the prejudice prong.

> "'When claims of ineffective assistance of counsel involve the penalty phase of a capital murder trial the focus is on "whether 'the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Jones v. State,* 753 So.2d 1174, 1197 (Ala. Crim. App. 1999), quoting *Stevens v. Zant,* 968 F.2d 1076, 1081 (11th Cir.1992).

*McWhorter v. State*, 142 So. 3d 1195, 1247 (Ala. Crim. App. 2011); *see also Strickland*, 466 U.S. at 695 ("When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer— including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). Review of the record reflects it was reasonable for the state court to conclude that counsel's failure not to present the proffered mitigation evidence was not prejudicial,[55] as the nonstatutory mitigation evidence proffered in the postconviction proceedings would not have outweighed the aggravating factors. *Wong v. Belmontes*, 558 U.S. 15, 20, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) ("In evaluating that question, it is necessary to consider *all* the relevant evidence that the jury would have had before it had [defense counsel] pursued the different path—not just the mitigation evidence [he] could have presented, but also the [aggravating] evidence that almost certainly would have come with it.").

The proffered Rule 32 evidence put forth by Deardorff revealed that he had a genetic predisposition to mental health and addiction issues, marked by his deceased brother's alcoholism,

---

[55] Although the ACCA did not directly address the prejudice prong in affirming the trial court's denial of relief, the trial court concluded that the proffered evidence "would not have altered the outcome of Deardorff's trial, . . . [as] [t]he jury still likely would have recommended a death sentence", and the trial court "would have found that the aggravating circumstances outweighed the mitigating circumstances, even if the Jury had recommended a sentence of life imprisonment without the possibility of parole." (Doc. 15-65 at 65).

his sister's hospitalization in a psychiatric facility as an adolescent, and his daughter's depression, anxiety, and obsessive-compulsive disorder. (Doc. 15-37 at 53, 90-91). Dr. Cunningham, a psychologist, identified 23 adverse developmental factors present in Deardorff's background, including generational family dysfunction, rejection by paternal family, hereditary predisposition for alcohol and drug abuse/dependence, and hereditary predisposition to psychological disorder and personality pathology, inadequate weight gain of mother during pregnancy, head injury in early childhood, disturbed childhood behavior, premature marriage of mother, mother's age of 16 at Donald's birth, severe emotional and relationship stresses on mother during pregnancy, abandonment of biological father, marital problems between mother and adoptive father, parental emotional detachment of adoptive father, pathological divorce and emotional abuse, victimization of mother with associated head injury and seizures, inadequate supervision and guidance, sexual abuse, teen onset alcohol and/or drug abuse, school dropout, acute deterioration in U.S. Navy service, marital relationship instability, cocaine dependence, and criminal offenses and incarceration in adulthood. (Doc. 15-37 at 46-79). Dr. DeFilippis, a psychiatrist, also noted genetic links to psychiatric issues in Deardorff's history and connected them with grandiose statements Deardorff made at trial and during personal interviews and opined that Deardorff suffered from Bipolar II disorder, possible cocaine dependence, and personality disorder with compulsive and narcissistic characteristics. (*Id*. at 91). Though these findings develop a better understanding of Deardorff's personality, they do not necessarily lessen his culpability. Moreover, the factors are challenged, if not belied, by other portions of the record and if admitted may have opened the door to damaging rebuttal evidence. *See Darden v. Wainwright,* 477 U.S. 168, 186–87, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (counsel's decision not to present character or mental-state evidence in mitigation, and instead to rely upon a simple plea for mercy from the defendant

himself, was sound trial strategy because the mitigating evidence would have opened the door to damaging rebuttal evidence of the defendant's prior convictions, marital infidelity, and a psychiatric opinion that the defendant was a sociopathic personality who was very capable of committing the crimes at issue).  For instance, claims of impairment due to childhood head trauma are disputed by the record confirmation that Deardorff attended school until 12th grade, received decent grades, was never enrolled in special education classes, never repeated a grade, was not a behavior problem in school, and ultimately received his diploma in the Navy.  (*Id*. at 81).  It is also undisputed that Deardorff has never been treated for mental health issues, with his mother reporting he was not depressed and was never psychotic (doc. 15-37 at 86), Navy records repeatedly report that he suffers no mental health issues (doc. 1 at 118, 174, 179, 188), and prison records would further support that he was not receiving mental health treatment or medication. (Doc. 15-37 at 84).  The Navy records also support that Deardorff received accolades during his first tour with the Navy as a supervisor, being recognized as "AN <u>ABSOLUTE</u> TOP PERFORMER", with "unlimited growth potential" (Doc. 1 at 153) and "highly recommended for further advancement and retention in the naval service."  (*Id*. at 162).  Evidence that Deardorff served so superiorly in his capacity as a supervisor in the Navy could have been interpreted by the jury as reinforcement that Deardorff was the dominate codefendant in the capital offense – negating Deardorff's attempt to shift blame to Peacock.  Also, the proffered evidence could have opened the door to the jury hearing that Deardorff was previously arrested and served time for stealing a vehicle and forging checks off a closed account of someone else (doc. 15-37 at 84) – convictions noticeably similar to the allegations that he stole and drove Mr. Turner's vehicles, forged and cashed Mr. Turner's checks and used his credit cards.  "In other words, the non-statutory mitigation evidence [Deardorff] presented could have been a double-edged sword."

*Gavin*, 40 F.4th at 1269.  Thus, the state court's determination is not unreasonable in light of the presented facts.[56]

Consequently, Deardorff has failed to establish the state court's determination that he was not prejudiced by counsel's failure to investigate and present mitigating evidence "'was not so obviously wrong as to be beyond any possibility of fairminded disagreement' and the district court "exceeded its authority" in rejecting the state court's determination."  *Gavin*, 40 F.4th at 1270 (quoting *Shinn v. Kayer*, —— U.S. ——, 141 S. Ct. 517, 526, 208 L. Ed. 2d 353 (2020) (quotation omitted)).  Thus, Deardorff is denied habeas relief of this claim.

## 2. Deardorff claims that the prosecutor improperly commented on his failure to testify during closing argument in the guilt phase in violation of his Fifth Amendment rights.[57]

Deardorff alleges that the prosecutor made improper arguments during its guilt-phase closing regarding Deardorff not testifying – stating "he didn't make testimony." (Doc. 1 at 23-24). Deardorff asserts that the prosecutor's comment violated his Fifth Amendment right not to be compelled to testify against himself.

---

[56] Furthermore, the mitigation evidence presented by Deardorff is a far cry from that which federal courts have determined warranted habeas relief.  *See Wiggins,* 539 U.S. 510, 533 (counsel failed to investigate and put forth evidence of severe privation and abuse in the petitioner's childhood, including alcoholic and absentee mother, physical torment, sexual molestation, repeated rape during years of foster care, homelessness, and diminished mental capacity); *Williams v. Taylor*, 529 U.S. 362 (2000) (counsel failed to present evidence "in connection with Williams' commitment when he was 11 years old that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that the was borderline mentally retarded, had suffered repeated head injuries, and might have mental impairments organic in origin."); *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) (counsel rendered ineffective assistance where he failed to put forth any mitigating evidence despite that an investigation would have uncovered an impoverished childhood, epileptic seizures, and organic brain damage); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) (counsel's failure to conduct a mitigation investigation beyond petitioner's character was ineffective where "obvious evidence of serious mental illness" was undiscovered).

[57] Presented as Claim III of the habeas petition.  (*See* Doc. 1 at 23-25).

The ACCA reviewed Deardorff's claim and concluded the comment was not a direct reference to Deardorff having not testified and, instead, found the comment "more likely . . . directed at Deardorff's failure to present other testimony that would have supported his defense, if those witnesses existed."  6 So.3d 1205, 1221.  Specifically, the ACCA stated:

> The comment now objected to was made in the prosecution's rebuttal closing argument during the guilt phase of the trial. During that rebuttal argument, the prosecutor addressed some of the arguments defense counsel had made in their closing arguments, and he restated his theory of the case against Deardorff. The comment was made near the middle of the prosecutor's rebuttal argument:

> > "What do we have on Donald Deardorff that points to him? You had the default judgment and you had the motive. What else do we have? Deardorff has no place to live and he's having trouble. What else do we have? You have Ted Turner's will naming (sic). What else do you have? I'm having a hard time reading that. Let me get my list. Here we go. Trifocals are better. You've got Deardorff's car at the catfish house just like they said. You've got Deardorff's use of Ted Turner's computer.

> > "Now, let me tell you, y'all remember the evidence on this. This is critical, because [defense counsel] suggested to you it was 1:36. You remember the evidence that the check was 12:28 at Fairhope Bank. It's in evidence. And when they said that computer was turned on that porno site was 12:28, the exact time. And you heard from the witness stand that Tom Montgomery found a problem on that time clock, and it wasn't 1:36, it was 1:03. That's the evidence before this jury. It's not 1:36 as [defense counsel] suggested. It's 1:03.

> > "And at Dawn's house. Now, why do we think the same? It's the same porn site. Now, is [defense counsel] suggesting that Mr. Peacock has killed Mr. Turner and there is somebody else in that house while he's cashing the check, visiting a porn site that just so happened to be visited at Dawn Dunaway's house? No. It's not common sense and it's not reasonable.

> > "What other areas do you have? Connection. Again, you have the money, pistol, car part, receipt books. And I made a mistake earlier. I forgot that the computer orders, I thought it came out of the shed. It came out of the car. What came out of the shed, I think, was the tape, the masking tape, the same masking tape that was used around Ted Turner's hands, I submit to you. The same shed that is not

connected to Peacock, it's connected to Deardorff. Mr. Peacock doesn't have a key to it. Could not get into it.

"And the gig is up. Take capital murder off the table. You heard the phone calls from the jail and to his mother. *He didn't make testimony.* There ain't no doubt about it. They've got the power to subpoena. They could bring anybody up here they wanted to.

"We put inmates up here. You've got to determine whether they're telling you the truth. But I'm going to tell you something. It's hard for me to believe that Mr. Fambro can make up something that nobody knows. Didn't nobody know he was killed up there around Stockton at this time. Mr. Fambro nails it. And he had him shot."

(R. 2788-91.) (Emphasis added.)

 . . .

Viewing the objected-to comment in context of all of the evidence and in context of the entire closing argument, as our caselaw directs us to do, we first note that we are unable to discern exactly what the prosecutor's comment intended to convey. The above-quoted portion of the rebuttal argument was not cohesive. Rather, it appears that the prosecutor was responding, point-by-point and from a list, to defense counsel's closing arguments. It further appears that the comment to which Deardorff now objects was directed to the various types of evidence the State presented regarding the statements Deardorff made while he was in jail, including the statements he made to his mother, to the police, and to other inmates. It also appears that the prosecutor was responding to defense counsel's assertions that the inmates called by the State were not telling the truth and was making the point that, if other witnesses could have testified to different facts, Deardorff could have called them to testify. Viewing the evidence presented and the entire argument in context, we are unable to conclude with any degree of certainty that the isolated comment was, in fact, a comment on the defendant's failure to testify. It appears more likely that the comment was directed at Deardorff's failure to present other testimony that would have supported his defense, if those witnesses existed. Therefore, no plain error occurred. *See also Ex parte Musgrove,* 638 So.2d 1360 (Ala.1993); *Payne v. State,* 683 So.2d 440, 449-51 (Ala.Crim.App.1995), *aff'd,* 683 So.2d 458 (1996).

Even if the comment could be interpreted as an indirect comment on Deardorff's failure to testify, we would find no plain error. We have previously held:

"'Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. *Ex parte Yarber,* 375 So.2d [1231,] 1234 [ (Ala.1979) ]; *Ex*

*parte Williams,* [461 So.2d 852, 853 (Ala.1984)]; *Ex parte Wilson,* [571 So.2d 1251 (Ala.1990) ]; *Ex parte Purser,* [607 So.2d 301 (Ala.1992) ]. A virtual identification will not exist where the prosecutor's comments were directed toward the fact that the State's evidence was uncontradicted, or had not been denied. See *Beecher v. State,* 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); *Ex parte Williams,* supra; *Ex parte Purser,* supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.'

"*Ex parte Brooks,* 695 So.2d 184, 188-89 (Ala.1997) (footnotes omitted)."

*Gavin v. State,* 891 So.2d 907, 981 (Ala.Crim.App.2003).

The prosecutor's comment seems to suggest, at most, that the defense failed to present testimony to contradict any of the testimony the prosecution presented that tended to establish that Deardorff was the manipulator, the one who directed Peacock's actions, and the one who had made statements admitting his involvement in the capital murder. As the prosecutor noted in the same portion of the rebuttal argument to which Deardorff now objects, the defense could have called any witnesses it had who would contradict the prosecution's theory of the case. The prosecutor also noted that the jury would have to determine whether the prosecution witnesses had been truthful.

Remarks that refer to the failure of the defense and to the fact that the State's evidence is uncontradicted are permitted and have been found not to violate a defendant's constitutional right to refuse to testify. The comment was "not manifestly intended or of such a character that a jury would naturally and necessarily" take it to be a comment on Deardorff's choice not to testify. *Gavin,* 891 So.2d at 983. Therefore, even if the comment could have been construed as an indirect comment on Deardorff's failure to testify, we would find that Deardorff was not entitled to relief on his claim, because no plain error would have occurred.

6 So.3d 1205, 1219-21.

It is well established "that the Fifth Amendment. . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615, 85 S. Ct. 1229, 1233, 14 L. Ed. 2d 106 (1965).  In determining if a prosecutor's comment violated a defendant's constitutional right, we ask, "(1) [if] the statement was manifestly intended to be a comment on the defendant's failure to testify;"

*United States v. Thompson*, 422 F.3d 1285, 1299 (11th Cir. 2005), or (2) would the jury "naturally and necessarily understand the comments as highlighting the defendant's failure to testify." *United States v. Perez*, 29 F.4th 945, 988 (8th Cir. 2022) (internal quotation and citation omitted); *see also United State v. Swindall*, 971 F.2d 1531, 1551 (11th Cir. 1992) ("The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so."). "To determine the manifest intent and the natural and necessary effect of allegedly impermissible comments, we must examine the comments in the context within which they were made." *Williams v. Wainwright*, 673 F.2d 1182, 1184 (11th Cir. 1982). "We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify, if some other explanation for his remark is equally plausible." *Id.* (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977).

Review of the ACCA's decision reflects a thorough recount of the prosecutor's statement and the context surrounding it.  (*See* Doc. 15-21 at 191-96).  Reviewing the statement at issue within the framework of the prosecutor's entire closing argument supports the ACCA's reasoning, that the prosecutor's purpose was to point out that the State carried its burden of proof, and no facts existed in the record which contradicted the State's evidence.  Notably, the "prosecution is entitled to refer to the fact that the defense has failed to rebut a natural inference that may be drawn from the *facts* in evidence*." United States v. Thompson*, 466 F. App'x 838, 846 (11th Cir. 2012) (quoting *United States v. Griggs,* 735 F.2d 1318, 1323 (11th Cir.1984) (per curiam) (emphasis added)).  As determined by the ACCA, the natural inference drawn from the prosecutor's comment went to Deardorff's failure to present witnesses or testimony to rebut the State's evidence.  *United States v. Knowles,* 66 F.3d 1146, 1163 (11th Cir.1995) (The mere possibility or probability that the jury could so construe the comment as a defendant's failure to testify is insufficient.).

Furthermore, prior to deliberations, the trial court instructed the jury as to Deardorff's right not to testify, ordering:

> You are to base your verdict on the evidence in this case. Evidence to be considered by you is testimony, exhibits, and presumptions of law that are not refuted by evidence. You are not to consider as evidence, the indictment, arguments of the lawyers, or rulings by the Court.
>
> . . .
>
> The burden is on the prosecution to prove that the defendant is guilty beyond a reasonable doubt. The burden of proof never shifts to the defendant. The law never imposes upon any defendant the duty of taking the witness stand himself or calling any witness or putting on any evidence whatsoever. If the prosecution's evidence in and of itself, standing alone, is not sufficient to convince you of the defendant's guilt beyond a reasonable doubt, then the law requires you that you must find the defendant not guilty.
>
> . . .
>
> Now, ladies and gentlemen, the defendant has not testified in this case as he has a perfect right. You are instructed that is a fact from which you can draw no inference. It is not to be considered by you as a fact in the defendant's favor, nor is it to be laid to the defendant's detriment. You may not draw conclusions of any sort from the defendant's failure to testify.

(Doc. 15-22 at 12-13, 14, 20). Such instructions are curative of the prosecutor's comment. *See United States v. Shepard*, 485 F. App'x 986, 988 (11th Cir. 2012) ("The court specifically instructed the jury on Shepard's right not to testify, making it even less likely that the prosecutor's remarks would have been interpreted as a comment on his failure to testify."); *United States v. Smith,* 918 F.2d 1551, 1562 (11th Cir.1990) ("Because statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only evidence in the case be considered"); *United States v. McGarity,* 669 F.3d 1218, 1242 (11th Cir.2012) (holding that prosecutor eliciting testimony regarding defendant's failure to testify was harmless error and was "overridden by both the overwhelming evidence of the defendants' guilt, and by the court's subsequent jury instructions").

As Deardorff has not demonstrated any unreasonableness in the state court's decision, he is due no relief on this claim.

**3. Deardorff claims that trial court erred when it failed to *sua sponte* declare a mistrial after Juror C.M. declared herself mentally incapable of deliberating and engaged in improper *ex parte* contact with C.M.[58]**

As laid out and quoted, *supra*, in Section IV, 1, c., Juror C.M. sent a note to the trial court, during guilt phase deliberations, indicating she was frightened and finding it difficult to be a juror on a murder case; she further requested to be dismissed as a juror or be given "help". (*See* Doc. 15-4 at 103). As previously discussed, in response to C.M.'s note, the trial court convened the jury and issued a generalized instruction to the entire jury. Deardorff contends the trial court erred by: (1) failing to declare a mistrial after receiving Juror C.M.'s note; and (2) engaging in improper *ex parte* contact with Juror C.M. regarding the note. (Doc. 1 at 27-28). Respondent contends that this claim is procedurally defaulted and barred from federal habeas review, and this Court agrees.

The record reveals that while Deardorff did not raise this claim on direct appeal,[59] he did present the issue in his Amended Rule 32 Petition, as three subclaims: (1) Juror C.M.'s inability to sit in judgement due to her mental impairment created a manifest necessity for this Court to discharge the jury; (2) this Court's instruction to the jury following Juror C.M.'s note improperly

---

[58] Deardorff presented this claim as Claim V in his habeas petition. (*See* Doc. 1 at 27).

[59] While Deardorff contends the claim was presented to the Alabama Supreme Court for writ of certiorari on direct appeal (doc. 16 at 11-12), the Court disagrees. That petition alleges that the juror's note put the trial court "on notice that good cause to discharge a juror may [have] exist[ed]" and that the trial court erred when it failed to investigate whether Juror C.M. "was fit" to continue jury duty. (Doc. 15-25 at 212-13). This differs from the current claim that the court erred in failing to *sua sponte* declare a mistrial based on the submitted note and the court's instructions. (*Compare* Docs. 1, 16 *with* Doc. 15-25 at 65-66, 212-13). The rule of exhaustion requires "that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation," which affords the state courts an "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim," *Kelley*, 377 F.3d 1317, 1344-45. Accordingly, it cannot be said that this claim was fairly presented on direct appeal.

coerced the jury into rendering a verdict; and (3) Unknown to defense counsel, this Court improperly contacted the jury outside of Mr. Deardorff's presence. (Doc. 15-29 at 193-96). In arguing subclaims 1 and 2, Deardorff provided only facts contained in the trial record, but Deardorff did present extrinsic factual allegations as to subclaim 3. The entire claim was dismissed by the trial court, stating "[s]pecifically, these issues could have been raised on appeal. (Doc. 15-30 at 171). The court further noted "that, as the trial judge, no conversations ever occurred between the Court and the jurors concerning any factual or legal aspects of the case except on the record with counsel and defendant present." (*Id*.). Thereafter, Deardorff did not present this claim to the Alabama Court of Criminal Appeals or the Alabama Supreme Court for discretionary review. (Doc. 15-76; 15-78 at 138).

To fully exhaust a claim, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). As previously discussed, in Alabama, a complete round of the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing in that court, and a petition for discretionary review in the Supreme Court of Alabama, *Price v. Warden, Att'y Gen. of Ala*., 701 F. App'x 748, 749-50 (11th Cir. 2017) (per curiam), and the exhaustion requirement applies to state post-conviction proceedings as well as to direct appeals. *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003). Given that Deardorff "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] . . . there is a procedural default for purposes of federal habeas[.]" *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *see also Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) (A habeas claim "is procedurally defaulted if it has

not been exhausted in state court and would now be barred under state procedural rules."); Ala. R. Crim. Proc. 32.2(b) (barring a second or successive petition on any ground that was known at the time that the first petition was heard).

Deardorff has further failed to demonstrate cause for the default or resulting prejudice, nor a fundamental miscarriage of justice. *See Murray v. Carrier,* 477 U.S. 478, 496 (1986). (Petitioner may overcome procedural default if he can show cause exists, that is "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule."); *see also Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1011 (11th Cir. 2012) (per curiam) ("To overcome procedural default through a showing of actual innocence, the petitioner must present reliable evidence ... not presented at trial such that it is more likely than not that no reasonable juror would have convicted him of the underlying offense.") (citations and internal quotation marks omitted).

Therefore, the claims raised in the instant habeas petition are procedurally defaulted because they have not been exhausted in state court and would now be barred under state procedural rules.

4. **Deardorff claims insufficient evidence to establish murder was heinous, atrocious, or cruel when compared to other capital offenses and that the aggravating circumstance is unconstitutional.[60]**

As previously discussed, the State argued as a statutory aggravating circumstance that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." ALA. CODE § 13A-5-49(8). The jury was instructed as to the "heinous, atrocious, or cruel" ("HAC") aggravator, as follows:

The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed

---

[60] Presented as Claim VIII of the habeas petition. (*See* Doc. 1 at 47-50).

to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.   What is intended to be included in this aggravating circumstance is only those cases where the actual commission of the capital offense is accomplished by such additional acts as to set the crime apart from the norm of capital offenses.

For a capital offense to be especially heinous, atrocious, or cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim. All capital cases are heinous, atrocious, and cruel to some extent, but not all capital offenses are especially heinous, atrocious, or cruel compared to other capital offenses.

You should not find or consider this aggravating circumstance unless you find that this particular capital offense involves a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

Now, as I stated to you before, the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case.   This means that before you can even consider recommending that the defendant's punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that at least one or more of the aggravating circumstances exist.

. . .

You may not consider an aggravating circumstance unless you are convinced by the evidence beyond a reasonable doubt of the existence of that aggravating circumstance in this case.

(Doc. 15-22 at 142-45).  Because the jury was not required to specify the findings underlying its recommendation, it cannot be determined whether the jury found the existence of the aggravating circumstance.   It is clear from the record, however, that the trial judge expressly found this aggravating circumstance to exist in imposing a sentence of death:

The capital offense was especially heinous, atrocious and cruel compared to other capital offenses in that the victim, Ted Turner, lived alone, was unsuspecting and unarmed when overpowered by two assailants; was held in a hall closet for over twenty-four (24) hours; was removed from his home and driven in his own vehicle to a wooded area while being bound and having a pillow case taped over his head; was forced to walk an extended distance into the woods after only recently having knee surgery which limited the use of his leg, and was shot in the back of the head at least three times after complying with all of the wishes of his assailants, therefore

[the Ala. Code §] 13A-5-49(8) aggravating circumstance is present. The aggravating circumstance that has been found above is found to be present beyond a reasonable doubt, and an aggravating circumstance to be considered.

(Doc. 15-1 at 33); *see also Deardorff v. State*, 6 So. 3d 1205, 1226–27 (Ala. Crim. App. 2004),

*aff'd sub nom. Ex parte Deardorff*, 6 So. 3d 1235 (Ala. 2008).

Deardorff argues that the evidence presented was insufficient for a finding of this aggravating circumstance beyond a reasonable doubt. (Doc. 1 at 47-49). The ACCA reviewed the claim and concluded that the trial court's determination was "fully supported by the record", 6 So. 3d at 1228, finding:

> [T]he victim was held captive in a closet in his own home for more than 24 hours. He complied with each demand his captors made, and he never attempted to fight them or to escape. The evidence presented at trial indicated that Turner pleaded for his life while he was being held captive, agreeing to do whatever was asked of him so that he would not be killed.
>
> Turner knew that Deardorff was armed with a pistol because Deardorff had threatened to kill Turner with it when Turner arrived home and found Deardorff and Peacock inside his house waiting for him. The addendum to Turner's will, which was written on the day Turner obtained a default judgment in his case against Deardorff, indicated that Turner was afraid of what Deardorff might do to him. The trial court correctly noted that Turner had recently had knee surgery and that his mobility was limited. This condition would have added to the physical discomfort of being bound and confined in a closet. When the assailants took Turner from his house, they bound his hands and placed duct tape over his mouth. During the trip, they placed a pillowcase over his head and secured it with duct tape. They then forced Turner to walk a long way down a logging road; the trial court correctly noted that the extended walk would have been difficult for Turner, given his medical condition. Once they reached the end of the logging road, Deardorff forced Turner to kneel on the ground. He shot Turner repeatedly in the back of the head.

6 So. 3d at 1227–28. In further support of the HAC factor, the ACCA found the victim suffered psychological torture:

> From the moment Deardorff threatened Turner with "blowing his brains out" to the moment he was forced to kneel, bound and with his head covered with a pillowcase secured with duct tape, Turner's fear for his life was undoubtedly great. Turner knew that Deardorff was angry and vengeful, and he knew that he was armed. The terror he experienced must have escalated tremendously when his mouth was taped and his hands were bound as he was taken away from his home, driven away in his

own car. When the pillowcase was taped over his head and he could no longer see where he was being taken, he had to know that his death was imminent. This type of prolonged psychological torture has been held to support the finding of the § 13A-5-49(8) aggravating circumstance.

*Id*. at 1228.  The Alabama Supreme Court affirmed the ACCA's determination, finding:

> Being threatened with death, being held in captivity and confined in a closet, being transported by car while his head was hooded and his hands taped, being forced to walk down the dirt road with a hood over his head and his hands taped, and the events immediately preceding Turner's killing constitute psychological torture so as to meet the standard for a murder that is "especially heinous, atrocious, or cruel." There was no plain error in the trial court's finding that Turner's murder was especially heinous, atrocious, of cruel, and Deardorff is not entitled to any relief on this claim.

*Ex parte Deardorff*, 6 So. 3d 1235, 1240 (Ala. 2008).

Alabama has limited its term "especially heinous, atrocious, or cruel" to those "conscienceless or pitiless homicides which are unnecessarily tortuous to the victim", *Ex parte Kyzer*, 399 So.2d 330, 334 (Ala. 1981).  This limiting instruction has consistently been held sufficient to narrow the meaning of the words "heinous, atrocious or cruel" and "limit[] their application to a relatively narrow class of cases, so that their use 'informs the sentencer of what it must find to impose the death penalty.'" *Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989) (alterations in original omitted) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 108 S. Ct. at 1858 (1988)); *see also Proffitt v. Florida,* 428 U.S. 242, 255-56, 96 S. Ct. 2960, 2986, 49 L. Ed. 2d 913 (opinion of Stewart, Powell, Stevens, JJ.), *reh'g denied,* 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158 (1976) (The class of cases that are "unnecessarily torturous to the victim" is not too indefinite to serve the narrowing function mandated by the Eighth Amendment.).  Here, the trial judge instructed the jury, "You should not find or consider this aggravating circumstance unless you find that this particular capital offense involves a conscienceless or pitiless crime which was unnecessarily torturous to the victim" (doc. 15-22 at 143), thus sufficiently narrowing the aggravator in satisfaction of *Maynard.  See* 486 U.S. 356 (requiring a constitutionally adequate

limiting construction of the term "especially heinous, atrocious, or cruel" to satisfy the Eighth Amendment).

Deardorff's constitutional challenge to the sufficiency of the evidence, therefore, turns on whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) ("[I]n determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the more appropriate standard of review is the 'rational factfinder' standard established in *Jackson*...."); *Richmond v. Lewis*, 506 U.S. 40, 47, 113 S. Ct. 528, 121 L. Ed. 2d 411 (1992) (Federal habeas review of the state court's application of the narrowing construction should be reviewed under the "rational factfinder" standard of *Jackson*.). The essential elements or "[f]actors indicative of an offense's being 'especially heinous, atrocious, or cruel' include, but are not limited to, whether the infliction on the victim of physical violence was beyond that necessary to cause death, whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death, whether the victim suffered psychological torture." *Clark v. State*, 896 So. 2d 584, 596 (Ala. Crim. App. 2000) (quoting *Norris v. State,* 793 So.2d 847 (Ala. Crim. App. 1999)).  An examination of the record supports the state court's decision.

While Deardorff argues that swift gunshot wounds, as those suffered by Mr. Turner, fall short of establishing the aggravating HAC factor, *see Norris*, 793 So.2d at 859 (noting cases where "instantaneous death caused by gunfire is not ordinarily a heinous killing), the record evidence depicts facts showing that Mr. Turner would have anticipated his death and experienced fear preceding it.  Alabama courts have consistently found such fear, that where the victim "is aware of, but helpless to prevent[] impending death", to evidence psychological torture sufficient to

support a HAC aggravating factor.  *Id*. at 847; *see also Ex parte Rieber,* 663 So.2d 999, 1003 (Ala.), *cert. denied,* 516 U.S. 995, 116 S. Ct. 531, 133 L.Ed.2d 437 (1995) ("[E]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel."); *White v. State,* 587 So.2d 1218, 1234 (Ala. Crim. App. 1990) (noting that '[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel).  Based on the record, a rational factfinder could conclude that Mr. Turner experienced physical and emotional pain from the moment Deardorff entered his home, held him hostage in his own closet, and surely feared impending doom once he was bound with duct tape, had a pillowcase secured over his head, was driven in a car to an unknown location, and made to walk down an unknown wooded area.  *See Weeks v. State,* 456 So. 2d 395, 403 (Ala. Crim. App. 1983), *aff'd sub nom. Ex parte Weeks*, 456 So. 2d 404 (Ala. 1984) (HAC factor found where in the course of a robbery, the defendant placed a pillowcase over the victim's head and tightly bound his hands and feet, and shot him through the pillowcase at close range); *Jacobs v. State*, 361 So. 2d 607, 633-34 (Ala. Crim. App. 1977), *aff'd,* 361 So. 2d 640 (Ala. 1978) (HAC factor found where defendant planned to rob and murder 79-year-old victim, stalking him and enticing him into vehicle, before driving him to a remote, wooded area, striking him in the face and shotting him twice in the back of the head, despite victim's pleas to have his life spared).  Thus, the record supports the state court's decision and Deardorff has failed to show that the decision was contrary to, or an unreasonable application of, federal law, or was based on an unreasonable determination of the facts considering the evidence presented.

Deardorff also argues in his habeas petition that the state courts have interpreted the HAC statute in a manner that violates due process (including the requirements of fair warning of what

conduct is eligible for death and the due process derived rule of lenity) such that, it renders the process of imposing the death penalty unreliable in violation of the Eight Amendment. (Doc. 1 at 51). According to Deardorff, while the HAC statute states a defendant is death eligible where "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses", Alabama eliminated these last five words, "compared to other capital offenses", with its decision in *Ex parte Bankhead*, 585 So. 2d 112, 125 (Ala. 1991), thereby broadening the scope of the statute. (Doc. 1 at 50-51). The State contends that this claim is procedurally defaulted because it is being raised, now, in the federal habeas petition for the first time. The Court agrees.

The record contradicts Deardorff's assertion that he presented this claim to the state courts, nor can it be said that this challenge is encompassed in previously asserted claims in state court. *See Picard v. Connor*, 404 U.S. 270, 275-77, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (It is insufficient for a petitioner to merely present all the facts necessary to the state court to support a claim. Rather, the petitioner must sufficiently present his claim to the state court such that the state court has the opportunity to apply controlling legal principles to the facts bearing on the constitutional claim.). In the state courts, Deardorff challenged that the application of the HAC aggravating circumstance was not applied in a limited manner as circumscribed by *Maynard v. Cartwright*, 486 U.S. 356, that the court's decision was unsupported by the evidence in violation of in violation of *Godfrey v. Georgia*, 446 U.S. 420 (1980), that no instruction was given to the jury on psychological torture (on which the state courts based their rulings), and that psychological torture was not qualitatively narrow to limit death eligibility to the "worst of the worst" offenders. (*See* Docs. 15-24 at 22-25; 15-25 at 56; 15-27 at 2-26). Never did Deardorff maintain that that the courts eliminated statutory language as to render the language useless, as he now asserts. "To exhaust the claim sufficiently, [Deardorff] must have presented the state court with this particular

legal basis for relief in addition to the facts supporting it." *Kelley v. Sec'y for Dep't of Corr.,* 377 F.3d 1317, 1350 (11th Cir. 2004).  Accordingly, this claim is unexhausted.  Because Deardorff may no longer return to state court to relitigate it, this claim is procedurally defaulted, Ala. R. Crim. P. 32.2(a)-(c), and Deardorff has not plead any facts that would excuse the procedural default.[61]

Alternatively, Deardorff's claim is meritless.  As previously mentioned, Alabama "has decided upon an approach for the purposes of § 13A–5–49(8).  In comparing capital offenses for the purposes of determining whether a capital offense was 'especially heinous, atrocious or cruel,' the court uses the *Kyzer* standard. . . [that is], those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Ex parte Bankhead*, 585 So. 2d 112, 125 (Ala. 1991) (quoting *Kyzer,* 399 So.2d at 334).  The record confirms the jury was instructed on this *Kyzer* standard by the trial judge.  (*See* Doc. 15-22 at 142-45).  And it reasons that the trial judge, as sentencer, was not only familiar with the standard but applied it.  *Sochor v. Fla*., 504 U.S. 527, 537, 112 S. Ct. 2114, 2121–22, 119 L. Ed. 2d 326 (1992) ("We must presume the trial judge to have been familiar with this body of case law, which, at a minimum, gave the trial judge some guidance.") (internal alterations, quotation, and citation omitted)).  Consequently, Deardorff is not entitled to relief on this claim.

---

[61] A petitioner can overcome a procedural default in one of two ways, (1) if he can show cause for the default and resulting prejudice, *Murray v. Carrier*, 477 U.S. 478, 496 (1986), or (2) by establishing a fundamental miscarriage of justice, which "occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Henderson v. Camp*bell, 353 F.3d 880, 892 (11th Cir. 2003).
The petition is void of facts or allegations of cause for failing to raise the claim in state court.  *See Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999) ("To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court.").  Rather, Deardorff asserts he raised the claim in state court.  Neither has Deardorff established "that there is at least a reasonable probability that the result of the proceeding would have been different" had the constitutional violation not occurred, *Henderson*, 353 F.3d at 892, or that, in light of new evidence, it is probable that no reasonable juror would have convicted him." *Mize*, 532 F.3d at 1190.

**5.  Deardorff claims that Alabama's judge-based capital sentencing violates the Sixth Amendment and the requirements of *Ring* and *Apprendi*.**[62]

Deardorff asserts in his final claim that "Alabama's judge-based capital sentencing scheme is unconstitutional" under the Sixth Amendment because the weighing of aggravating and mitigating circumstances in determining his death sentence was done by the trial judge, rather than the jury.  (Doc. 1 at 51).  The crux of this claim being that the jury does not unanimously make the findings as to the aggravating circumstances in the impositions of death sentences in Alabama. ACCA denied this claim on review, finding that "[e]ach of the claims raised [by Deardorff] has been considered and rejected by Alabama courts. *Deardorff*, 6 So. 3d 1205, 1232 (Ala. Crim. App. 2004), *aff'd sub nom. Ex parte Deardorff*, 6 So. 3d 1235 (Ala. 2008).  Deardorff claims in his habeas petition that "[t]he ACCA's decision represents an unreasonable application of clearly established federal law as set forth in *Ring* and *Apprendi*" because he "was not eligible for a death sentence until the trial court *independently* found at least one aggravating circumstance, considered any applicable mitigating circumstances, and weighed them against each other."  (Doc. 1 at 53).

In *Ring v. Arizona*, 536 U.S. 584, 589, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) the United States Supreme Court held the aggravating factor necessary for sentencing must be established by jury.  The specific legal effect of *Ring* was to overrule prior Supreme Court jurisprudence that "allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." 536 U.S. at 609.  "The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury."  *Lee v. Commissioner, Ala. Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir 2013).  Indeed, the *Ring* Court made clear that

---

[62] Presented as Claim IX of the habeas petition. (*See* Doc. 1 at 50-56).

it was not deciding whether the Sixth Amendment (1) required a jury to make findings as to mitigating circumstances, (2) required the jury to make the ultimate determination as to whether to impose a death sentence, or (3) forbade the state court from reweighing aggravating and mitigating circumstances. *Ring*, 536 U.S. at 597 n.4.

Under Alabama law, the guilt and penalty phases of a capital defendant's trial is bifurcated, and a defendant convicted of a capital offense cannot be sentenced to death unless at least one statutory aggravating circumstance exists. *See* ALA. CODE §§ 13A-5-45, 49. Certain capital cases, like a murder committed during a robbery, burglary, or kidnapping have a "built-in aggravating circumstance" that corresponds to an aggravating circumstances listed in § 13A-5-49; thus, "when a defendant is found guilty of such a capital offense, 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.'" *Waldrop v. Comm'r, Ala. Dep't of Corr.,* 711 F. App'x 900, 922 (11th Cir. 2017), *cert. denied*, __U.S. __, 139 S. Ct. 118, 202 L. Ed. 2d 74 (2018) (citing § 13A-5-45(e), which states, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing."). "Nothing in *Ring*—or any other Supreme Court decision— forbids the use of an aggravating circumstance implicit in a jury's verdict." *Lee*, 726 F.3d at 1198.

Here, the record reflects Deardorff was charged, *inter alia*, with capital murder, that is murder in commission of a kidnapping, robbery, and/or burglary in the first degree, in violation of Ala. Code §§ 13A-5-40(a)(1), (2) and (4), (Doc. 1 at 36, 38-42), which pairs with the statutory aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of . . . robbery, burglary, or kidnapping"

identified in Ala. Code § 13A-5-49(4).  By the terms of the Alabama statute, "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." § 13A-5-45(f). What this means is that when Deardorff's jury unanimously found beyond a reasonable doubt that he was guilty of murder in the course of a burglary under § 13A-5-40(a)(4), murder-robbery under § 13A-5-40(a)(2), and murder-kidnapping under § 13A-5-40(a)(1), they also unanimously found beyond a reasonable doubt the aggravating circumstance set forth at § 13A-5-49(4).  (*See* Doc. 15-22 at 64-65).  Those jury findings as to the existence of aggravating circumstances are what made Deardorff death-eligible in the Alabama capital sentencing scheme.[63]  Thus, there is no *Ring* problem here because Deardorff's jury found the aggravating circumstance of burglary, robbery, and kidnapping (which rendered him eligible for the death penalty) beyond a reasonable doubt.  *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1260 (11th Cir. 2012) ("The jury's verdict necessarily contained [findings that an aggravating circumstance existed] because the jury was instructed that it could not recommend a death sentence unless it found beyond a reasonable doubt that one or more aggravating circumstances existed ...."); *United States v. Townsend*, 630 F.3d 1003, 1013-14 (11th Cir. 2011) (finding that because the court instructed the jury that it must make a prerequisite finding as to the

---

[63] The jury was specifically instructed by the trial court during the guilt phase:

> If you find that the State of Alabama has failed to prove beyond a reasonable doubt any one or more elements of the offense of intentional murder committed during robbery in the first degree, then you cannot find the Defendant guilty of capital murder.
> . . .
> Now, your verdict must be unanimous.

(Doc. 2-10 at 12, 33).

existence of an element before convicting the defendant, the jury's guilty verdict necessarily meant the jurors found the element); *McNabb v. Thomas*, Civ. Act. No. 208-CV-683-MEF, 2012 WL 1032540, at *20, 2012 U.S. Dist. LEXIS 41327, at *60 (M.D. Ala. Mar. 27, 2012), *aff'd sub nom. McNabb v. Comm'r Ala. Dep't of Corr.,* 727 F.3d 1334 (11th Cir. 2013) (discussing the jury's unanimous finding beyond a reasonable doubt of at least one statutory aggravating circumstance shifted the maximum penalty upwards from life without parole to death, and any other statutory aggravating circumstances are not "necessary for the imposition of the death penalty.") (quoting *Ring*, 536 U.S. at 609).

For these reasons, the Court is unpersuaded by Deardorff's argument that the state court's determination was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Thus, Deardorff is not entitled to habeas relief.

## V.    REQUEST FOR EVIDENTIARY HEARING

Petitioner Deardorff requests an evidentiary hearing.  (*See* Doc. 1 at 57).  To the extent Deardorff's claims in this federal habeas corpus proceeding were disposed of on the merits during his direct appeal or Rule 32 proceeding, he is not entitled to a federal evidentiary hearing to develop new evidence attaching the state appellate or state habeas court's resolution of those claims.  Under the AEDPA, the state court is the proper place for development of the facts.

> AEDPA also restricts the ability of a federal habeas court to develop and consider new evidence. Review of factual determinations under §2254(d)(2) is expressly limited to "the evidence presented in the State court proceeding." And in *Cullen v. Pinholster*, 563 U. S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011), we explained that review of legal claims under §2254(d)(1) is also "limited to the record that was before the state court." *Id.*, at 181, 131 S. Ct. 1388, 179 L. Ed. 2d 557. This ensures that the "state trial on the merits" is the "main event, so to speak, rather than a tryout on the road for what will later be the determinative federal habeas hearing." *Wainwright v. Sykes*, 433 U. S. 72, 90, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (internal quotation marks omitted).

*Shoop v. Twyford*, ___ U.S. ___,142 S. Ct. 2037, 2043-44, 213 L. Ed. 2d 318 (2022).  There are only two exceptions to the general rule: "[e]ither the claim must rely on a 'new' and 'previously unavailable' 'rule of constitutional law' made retroactively applicable by this Court, or it must rely on 'a factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* at 2044 (quoting §2254(e)(2)(A)).  "And even if a prisoner can satisfy one of those two exceptions, he must also show that the desired evidence would demonstrate, 'by clear and convincing evidence,' that 'no reasonable factfinder' would have convicted him of the charged crime." *Id.* (quoting 28 U.S.C § 2254(e)(2)(B)).

Thus, Deardorff is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during Deardorff's Rule 32 proceeding.  Nor does Deardorff establish one of the two exceptions.  "Moreover, a petitioner seeking an evidentiary hearing must make a 'proffer to the district court of any evidence that he would seek to introduce at a hearing.'" *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1319 (11th Cir. 2016).  "A §2254 petitioner is not entitled to an evidentiary hearing if he fails to 'proffer evidence that, if true, would entitle him to relief.'"  *Hamilton v. Sec'y, Fla. Dep't of Corr.*, 793 F.3d 1261, 1266 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1661 (2016).  Because Petitioner failed to make a valid proffer of new evidence in support of his claims, he is not entitled to an evidentiary hearing to develop that evidence in this court.

## VI.   CERTIFICATE OF APPEALABILITY

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under 28 U.S.C. § 2254, the petitioner must obtain a Certificate of Appealability ("COA").[64]

---

[64] This court is required to issue or deny a COA when it enters a final Order that is adverse to a federal habeas petitioner.  *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

*Miller-El v. Johnson*, 537 U. S. 322, 335-36 (2003); 28 U.S.C. §2253(c)(2).  A COA is granted or

denied on an issue-by-issue basis.  *Jones v. Sec'y, Fla. Dep't of Corr.*, 607 F.3d 1346, 1354 (11th

Cir. 2010) (no court may issue a COA unless the applicant has made a substantial showing of the

denial of a constitutional right and the COA itself "shall indicate which specific issue or issues

satisfy" that standard), *cert. denied*, 562 U. S. 1012 (2010); 28 U.S.C. §2253(c)(3).

A COA will not be granted unless the petitioner makes a substantial showing of the denial

of a constitutional right.  *Tennard v. Dretke*, 542 U. S. 274, 282 (2004); *Miller-El v. Johnson*, 537

U. S. at 336; *Slack v. McDaniel*, 529 U. S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U. S. 880, 893

(1983).  To make such a showing, the petitioner need *not* show he will prevail on the merits but,

rather, must demonstrate that reasonable jurists could debate whether the petition should have been

resolved in a different manner or that the issues presented are adequate to deserve encouragement

to proceed further.  *Tennard v. Dretke*, 542 U. S. at 282; *Miller-El v. Johnson*, 537 U. S. at 336.

The showing necessary to obtain a COA on a particular claim is dependent upon the manner

in which the District Court has disposed of a claim.  "[W]here a district court has rejected the

constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:

The petitioner must demonstrate that reasonable jurists would find the district court's assessment

of the constitutional claims debatable or wrong."  *Miller-El v. Johnson*, 537 U. S. at 338 (quoting

*Slack v. McDaniel*, 529 U. S. at 484).  In a case in which the petitioner wishes to challenge on

appeal this court's dismissal of a claim for a reason not of constitutional dimension, such as

procedural default, untimely filing, or lack of exhaustion, the petitioner must show that jurists of

reason would find it debatable whether the petition states a valid claim of the denial of a

constitutional right *and* whether this court was correct in its procedural ruling.  *See Slack v.*

*McDaniel*, 529 U. S. at 484 (when a district court denies a habeas claim on procedural grounds,

without reaching the underlying constitutional claim, a COA may issue only when the petitioner shows that reasonable jurists would find it debatable whether the claim is a valid assertion of the denial of a constitutional right and whether the district court's procedural ruling was correct).

The Court concludes that jurists of reason would not find debatable either the court's procedural rulings or its assessment of the constitutional claims as to Deardorff's claims, with the exception of whether Deardorff's trial counsel was ineffective during the penalty phase for failing to locate and present mitigation evidence and failing to prepare the witnesses called, presented as Claim 1.e.  While the Court is confident in its conclusions under the "doubly deferential" AEDPA standard, jurists of reason could find the decision debatable based on the record facts.

No doubt, counsel has an "obligation to conduct a thorough investigation of defendant's background." *Williams v. Taylor*, 529 U.S. at 396.  Decisions of counsel to not investigate are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690–91.  Here, counsel testified that he was aware of a duty to investigate mitigation evidence, even where a defendant maintained his innocence.  (Doc. 15-70 at 201).  Counsel then testified that he failed to investigate or limited their investigation in several glaring areas, including psychological evaluations, family interviews, hiring a competent expert, and obtaining records. The ACCA found trial counsel's actions to be reasonable based entirely on the premise that Deardorff instructed counsel to not present mitigation evidence, despite that counsel could not recall why Deardorff did not want mitigation evidence presented.  (Doc. 15-70 at 199).  Thus, the reasonability of counsel's decision and the ACCA's determination requires crediting counsel's testimony over Deardorff's sworn affidavit, which affirms, "At no time did I ever tell my defense

lawyers that I did not want them to investigate and present mitigation evidence on my behalf during the penalty phase of my capital trial", and further affirms, "the reason that both my mother and I testified at the penalty phase was because I did want my defense attorneys to present mitigation evidence." (Doc. 15-37 at 173). Because the state court failed to mention, much less discuss, Deardorff's affirmed statement that he never instructed counsel to not present mitigation evidence, jurists of reason could debate whether the ACCA's decision was contrary to, or an unreasonable application of, *Strickland*, or an unreasonable application of the presented facts. The decision is particularly disputable given that counsel's testimony at the Rule 32 evidentiary hearing repeatedly confirmed that trial counsel had no recollection of the penalty phase of the trial, including what mitigation factors or evidence they attempted to put on, witnesses called, whether Deardorff testified, or whether counsel spoke with witnesses regarding their testimony prior to taking the stand.[65] (Doc. 15-70 at 189-93, 99-200). Accordingly, jurists of reason could debate whether Deardorff in fact instructed counsel not to present mitigation evidence or rather that he wanted mitigation evidence presented - just not from Mr. McCall, as he affirmed. If the latter is concluded, then the objective reasonability of counsel's decision not to investigate or present mitigating evidence, to obtain a psychological evaluation of Deardorff, to acquire background records, and to prepare the witnesses called becomes debatable as well.

To start, based on the codicil presented at trial, counsel had reason to know that (at least) Mr. Turner believed Deardorff might be "crazy"; yet, it is undisputed that counsel failed to obtain a psychological evaluation of Deardorff, and Deardorff has produced the expert opinions of Drs.

---

[65] Counsel's consistent lack of recall also raises doubts as to the state court's reasoning and reliance on the need for counsel's testimony to establish this claim. Namely, it begs the question, if counsel persistently testified as to having no recollection of anything meaningful related to mitigation, how would additional questioning realistically fill voids in the record to establish the necessary *Strickland* prongs?

Cunningham and DeFilippis and lay witnesses, which indicate a strong genetic history of mental illness in Deardorff's family and the likelihood of mental illness and/or instability of Deardorff, which would likely have been discovered if counsel had obtained another mitigation expert, interviewed family members, and/or retained a psychological evaluation of Deardorff.   With knowledge that the State was prepared to use evidence of Deardorff's "dishonorable discharge from the Military" for "the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident", it is undisputed that counsel failed to obtain copies of Deardorff's military records.  Reasonable jurists could debate whether acquiring and reviewing the Navy records would have allowed counsel to present a more favorable, mitigating side to Deardorff and whether knowledge of the contents would have allowed for more sympathetic testimony to be presented from Ms. Byrd, including direct examination, cross examination and redirect by trial counsel.  *See Rompilla v. Beard*, 545 U.S. 374, 392 (counsel's failure to review previous conviction files for aggravating details and mitigation leads which might have influenced the jury's appraisal of petitioner's culpability was unreasonable given that counsel had notice that the prosecution sought to prove petitioner had a violent criminal history).   Also, despite having court approved funds for a mitigation expert, it is undisputed that counsel hired a convicted felon, on federal probation and ankle monitoring, who failed to produce usable work product, and thereafter counsel failed to hire another mitigation expert or independently perform any mitigation investigation.  Consequently, the record reflects facts supporting that counsel failed to take even initial steps in interviewing witnesses or requesting records.  *Porter v. McCollum*, 558 U.S. 30, 39–40; *but cf. Bobby v. Van Hook,* 558 U.S. 4, 9 – 12, 130 S. Ct. 13, 18–19, 175 L.Ed.2d 255 (2009) (holding performance not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources).  And, though

counsel testified that Deardorff "did not want people prying into his family" (doc. 15-70 at 198), such does not "obviate the need for defense counsel to conduct some sort of mitigation investigation." *Porter*, 558 U.S. at 40.  Here, jurists of reason could find it debatable whether counsel performed reasonably under these circumstances. *Cf. Mann v. Ryan*, 774 F.3d 1203 (9th Cir. 2014) (counsel's performance was found to be nonexistent in preparing mitigation defense and thus constitutionally deficient).

As pointed out by Deardorff, two jurors, without any mitigation evidence presented, voted against recommending a sentence of death.  In other words, the jury recommended a sentence of death by the narrowest of margins under Alabama law without hearing any evidence of Deardorff's possible mental illness, struggle with drugs, outstanding military performance, traumatic military posts, childhood experiences, or family history.  To establish prejudice, Deardorff need only show "a reasonable probability that at least one juror would have struck a different balance" between life and death. *Wiggins*, 539 U.S. at 537.  Such is debatable among jurist of reason here. Interestingly, the trial court found otherwise, with its declaration, that even if the jury had been persuaded by presented mitigation evidence, it would have sentenced Deardorff to death regardless of a jury recommendation of life.  This proclamation does not alter the objective standard of reasonableness that this Court must follow.  At this stage, Deardorff must only show that jurist of reason could find the decision debatable. *Miller–El v. Cockrell,* 537 U.S. 322, 338, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003) (A claim is considered "debatable" even if every reasonable jurist would agree that the petitioner will not prevail.).  The Court acknowledges reasonable jurists could disagree with its determination that the state court's decision is not contrary to, or an unreasonable application of, federal law or an unreasonable decision in light of the presented facts.  Therefore, Deardorff is entitled to a Certificate of Appealability as to Claim 1.e.

Accordingly, any certificate of appealability filed by Deardorff is DENIED, except as to Claim 1.e., which is hereby GRANTED.  Since the Court has found that Deardorff is entitled to a Certificate of Appealability as to Claim 1.e., if he appeals, and if he is indigent, he would be entitled to appeal *in forma pauperis.*

## VII. CONCLUSION

Based on the foregoing, the Court concludes that Deardorff's petition for habeas corpus relief be **DENIED**, that this action be dismissed, and that judgment be entered in favor of the Respondent, and against the Petitioner, Donald E. Deardorff.  It is further recommended that any motion for a Certificate of Appealability or for permission to appeal *in forma pauperis* be **denied**, except as to Claim 1.e., which is **granted**.

**DONE and ORDERED** this 30th day of September, 2022.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE